UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| MARC JOSEPH, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY OILFIELD SERVICES INC., CHRISTOPHER A. WRIGHT, MICHAEL STOCK, CARY D. STEINBECK, WILLIAM F. KIMBLE, PETER A. DEA, N. JOHN LANCASTER, JR., BRETT STAFFIERI, KEN BABCOCK, JESAL SHAH, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, EVERCORE GROUP L.L.C., PIPER SANDLER & CO., TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC, HOULIHAN LOKEY CAPITAL, INC., INTREPID PARTNERS, LLC, PETRIE PARTNERS SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, INC., RIC ENERGY IV DIRECT PARTNERSHIP, L.P., and RIC IV LIBERTY HOLDINGS, L.P., <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Marc Joseph ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Liberty Oilfield Services, Inc. ("Liberty Oilfield" or the "Company"), as well as media

and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired Liberty Oilfield's securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Liberty Oilfield's January 17, 2018 initial public offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.     In January 2018, Defendants held the IPO, issuing approximately 14.6 million of Liberty Oilfield Class A stock to the investing public at $17.00 per share, pursuant to the Registration Statement.

3.     By the commencement of this action, Liberty Oilfield's shares trade significantly below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as the alleged misstatements entered and subsequent damages

took place within this judicial district. The Company is also headquartered in this judicial district.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Liberty Oilfield securities in this District.

## PARTIES

8.     Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Liberty Oilfield securities pursuant and/or traceable to the IPO and was damaged thereby.

9.     Defendant Liberty Oilfield is a holding company with membership interests in Liberty Oilfield Services New HoldCo LLC ("Liberty LLC"). Through Liberty LLC, the Company provides hydraulic fracturing services and goods to onshore oil and natural gas exploration and production companies in North America. Defendant Liberty Oilfield is incorporated in Delaware and maintains its principal executive offices at 950 17th Street, Suite 2400, Denver, Colorado 80202. Liberty Oilfield's shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LBRT."

10.     Defendant Christopher A. Wright ("Wright") is, and was at the time of the IPO, the Company's Chief Executive Officer ("CEO") and has been the Chairman of the Company's

Board of Directors since at least March 2018. Defendant Wright reviewed, contributed to, and signed the Registration Statement.

11.     Defendant Michael Stock ("Stock") is, and was at the time of the IPO, the Company's Chief Financial Officer ("CFO") and was a Director of the Company from February 2017 to January 2018.

12.     Defendant Cary D. Steinbeck ("Steinbeck") has been a Director of the Company since January 2018. Defendant Steinbeck reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

13.     Defendant William F. Kimble ("Kimble") has been a Director of the Company since January 2018. Defendant Kimble reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

14.     Defendant Peter A. Dea ("Dea") has been a Director of the Company since January 2018. Defendant Dea reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

15.     Defendant N. John Lancaster, Jr. ("Lancaster") is a Liberty Oilfield Director and has been since January 2018, and is a Partner at Riverstone Holdings LLC ("Riverstone"), a private equity firm, and has been since at least February 2017. Riverstone nominated Defendant Lancaster to Liberty Oilfield's Board pursuant to a Stockholders' Agreement in which the Company and Defendant RIC Direct (defined below) are parties. Defendant Lancaster reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

16.     Defendant Brett Staffieri ("Staffieri") is a Liberty Oilfield Director and has been since January 2018, and is a Partner at Riverstone and has been since at least August 2019. Defendant Staffieri was also a Managing Director at Riverstone from 2014 to at least March 2019. Riverstone nominated Defendant Staffieri to Liberty Oilfield's Board pursuant to a Stockholders' Agreement in which the Company and Defendant RIC Direct are parties. Defendant Staffieri reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

17.     Defendant Ken Babcock ("Babcock") is a Liberty Oilfield Director and has been since January 2018, and the Chief Executive Officer of Abaco Energy Technologies LLC, a company formed by Riverstone, and has been since at least October 2013. Riverstone nominated Defendant Babcock to Liberty Oilfield's Board pursuant to a Stockholders' Agreement in which the Company and Defendant RIC Direct are parties. Defendant Babcock reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

18.     Defendant Jesal Shah ("Shah") is a Liberty Oilfield Director and has been since January 2018, and a Principal at Riverstone and has been since at least March 2019. Defendant Shah was also a Vice President at Riverstone from at least May 2017 to at least February 2019 and has held other various positions at Riverstone since joining that company in 2010. Riverstone nominated Defendant Shah to Liberty Oilfield's Board pursuant to a Stockholders' Agreement in which the Company and Defendant RIC Direct are parties. Defendant Shah reviewed and contributed to the Registration Statement and is identified therein as an incoming director nominee.

19.     The Defendants named in ¶¶ 10-18 are referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Liberty Oilfield investors, all motivated by their own and the Company's financial interests.

20.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway, New York, NY 10019.

21.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Goldman Sachs' address is 200 West Street, New York, NY 10282.

22.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Wells Fargo's address is 550 South Tryon Street, 6th Floor, Charlotte, NC 28202.

23.     Defendant Citigroup Global Markets INC ("Citigroup") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 388 Greenwich Street, Tower Building, New York, NY 10013.

24. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. J.P. Morgan's address is 383 Madison Avenue, New York, NY 10017.

25. Defendant Evercore Group L.L.C. ("Evercore") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Evercore's address is 55 East 52nd Street, New York, NY 10055.

26. Defendant Piper Sandler & Co. (F/K/A Piper Jaffray & Co.) ("Piper Sandler") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Piper Sandler's address is 800 Nicollet Mall, Minneapolis, MN 55402.

27. Defendant Tudor, Pickering, Holt & Co. Securities, LLC (F/K/A Tudor, Pickering, Holt & Co. Securities, Inc.) ("TPH") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. TPH's address is 1111 Bagby, Suite 4900, Houston, TX 77002.

28. Defendant Houlihan Lokey Capital, Inc. ("Houlihan Lokey") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Houlihan Lokey's address is 10250 Constellation Boulevard, 5th Floor, Los Angeles, CA 90067.

29. Defendant Intrepid Partners, LLC ("Intrepid") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Intrepid's address is 540 Madison Avenue, 25th Floor, New York, NY 10022.

30. Defendant Petrie Partners Securities, LLC ("Petrie Partners") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. Petrie Partners's address is 1144 15th Street, Denver, CO 80202.

31. Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO, helping to draft and disseminate the IPO documents. SunTrust's address is 3333 Peachtree Road, N.E. Atlanta Financial Center, South Tower, 9th Floor Atlanta, GA 30326.

32. Defendants Morgan Stanley, Goldman Sachs, Wells Fargo, Citigroup, J.P. Morgan, Evercore, Piper Sandler, TPH, Houlihan Lokey, Intrepid, Petrie, and SunTrust are referred to herein as the "Underwriter Defendants."

33. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Liberty Oilfield, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b) The Underwriter Defendants also demanded and obtained an agreement from Liberty Oilfield and the Individual Defendants that Liberty Oilfield would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted Liberty Oilfield and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Liberty Oilfield, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Liberty Oilfield's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Liberty Oilfield's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Liberty Oilfield securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about Liberty Oilfield would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Liberty Oilfield's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Liberty Oilfield's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

34.     RIC Energy IV Direct Partnership, L.P. ("RIC Direct") is an investment partnership managed by its general partner, Riverstone/Carlyle Energy Partners IV, L.P., through its general partner, RIC Energy GP IV, LLC.

35.     RIC IV Liberty Holdings, L.P. ("RIC Liberty") is an investment partnership managed by its general partner, Riverstone/Carlyle Energy Partners IV, L.P., through its general partner, RIC Energy GP IV, LLC.

36.     Defendants RIC Direct and RIC Liberty are referred to herein as the "Riverstone Defendants." The Riverstone Defendants are affiliates of Riverstone. Immediately prior to the IPO, the Riverstone Defendants beneficially owned a 49.7% membership interest in Liberty LLC. Defendant RIC Direct sold 300,541 Liberty Oilfield shares in the IPO.

37.     In connection with the closing of the IPO, on January 17, 2018, the Company and RIC Direct, among others, entered into a Stockholders' Agreement concerning the right to designate a number of nominees to the Board based on the percentage of beneficial ownership of Common A and Class B stock held by Riverstone and its affiliates. Pursuant to the Stockholders' Agreement, Riverstone and its affiliates had the right to appoint five directors to the Board at the time of the IPO.   Riverstone and its affiliates nominated Defendants Lancaster, Staffieri, Babcock, and Shah, four out of nine directors.

38.     Liberty Oilfield, the Individual Defendants, the Underwriter Defendants, and the Riverstone Defendants are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background Information

39.     Liberty Oilfield purports to be a provider of hydraulic fracturing services to onshore oil and natural gas exploration and production ("E&P") companies in North America. It provides services primarily in the Permian Basin, the Eagle Ford Shale, the Denver-Julesburg Basin, the Williston Basin, the San Juan Basin, and the Powder River Basin.

40.     The Company faces substantial competition within its industry, competition that intensified leading up to the Company's IPO in January 2018. According to a January 25, 2018 Houston Chronicle article titled, "Sand, Water, and Horsepower: Welcome to the Year of the Fracker," the ratio of fracking fleets to drilling rigs nearly doubled. In 2014, there was one fleet for every four rigs. By the beginning of 2018, that number increased to one fleet for every two rigs.

41.     According to a March 2018 S&P Global Market Intelligence article, Moody's January 2, 2018 note to clients stated that pricing in the market would not improve until the "oversupplied oilfield services markets align more closely with demand." A Bernstein analyst wrote in a March 8, 2018 note to clients that "the biggest risk to the pressure pumping market is supply discipline (or lack thereof). Discipline is the name of the game for continued pricing gains in this fragmented, low-barriers to entry market."

42.     The Company, and its competitors, however, did not exercise supply discipline. By the time of the IPO, the market for fracking services was oversupplied, an oversupply that was being exasperated by technological advances that lessened the need for fleets.

43.     The contracts the Company enters into with its customers are up to a year long.

Thus, while the contracts may provide some flexibility in terms of pricing, Liberty Oilfield would mostly notice the effect of the oversupply as it enters into new contracts. That is because, as explained in the  Registration Statement, "[t]he Company's contractual agreements with its customers provide fixed and determinable rates for individual fracturing stages and volumes of materials utilized per stage."

### Liberty Oilfield's False and/or Misleading Registration Statement

44.     On February 14, 2017, Liberty Oilfield filed with the SEC a registration statement on Form F-1 which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), would be used for the IPO.

45.     On January 16, 2018, Liberty Oilfield filed with the SEC the final prospectus for the IPO of common stock on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, Liberty Oilfield sold 14.6 million shares at $17.00 per share. The Company received gross proceeds of approximately of $220.4 million in offering proceeds, after deducting $23.4 million of underwriting discounts, commissions, and other costs.

46.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

47.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

48.     In the Registration Statement Liberty Oilfield claimed that the fracking

industry's downturn from 2014 through 2016 led to a supposed decrease in competition, as competitors filed for bankruptcy or other debt restructuring. The Registration Statement also claimed that Liberty Oilfield's technological ability and expertise will position it well against competitors. It also stated that "greater rig efficiencies" would push more demand to the Company and the market overall. In particular, the Registration Statement claimed:

> While our industry experienced a significant downturn from late 2014 through the first half of 2016, we significantly increased our capacity while maintaining full utilization. We performed approximately 50% more hydraulic fracturing stages in 2015 than in 2014 and approximately 20% more hydraulic fracturing stages in 2016 than in 2015. This trend has continued into 2017. During the downturn, total U.S. marketable fracturing capacity declined between 40% and 60%. In contrast, over 95% of our capacity was active and deployed during this period. We believe our utilization reflects the strong partnerships we have built with our customers and we believe these partnerships will continue to support the demand for our services as we deploy two new fleets and one previously acquired fleet that we are currently upgrading to our specifications by the second quarter of 2018.

*        *        *

> Overall demand and pricing for hydraulic fracturing services in North America has declined from their highs in late 2014 as a result of the downturn in hydrocarbon prices and the corresponding decline in E&P activity. While the pricing for our hydraulic fracturing services declined substantially, negatively affecting our revenue per average active HHP, and has not returned to its 2014 highs, the industry witnessed an increase in demand for these services beginning in the third quarter of 2016 and continuing into 2017 as hydrocarbon prices have recovered somewhat, and we are currently experiencing price increases and increases in our revenue per average active HHP. We expect this demand to continue to increase as E&P companies increase drilling and completion activities. According to Baker Hughes Incorporated's ("Baker Hughes") North American Rig Count, the number of active total rigs in the United States reached a low of 404, as reported on May 27, 2016, but has since increased by more than 130% to 931 active rigs as reported on December 8, 2017. If hydrocarbon prices stabilize at current levels or rise further, we expect to see further increased drilling and completion activity in the basins in which we operate. Should hydrocarbon prices decrease, our pricing and revenue per average active HHP may decrease due to lower demand for our services, negatively affecting our liquidity and financial condition. Please see "Risk Factors—Risks Related to Our Business—Our business depends on domestic capital spending by the oil and natural gas

industry, and reductions in capital spending could have a material adverse effect on our liquidity, results of operations and financial condition" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—How We Evaluate Our Operations."

In addition to increased industry activity levels, we expect to benefit from increased horizontal drilling as well as other long-term macro industry trends that improve drilling economics such as (i) greater rig efficiencies that result in more wells drilled per rig in a given period and (ii) increased complexity and service intensity of well completions, including longer wellbore laterals, more and larger fracturing stages and higher proppant usage per well.

These industry trends will directly benefit hydraulic fracturing companies like us that have the expertise and technological ability to execute increasingly complex and intense well completions. Given the improved returns that E&P companies have reported for new well completions, we expect these industry trends to continue.

We believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity since late 2014 will benefit us as industry demand increases. Industry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014 and approximately 75% of this capacity is currently active and deployed. A number of our competitors have filed for bankruptcy or have otherwise undergone substantial debt restructuring, significantly reducing available capital and their ability to quickly redeploy fleets. In contrast, our rigorous preventive maintenance program, in addition to scheduled and in-process fleet additions and upgrades, has positioned us well to benefit from improving market dynamics. During the recent downturn, many oilfield service companies significantly reduced their employee headcounts, which will constrain their ability to quickly reactivate fleets. Over the same period, we retained our high quality and experienced employees, did not conduct lay offs and substantially increased our workforce.

*       *       *

Further, Coras Oilfield Research ("Coras") reports that the amount of proppant used per horizontal well has grown from six million pounds per well in 2014 to over ten million pounds per well in 2016. ***Our services are essential to the development of oil and natural gas wells in the major shale plays that we serve in the United States. As a result of these trends of increased activity and intensity, the prices we are able to charge for our hydraulic fracturing services have begun to recover and we expect further price strengthening.***

(Emphasis added.)

14

49.     The Registration Statement also claimed the following regarding the tightening of the fracking services market since the downturn in 2014:

### Tightening of Supply in the Hydraulic Fracturing Services Market

Due to the significant maintenance required as a result of increasing service intensity, the potential cost to redeploy older, idle fleets has significantly increased. These costs depend on the level of previous use and preventive maintenance spending, as well as the amount of time spent idle.

We believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity since late 2014 benefits us as industry demand increases. Industry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014 and approximately 75% of this capacity is currently active. A number of our competitors have filed for bankruptcy or have otherwise undergone substantial debt restructuring, significantly reducing available capital and their ability to quickly redeploy fleets. In contrast, our rigorous preventive maintenance program, in addition to scheduled and in-process fleet additions and upgrades, has positioned us well to benefit from improving market dynamics. During the recent downturn, many oilfield service companies significantly reduced their employee headcounts, which will constrain their ability to quickly reactive fleets. Over the same period, we retained our high quality and experienced employees, did not conduct lay offs and substantially increased our workforce.

*Because demand for new equipment exceeds active supply, we believe that pricing power has begun to return to the broader oilfield services sector as well as the hydraulic fracturing industry. We are currently experiencing price increases, and believe that this trend will continue.*

(Emphasis added.)

50.     The Registration Statement contained a section discussing Liberty Oilfield's recent trends and outlook. This section reiterated the earlier described false and misleading statements about demand of the Company's services increasing and competition decreasing, stating in pertinent part:

*These industry trends will directly benefit hydraulic fracturing companies like*

15

***us that have the expertise and technological ability to execute increasingly complex and intense well completions.*** Given the improved returns that E&P companies have reported for new well completions, we expect these industry trends to continue.

***We believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity since late 2014 will benefit us as industry demand increases.*** Industry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014 and approximately 75% of this capacity is currently active and deployed. A number of our competitors have filed for bankruptcy or have otherwise undergone substantial debt restructuring, significantly reducing available capital and their ability to quickly redeploy fleets. In contrast, our rigorous preventive maintenance program, in addition to scheduled and in-process fleet additions and upgrades, ***has positioned us well to benefit from improving market dynamics. During the recent downturn, many oilfield service companies have significantly reduced their employee headcounts, which will constrain their ability to quickly reactivate fleets. Over the same period, we retained our high quality and experienced employees, did not conduct lay offs and substantially increased our workforce.***

(Emphasis added.)

51.     Rather than disclose the known adverse historical facts, the Registration Statement provided boilerplate risk statements about potential contingent future issues that may occur. While these risk statements acknowledged the material importance to investors of industry conditions, the risk disclosures themselves were materially misleading because they failed to disclose the oversupply currently in the market. The Registration Statement stated, in pertinent part:

Industry conditions are influenced by numerous factors over which we have no control, including:

*        *        *

. . . the supply of and demand for hydraulic fracturing and equipment in the United States[.]

52.     The Registration Statement also discussed the competition the Company

faced. However, these risk disclosures were in the form of losing market share, not that the oversupply of fracking services companies would lead to glut that would push down the price of Liberty Oilfield's services. In particular, the Registration Statement stated:

> **We face intense competition that may cause us to lose market share and could negatively affect our ability to market our services and expand our operations.**
>
> The oilfield services business is highly competitive. Some of our competitors have a broader geographic scope, greater financial and other resources, or other cost efficiencies. Additionally, there may be new companies that enter our business, or re-enter our business with significantly reduced indebtedness following emergence from bankruptcy, or our existing and potential customers may develop their own hydraulic fracturing business. Our ability to maintain current revenue and cash flows, and our ability to market our services and expand our operations, could be adversely affected by the activities of our competitors and our customers. If our competitors substantially increase the resources they devote to the development and marketing of competitive services or substantially decrease the prices at which they offer their services, we may be unable to effectively compete. All of these competitive pressures could have a material adverse effect on our business, results of operations and financial condition. Some of our larger competitors provide a broader range of services on a regional, national or worldwide basis. These companies may have a greater ability to continue oilfield service activities during periods of low commodity prices and to absorb the burden of present and future federal, state, local and other laws and regulations. Any inability to compete effectively with larger companies could have a material adverse impact on our financial condition and results of operations.

53.    The Registration Statement also stated a risk that the Company's customers could stop or reduce spending. However, this was presented in terms of these customers' spending in 2014 and spending on exploration. It did not concern the reduction in spending that would be created by an oversupply of fracking services companies. In particular, the Registration Statement stated:

> **Our business depends on domestic capital spending by the oil and natural gas industry, and reductions in capital spending could have a material adverse effect on our liquidity, results of operations and financial condition.**

Our business is directly affected by our customers' capital spending to explore for, develop and produce oil and natural gas in the United States. The significant decline in oil and natural gas prices that began in late 2014 has caused a reduction in the exploration, development and production activities of most of our customers and their spending on our services. These cuts in spending have curtailed drilling programs, which has resulted in a reduction in the demand for our services as compared to activity levels in late 2014, as well as the prices we can charge. These reductions have negatively affected our revenue per average active HHP. In addition, certain of our customers could become unable to pay their vendors and service providers, including us, as a result of the decline in commodity prices. Reduced discovery rates of new oil and natural gas reserves in our areas of operation as a result of decreased capital spending may also have a negative long-term impact on our business, even in an environment of stronger oil and natural gas prices. Any of these conditions or events could adversely affect our operating results. If the recent recovery does not continue or our customers fail to further increase their capital spending, it could have a material adverse effect on our liquidity, results of operations and financial condition.

54.     The Registration Statement also identified "technology advancements" as a potential risk. The Company did so, however, in terms of losing market share or being at a competitive disadvantage. It also claimed that new technology could make it easier for larger companies to do their own fracking support services, i.e., "vertically integrate." However, companies, were not vertically integrating. Rather, by the time of the IPO, that new technology was creating increased efficiencies, lessening the need for Liberty Oilfield's services, and increasing the oversupply of fracking services available on the market. The risk disclosure failed to mention this actual trend. In particular, the Registration Statement stated:

*Technology advancements in well service technologies, including those involving hydraulic fracturing, could have a material adverse effect on our business, financial condition and results of operations.*

The hydraulic fracturing industry is characterized by rapid and significant technological advancements and introductions of new products and services using new technologies. As competitors and others use or develop new technologies or

18

technologies comparable to ours in the future, we may lose market share or be placed at a competitive disadvantage. Further, we may face competitive pressure to implement or acquire certain new technologies at a substantial cost. Some of our competitors may have greater financial, technical and personnel resources than we do, which may allow them to gain technological advantages or implement new technologies before we can. Additionally, we may be unable to implement new technologies or services at all, on a timely basis or at an acceptable cost. ***New technology could also make it easier for our customers to vertically integrate their operations, thereby reducing or eliminating the need for our services.*** Limits on our ability to effectively use or implement new technologies may have a material adverse effect on our business, financial condition and results of operations.

55.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, requires disclosure of any known events or uncertainties that had caused, or were reasonably likely to cause, Liberty Oilfield's disclosed financial information not to be indicative of future results. The oversupply of fracking services was likely to (and in fact did) materially and adversely affect Liberty Oilfield's future results and prospects. The omitted material facts alleged herein were reasonably expected to and did have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

56.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk. Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects on the Company's future results and prospects, Defendants violated Item 105.

57.    The statements contained in ¶¶ 44-56 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) there was an oversupply in the hydraulic fracturing services market; (2) the Company's pricing power was weak; (3) the Company's services were not increasing and its competition was not decreasing; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

58.    On February 5, 2019, the Company announced its fourth quarter and full year 2018 financial and operational results. The press release revealed disappointing revenue and net income. In the press release, Liberty Oilfield claimed "fleet utilization" for the quarter was "challenging." While it briefly mentioned the oversupply of frac fleets in the market, the Company mainly blamed "last-minute decisions to defer completions in the fourth quarter," which were caused by a drop in commodity prices. It also downplayed any potential effect of the oversupply on the Company's services. The press release claimed that demand was high for the Company's fleet, stating that "[w]orking in concert with customers, Liberty continues to drive innovation and operational efficiency across [the] entire fleet. This performance translates to strong demand for Liberty's high-efficiency fleets...." Describing the lost projects as merely deferrals, the Company claimed that these projects "provided Liberty a solid backdrop for utilization at the start of 2019."

59.    Also on February 5, 2019, during Liberty Oilfield's earnings conference call held with analysts and investors, Defendant Wright highlighted the customer deferrals as the cause of the Company's financial result softness and that these deferred projects would prove "a solid backdrop for utilization at the start of 2019." In particular, Defendant Wright

stated:

> The fourth quarter of 2018 was challenging from a fleet utilization perspective. A number of customers made last minute decisions to defer completions in the fourth quarter due to a combination of capital budget and cash flow management decisions brought on in part by the rapid drop in the commodity price in November and December. While this was disruptive to our fourth quarter work calendar, we believe the focus of capital discipline by operators is ultimately a positive factor for the services industry as we move towards a sustainable production environment that could ultimately lead to less volatile activity levels and perhaps even a steadier commodity price.

> With these challenges, our fourth quarter revenue was $473 million, and net income was $34 million, or $0.27 per fully diluted share. Adjusted EBITDA for the quarter was $72 million, or $13 million per average active frac fleet on an annualized basis. Premium service quality, coupled with basin and customer diversity, provides the company the opportunity to continue generating strong returns on capital employed regardless of how the market unfolds in 2019.

> The fourth quarter customer project deferrals provided Liberty a solid backdrop for utilization at the start of 2019. In fact, in January, we pumped the highest monthly volume of sand in the company's history. We are currently projecting sequential revenue growth in the first quarter in the single digit percentage range and adjusted EBITDA to be approximately flat, as increased utilization is offset by pricing decreases.

60.     During the same call, Defendant Stock explained that the disappointing results were due to the one time deferrals, rather than the material oversupply trend. In particular, Defendant Stock stated:

> As Chris mentioned, the fourth quarter was challenging from a customer scheduling perspective. Last-minute project deferrals due to companies managing to announce budgets and cash flow balancing caused a significant increase in white space on the calendar. Typically, we would have far more visibility into these schedule changes and therefore, be better able to fill these gaps.

61.     On the same call, Defendant Wright furthered the impression that oversupply was not a trend, that market participants acted quickly to curtain this oversupply, and that

some fleets there were idled due to the oversupply actually returned to the market. In particular, Defendant Wright stated:

> [W]e hear stuff from our customers, we hear stuff in the - around the - in the bars. So what I'm going to get - give you is sort of a sense of what's going on. ***But in the broad sweep, last - from last summer, sort of the peak of activity level, and a very high peak it was, probably 20%, say 70, 80, 90 frac fleets that were fracking last summer are not fracking today or were not - probably some of that - a few of them are back, but they weren't fracking in December.***

62.     On the same call, Defendant Wright further explained that demand for Liberty Oilfield's services remained strong and "what bit [the Company] in the fourth quarter" was the short-term deferrals. Further, Defendant Wright claimed that the price for services had bottomed. In particular, he stated:

> So look, as we've said in the late summer, whatever, market's very strong, we saw some erosion in Q3 in activity level as we talked about on our last call. We saw a more significant erosion in Q4. And when there are these fleets that are pushed on the market and they're trying to get new work, that pushes pressure on pricing. So pricing, I don't know, from last fall or something, maybe pricing's declined by more than 10%. Half of that is a decrease in commodity prices. Think of the compression, for example, in sand prices. That's a plus for us, it's a plus for our customers. But maybe 5% of that is coming out of our variable margin. So that's - of course, that makes the market tougher. But activity level, we have these - schedule changes, they're normal for this industry. They happen all the time, but we usually know them with some advance. And as you've heard us say before, there's excess demand for Liberty. We can always move fleet somewhere else if we know a schedule changed. ***What bit us in the fourth quarter was very short notice changes in behavior that didn't allow us to redeploy those fleets or efficiently redeploy them. That hurts. Now that goes on in Q4. In Q1 today, every fleet, all 22 fleets we have are fracking, as I'm talking to you today.*** And I'd say, we've got good reason to believe that will continue, that will continue as far out as we can see. ***I think we feel pretty good about fleet utilization this year even though the market is softer. We'll keep our fleets busy. We've been in very close communication with our customers.*** They're somewhat apologetic for the vagaries of this changing market, exiting the dot-com phase that sometimes makes very rapid decisions required, but pricing is compressed.

22

And Sean, I guess, to maybe your most important question, I would say, across our fleets today, they are all pretty close or roughly in line with leading edge pricing. ***I think the compression in pricing has probably mostly happened. I would suspect we're at a bottom.***

(Emphasis added.)

63.     On the same call, Defendant Wright also claimed that the Company was already near its peak output levels, levels reached before this supposed, momentary blip in demand created mainly by customer deferrals. In particular, he stated:

> **[Analyst:]** Coming back to the activity outlook. I know that there's been several questions on this front, but I wanted to ask another one. Chris, you mentioned a full calendar as we go through 1Q and it sounds like into 2Q, does that mean there's line of sight to getting back to the mid-2018 rate of stages per fleet per month in 2Q or 3Q?

> **[Defendant Wright:]** Absolutely. I'd say we're there today or close to it. I mean, we're running 22 fleets and pumped record amount of sand in January. So I think, stage throughput and activity levels right now are good. We're winter so we're going to have disturbances, but boy so far winter has been very smooth. Winter has been very smooth.

64.     In light of the statements described above, while Defendants briefly mentioned oversupply, investors would believe that the oversupply would quickly correct itself, if it had not done so already; that the oversupply would not constitute a trend, and if it was, this trend would not materially affect the Company; and finally, that the trend was not in existence at the time of the IPO or Registration Statement.

65.     Despite Defendants' assurance, the following quarters' financial results continued to note the oversupply of frac fleets materially weighing down Liberty Oilfield's financial results. Defendants constantly mixed in positive news with these results, muddling investor response.

66.     On April 30, 2019, Liberty Oilfield issued a press release announcing its

financial results for the first quarter of the 2019 fiscal year. The Company reported revenue of $535 million and net income of $34 million. The press release noted that there was an oversupply of staffed frac fleets that caused a drop in pricing. Liberty Oilfield estimated that 20% of the frac fleets that were active in the prior year were now idle or in the process of being idled. Despite this sobering news, the Company's press release presented a rosy picture of Liberty Oilfield's financials and the market, and the impression that the effects of the oversupply in pricing had already worked its way through the system and pricing would improve. The Company also announced a $100 million stock repurchase. In particular, the press release stated:

> ***Entering the fourth quarter of 2018, there was an oversupply of staffed frac fleets*** in the market which, combined with the additional reduction in customer activity, led to a rapid reduction of pricing for frac services. These reductions worked their way through our fleet repricing negotiations from late fourth quarter 2018 into the middle of first quarter 2019. ***While there continues to be an oversupply of frac fleets in the market***, ***we believe that roughly 20% of the frac fleets that were active in the summer of 2018 are now either idle or in the process of being idled.*** As supply of active frac equipment balances with demand we expect pricing to potentially improve later this year.

(Emphasis added.)

67.     On May 1, 2019, Liberty Oilfield held its earnings conference call with analysts and investors. During call, Defendant Wright clarified that the cause of the decrease in pricing was the oversupply of frac services, not commodity prices. At the same time, he downplayed the long-term effect of this oversupply and that it had worked its way through the market. In particular, Defendant Wright stated:

> [T]here was a lot of price resetting in Q4 or at the very beginning of Q1. Think of when the supply and - not just commodity prices falling rapidly, even more importantly, just supply and demand in the frac market. There's just way more fleets looking for frac work than there was demand for frac

work in Q4 but then at the end of Q4 and going into Q1, so you get the markets work, and so you get pricing response there. So yes, I would say a large part of the big reset already flowed through Q1, but the later ones and resets that were middle of Q1, there's a little bit of an impact from there. But a long way to say yes. You said it correctly.

*       *       *

**So our guess is that the dominant driver and maybe the sole driver is lower supply. The market today is less oversupplied than it was 2 months ago and much less oversupplied than it was 4 months ago, so we're seeing supply removed from the market.** With customers with lower budgets and aggressive production targets, it's critical to them to have high throughput, reliable, efficient operations. So maybe there's even a little bit of skew in there in that the pull on Liberty fleets right now is actually quite strong. We're - there are plenty of people we like, we know, we'd like to work for - we don't have the capacity for today.

(Emphasis added.)

68.     On July 30, 2019, Liberty Oilfield issued a press release announcing its financial results for the second quarter of the 2019 fiscal year. The Company reported revenue of $542 million, slightly up from the previous quarter, and net income of $41 million. Again, Liberty Oilfield noted that there was an oversupply of frac services in the market. At the same time, the Company claimed that it had strong demand for its services and that demand will remain high.

69.     On February 5, 2020, Liberty Oilfield issued a press release announcing disappointing results for the fourth quarter and full year of 2019. In particular, the Company announced a quarterly loss of $0.15 per share compared to consensus estimates of only $0.04 per share. Revenue was only $398 million, a decrease of 23% quarter-over-quarter. In contrast to previous statements, Liberty Oilfield now admitted that there was a "substantial oversupply of frac equipment." In the press release, the Company revealed that even while total frac stages

increased, the additional efficiency of each fleet exasperated the oversupply within the fracking

services industry. In particular, the press release stated:

> The pricing dynamic entering into 2020 is challenging. Total industry frac stages in North America were up marginally year-over-year in 2019. However, efficiency gains across the industry have raised the number of frac stages completed by each fleet by 10% to 20%. which implies a decrease of at least 10% in the active frac fleets needed to meet demand. The slowing pace of frac activity led to progressively lower demand for frac fleets through the second half of 2019, resulting in pricing pressure on services. ***The substantial oversupply of frac equipment in the second half of 2019 was the pricing backdrop for 2020 dedicated fleet negotiations.***
>
> ***The supply of staffed fracturing fleets across the industry fell meaningfully in late 2019. While this trend will be helpful in the long term, we believe the impact of attrition has not yet supported an improvement in pricing for services at the start of 2020. There remains an oversupply of frac fleets in the market and we do not expect pricing to improve materially until supply of actively staffed frac equipment better balances with demand. Increased profitability will have to come from technology. increased efficiency and improved processes.***

(Emphasis added.)

70.     The price of Liberty Oilfield's securities has plummeted since the IPO. Liberty

Oilfield securities have traded significantly lower than the IPO price of $17.00 per share.

71.     As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of Liberty Oilfield's shares, Plaintiff and other Class members have

suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action on behalf of all those who purchased

Liberty Oilfield securities pursuant and/or traceable to the Registration Statement (the "Class").

Excluded from the Class are Defendants and their families, the officers and directors and

affiliates of Defendants, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Liberty Oilfield or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Securities Act;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violations of Section 11 of the Securities Act Against All Defendants

78.     Plaintiff incorporates all the foregoing by reference.

79.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

80.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

82.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

83.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

84.    Plaintiff acquired Liberty Oilfield securities pursuant to the Registration Statement.

85.    At the time of their purchases of Liberty Oilfield securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

86.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II
### Violations of Section 12(a)(2) of the Securities Act Against All Defendants

87.    Plaintiff incorporates all the foregoing by reference.

88.    By means of the defective Prospectus, Defendants promoted, solicited, and sold Liberty Oilfield securities to Plaintiff and other members of the Class.

89.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Liberty Oilfield securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not

misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

90.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Liberty Oilfield securities.

91.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Liberty Oilfield securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

92.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

### COUNT III
### Violations of Section 15 of the Securities Act Against the Individual Defendants

93.    Plaintiff incorporates all the foregoing by reference.

94.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

95.     The Individual Defendants were controlling persons of Liberty Oilfield by virtue of their positions as directors or senior officers of Liberty Oilfield. The Individual Defendants each had a series  of direct and indirect business and personal relationships with other directors and officers and major shareholders of Liberty Oilfield. The Company controlled the Individual Defendants and all of Liberty Oilfield's employees.

96.     Liberty Oilfield and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

97.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


April 3, 2020                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Phillip Kim*
Phillip Kim, Esq.
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Liberty Oilfield Services Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Liberty Oilfield Services Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First name:      Marc
Middle initial:
Last name:       Joseph
Address:
City:
State:
Zip:
Country:
Facsimile:
Phone:
Email:

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 05/21/2018 | 250 | 23.47 |

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/08/2019 | 250 | 9.02 |

**Certification for Marc Joseph (cont.)**

7.  I have not served as a representative party on behalf of a class under the federal
    securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 04/03/2020