## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:20-cv-00946-RBJ

CIPRIANO CORREA, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

LIBERTY OILFIELD SERVICES INC., et al.,

    Defendants.

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

The Opposition (ECF No. 71, "Opp.") and the State Plaintiff's Supplemental Opposition (ECF No. 72, "S. Opp.") underscore why Defendants' Motion should be granted by abandoning the Amended Complaint's core theory of falsity. Plaintiff's Complaint and pre-motion letter (ECF No. 54) attempted to establish the falsity of Liberty's statements about fracking demand and pricing principally by purporting to contrast Liberty's IPO disclosures about the fracking industry with the supposedly "true" disclosures of two competitors (NES and BJS). In the face of Defendants' Motion showing that all of those disclosures were perfectly consistent (*e.g.*, Mot. at 2 (reflecting Liberty and BJS both said "demand for new equipment exceeds[] active supply")), Plaintiff has retreated from the pleaded "contrast" theory (*see* Compl. ¶¶ 7, 53-56, 70, 75). Instead, the Opposition continues to mischaracterize the IPO Offering Documents' actual words and argues without basis that they are inconsistent with a news article that mentions neither Liberty nor an oversupply of fracking services, and anecdotes from two anonymous former low-level Liberty employees.

Critically, nowhere in the Opposition does Plaintiff point to any disclosure in the IPO Offering Documents that fracking demand exceeded supply ***generally***, the strawman the

Complaint challenges.  The Opposition instead makes clear that the alleged falsity is premised on

Plaintiff's purported impressions from Liberty's statement expressing its opinion that "demand for

*new equipment* exceeds active supply."  *E.g.*, Opp. at 8-9, 17 (emphasis added).  Plaintiff thus

ignores this Court's recent holding in *Guo v. Mahaffy*, 2020 WL 5798531, at \*9 (D. Colo. Sept.

29, 2020) that falsity allegations must be based on a disclosure's explicit language rather than what

might be inferred from it.  *See* Mot. at 1, 11 (citing *Guo*).  Nor is Plaintiff's improper inference of

an undisclosed oversupply supported by the *Houston Chronicle* article—now Plaintiff's sole basis

for his claim that Liberty hid something about industry supply and demand—which was published

after the IPO and generally describes a strong industry with no growing mismatch between supply

and demand.

Plaintiff's pleaded challenge to Liberty's statement that "[w]e are currently experiencing

price increases" also depended heavily on the contrast with disclosures of other companies, which

Plaintiff has abandoned after Liberty showed the other companies similarly said they saw

"increased pricing in 2017."  Mot. at 2.  Plaintiff's pricing allegations now depend solely on

anecdotes from the two anonymous former employees, but nothing in the Opposition or

Supplemental Opposition supports drawing an inference regarding Liberty's overall pricing or how

it compared to prior periods.  That Liberty was competing on price for some business simply does

not support an inference regarding its overall pricing, much less a reasonable inference that Liberty

was lying when it (like the other companies Plaintiff alleges were truthful) said it was seeing

increases in pricing.

Given that Plaintiff has based his disclosure claims on mischaracterizations and unfair

inferences, it is also unsurprising that he makes no attempt to reconcile his falsity theory with

Liberty's undisputed strong revenues and stock price for more than a year after the IPO.  The only fair conclusion is that Liberty went public in January 2018 as its industry was beginning to recover from a multi-year downturn, but industry conditions changed a year later in 2019 as oil prices declined, causing Liberty's stock price to slowly decline along with the rest of the industry. Plaintiff's hindsight-based effort to turn the normal ups and downs of the oil and gas industry into a securities class action premised on an alleged nondisclosure of publicly available information is meritless.

Plaintiff had the burden to plead facts from which the Court could reasonably infer that the Offering Documents contained a materially false or misleading statement.  The sparse facts alleged in the Complaint fall short of this standard.  This lawsuit should be dismissed with prejudice.

## ARGUMENT

### I.   Plaintiff fails to allege a false or misleading statement or omission.

The Opposition clarifies that the two statements Plaintiff challenges are: "demand for new equipment exceeds active supply" and "[w]e are currently experiencing price increases."  Opp. at 9, 14.[1]  Moreover, the Opposition shows that Plaintiff's modified falsity arguments still depend on a mischaracterization of Liberty's opinion about supply and demand, and a failure to plead facts suggesting that Liberty as a whole was not experiencing price increases at the time of the IPO.

---

[1]   Plaintiff attempts to cast his pleading burden as "minimal" notice pleading by citing pre-*Iqbal* and *Twombly* law.  Opp. at 2, 5-6.  For the reasons explained in the Motion and herein, Plaintiff does not meet his burden under current Supreme Court authority to plead specific facts showing more than the mere possibility of misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Plaintiff fails to allege that Liberty's opinion of the balance of supply and demand in the market was false or misleading.

#### 1. Plaintiff mischaracterizes Liberty's actual disclosures.

The Opposition confirms as a threshold matter that the alleged misrepresentation concerning supply and demand rests on a mischaracterization of the disclosures. *See Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1162 (10th Cir. 2018) ("The district court properly dismissed the claim based on the alleged misleading statement because the allegation is based on a mischaracterization of what Defendants said."). Plaintiff largely ignores that Liberty never represented that demand for fracking services exceeded supply generally. *See* Mot. at 10. Instead, the actual disclosure said only that "demand for *new* equipment exceeds active supply." Compl. ¶ 69; Ex. A (Prospectus) at 82-84 (emphasis added). Neither the Complaint nor either of the Opposition briefs contain any alleged facts regarding what the demand for "new equipment" was at the time of the IPO or how that demand related to the "active supply" of new equipment. This failure alone means the Court need go no further to conclude that Plaintiff has not adequately alleged falsity for Liberty's statement that "demand for new equipment exceeds active supply."

Plaintiff's failure to allege specific facts about the demand for "new equipment" or the "active supply" of new equipment is particularly glaring here where Plaintiff does not dispute that Liberty's statement is an opinion because the balance of supply and demand in a market is not an objective fact. *See* Opp. at 8-9; S. Opp. at 9-10; Mot. at 15. Statements of opinion are subject to special, heightened pleading standards, which Plaintiff does not come close to meeting. Mot. at 15-16.

First, the Opposition points to no allegations in the Complaint establishing an undisclosed oversupply at the time of the IPO. *See infra* at 6-9. And even if a plaintiff has pled "some fact

cutting the other way" from Liberty's opinion, that is insufficient to state a claim because reasonable investors understand that "opinions sometimes rest on a weighing of competing facts." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015); Mot. at 15.  Second, the Opposition does not contest that Liberty divulged the bases of its opinion about supply and demand.  *Compare* Mot. at 15-16, *with* Opp. at 8-9.  There can accordingly be no liability as a matter of law because investors can assess for themselves whether the disclosed basis supports the opinion.  *Omnicare*, 575 U.S. at 195 ("[T]o avoid exposure for omissions under § 11, an issuer need only divulge an opinion's basis, or else make clear the real tentativeness of its belief."); *see* Mot. at 16.

In the end, the Opposition never addresses the opinion Liberty actually expressed as to supply and demand for "new equipment," and fails to meet the *Omnicare* standard for challenging this opinion.  Either failure alone requires dismissal of Plaintiff's supply and demand claim.

### 2.  Plaintiff's claim cannot rest on his impressions from the disclosures.

Unable to challenge what Liberty actually said about active supply and the demand for new equipment, the Opposition argues that Liberty created a misleading impression that supply exceeded demand generally.  Plaintiff concedes Liberty disclosed that at the time of the IPO, only 75% of industry fracking capacity was "currently active and deployed."  Opp. at 6-7.[2]  Plaintiff,

---

[2]   The State Plaintiff inaccurately argues that Defendants rely solely on this statement to argue a failure to plead falsity.  S. Opp. at 6-7.  The failure to plead falsity arises out of Plaintiff's mischaracterization of Liberty's disclosures.  The State Plaintiff does not address this argument at all.  Moreover, the State Plaintiff's suggestion that there is some factual dispute regarding what Liberty meant when it disclosed that only 75% of industry fracking capacity was "currently active and deployed" is baseless.  *See* S. Opp. at 6.  The disclosure unambiguously told investors that there was excess fracking capacity in the industry because 25% of the capacity was not even being used.  The State Plaintiff does not offer any alternative interpretation, much less one that would be plausible under *Iqbal* and *Twombly*.

however, argues that the text surrounding this disclosure would have caused a reasonable investor

to understand Liberty's statements to indicate that industry fracking capacity was decreasing.  Opp.

at 7.  But as this Court recently recognized, the securities laws "ask[] whether there is a false or

misleading *statement*—not inference or interpretation."  *Guo*, 2020 WL 5798531, at *9.  "This

determination requires analyzing the . . . statement's explicit language, not what might be inferred

from it."  *Id.*  The Opposition ignores *Guo*.  Plaintiff cannot base a claim on so-called impressions

from Liberty's statements.

The actual language that Plaintiff claims created a misleading impression further confirms

no misleading statement existed as a matter of law.  Liberty's statements in Compl. ¶ 67 were

primarily of historical fact that Plaintiff does not contend were untrue.[3]  Such accurate statements

of historical fact are inactionable as a matter of law and do not give rise to a duty to disclose

additional information.  *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 996-99 (10th Cir.

2002).  *McDonald* (which Plaintiff also fails to address) provides another independent basis for

why Plaintiff cannot base a claim on his so-called impressions from Liberty's accurate disclosures.

### 3.  Plaintiff's sparse factual allegations do not support his undisclosed oversupply theory.

In any event, the Opposition identifies no pleaded facts supporting Plaintiff's core theory

that there was an undisclosed oversupply of fracking fleets at the time of the IPO.  Plaintiff has

---

[3]   The only non-historical statements in Compl. ¶ 67 were (i) statements of opinion, (ii) predictions about the future, and/or (iii) vague, optimistic statements.  These statements are inactionable as a matter of law and/or are not adequately pled to be false under the special, heightened pleading standards for these kinds of statements.  Mot. at 18-19 & n. 19.  Plaintiff does not address these statements in the Opposition, which further confirms that Plaintiff does not challenge Liberty's forward-looking statements quoted in the Complaint.  *See* Opp. at 16-18.  As a result, the bespeaks caution doctrine, which Defendants only raised with respect to forward-looking statements, is no longer relevant.

abandoned the "contrast" theory that was at the core of the Complaint that the public disclosures of NES and BJS purportedly conflicted with what Liberty said.  *See* Compl. ¶¶ 7, 53-56, 70, 75. In their opening brief, Defendants showed that those disclosures in no way support an inference of any infirmity in Liberty's Offering Documents.  *See* Mot. at 13-14.  The Opposition does not mention NES at all and tries to reverse course on Plaintiff's allegations about BJS's disclosures by now claiming their timing (in July 2017) renders them irrelevant.  Opp. at 8; *cf.* Compl. ¶¶ 7, 53 (describing BJS disclosure as "approximately the same time as Liberty").

Having abandoned the NES and BJS contrast to establish falsity, Plaintiff now relies on a single post-IPO *Houston Chronicle* article to allege an undisclosed industry fracking oversupply. *See* Opp. at 7-8, 12-13.  The article describes rising fracking supply around the time of the IPO, but it makes no claim that rising supply outpaced growing demand.  The article generally describes a market with high demand that some companies were expanding to try to meet.  Compl. Ex. 1; *see* Mot. at 12.  That is in no way inconsistent with Liberty's disclosures; in fact, Liberty disclosed that that independent data showed rig count in the United States had increased by "more than 130%" from mid-2016 to late-2017.  Ex. A (Prospectus) at 62.

Plaintiff further mischaracterizes the article as reflecting an "unprecedented" and "frenzied" increase in capacity.  Opp. at 6-8, 12-13.  But neither the article nor the Complaint describe anything as "frenzied," and the sole reference to "unprecedented" increases was one company's statement about increases in its own workforce.  Compl. ¶¶ 51-52, 68 & Ex. 1.  And contrary to Plaintiff's contention that the article depicted "fracking companies were acquiring idle fleets . . . and quickly redeploying them," Opp. at 7, all the article says is that one company had acquired some fleets that it "may" redeploy.  Compl. ¶¶ 51-52, 68 & Ex. 1 at 5-6.

In short, nothing in the article supports a reasonable inference that at the time of the IPO any industry capacity increases overshot the increased demand that the article also described. Defendants do not, as Plaintiff suggests, seek to have the Court resolve competing inferences in Defendants' favor on a motion to dismiss.  *See* Opp. at 12-13.  Rather, the issue is one of Plaintiff's pleading burden: does a single post-IPO article describing jointly rising demand and supply in the fracking market give rise to a plausible inference under *Iqbal* and *Twombly* that Liberty misled investors by not opining on potential excess supply?  It does not.  *E.g.*, *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297, 1302-03 (10th Cir. 2018) (holding in securities case that district court was correct in declining to draw plaintiff's proposed inference from an article where the inference was not plausible).

The State Plaintiff's reliance on *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1103-04 (10th Cir. 2003) further demonstrates this point.  *See* S. Opp. at 7 n.14.  He argues that allegations of "statements by industry observers to a trade publication" are sufficient to plead falsity, but those statements in *Adams* were directly about the defendant and how the defendant was losing money.  *Adams*, 340 F.3d at 1103.  The trade publication statements were also only one component of a larger set of specific allegations that collectively "articulated a plausible explanation for [plaintiffs'] allegations."  *Id.* at 1104.  Here, by contrast, the *Houston Chronicle* article is not buttressed by other allegations and more importantly does not mention Liberty at all, much less say that something Liberty said was false.

Finally, neither Plaintiff nor the State Plaintiff offers any explanation (much less a plausible allegation) for how Liberty's revenues and stock price performed so well for so long if market conditions in January 2018 were unfavorable, as Plaintiff claims.  Liberty's stock price was still

equal to the IPO price over fifteen months later on May 6, 2019.  *See* Mot. at 6-7; Ex. H (Liberty

stock price data).  It is also undisputed that Liberty's revenue was increasing both before and after

the IPO.  *See* Mot. at 5-7.[4]  This undisputed financial performance further precludes any inference

of an undisclosed oversupply at the time of the IPO.

### 4. Plaintiff cannot plead a claim based on nondisclosure of publicly available industry information.

Plaintiff does not dispute that his theory of falsity rests on an alleged nondisclosure of

publicly available information.  Opp. at 9-12.  Plaintiff fails to cite a single case within the Tenth

Circuit holding that a complaint adequately pleads an actionable misleading disclosure where the

alleged omission consists of readily accessible public information, such as general market

conditions in a widely covered industry.  *Id.*  "Whether information is material . . . depends on

other information already available to the market; unless the statement 'significantly altered the

"total mix" of information' available, it will not be considered material."[5]  *Grossman v. Novell,*

---

4    The State Plaintiff mentions a Liberty disclosure made over a year after the IPO about changed market conditions, after which Liberty's stock price began to decline along with the rest of the industry.  S. Opp. at 3 & n.6; *see also* Mot. at 7; ECF No. 1 ¶ 69.  As a matter of law, Liberty's disclosures in 2019 discussing oversupply issues "[e]ntering the fourth quarter" of 2018, Mot. at 7 (*see also* S. Opp. at 3), provide no basis to infer that the referenced oversupply existed at the time of the IPO in January 2018.  *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) ("Securities liability cannot be imposed on the basis of subsequent events."); *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1199 (10th Cir. 2013) (holding plaintiffs could not plead falsity as to MBS values "[w]ithout a contemporaneous collapse in the value of its MBSs, or at least some sign that their value would collapse shortly").

5    Plaintiff's out-of-circuit cases did not conclude that an issuer violated the securities laws by omitting widely available general public information about the issuer's industry.  *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213-16, 221 (5th Cir. 2004) (holding that omission of public information can be actionable in certain circumstances and affirming dismissal due to immateriality of the allegedly omitted public information, which is considered part of the "total mix" available to investors); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) (noting there are "limitations" on whether investors are on notice of public information in

*Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Accordingly, the Tenth Circuit does "not hesitate to dismiss securities cases pursuant to Rule 12(b)(6) where the alleged . . . omissions are plainly immaterial."  *Slater*, 719 F.3d at 1197.  And Plaintiff cannot brush off the in-circuit cases dismissing alleged failures to disclose public information by noting those were claims under Section 10(b).  *See* Mot. at 14; Opp. at 11-12.  "The meaning of materiality in a § 11 Securities Act claim is identical to that in a § 10-b Exchange Act claim for securities fraud."  *Slater*, 719 F.3d at 1197.[6]

### B.  Plaintiff fails to allege that Liberty's pricing statement was false or misleading.

The Opposition also fails to show falsity as to Liberty's statement that at the time of the IPO "[w]e are currently experiencing price increases" relative to the previously low prices it had experienced during the industry downturn.  *See* Mot. at 16.  Plaintiff does not and cannot dispute that there are no facts in the Complaint about what Liberty's average pricing was at the time of the IPO or how it compared with prior periods.  The few allegations on which Plaintiff relies—

---

case where alleged public information at issue involved a study specifically related to the issuer and its strategic options).

[6]  Plaintiff also cannot avoid the Tenth Circuit's materiality standard by alleging that Liberty did not authorize anyone else to provide information to investors.  Opp. at 10-11.  Liberty's generic statement does not mean that investors are not on notice of the general conditions of the industries in which they choose to invest.  In Securities Act cases, a reasonable investor "takes into account the customs and practices of the relevant industry."  *Omnicare*, 575 U.S. at 190.  "Public documents are part of [the] total mix if an investor interested in a particular type of information about a company would know of the existence of the record and could readily access it."  *United Food & Com. Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014).  The district court cases Plaintiff cites involved, unlike here, issuers that specifically told investors not to rely on information outside the offering documents in circumstances where specific publicity about the issuer was in the public realm.  *See* Opp. at 10-11 (citing *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 521-22 (S.D.N.Y. 2013) and *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010)).

anecdotes from two anonymous former low-level employees—are insufficient as a matter of law to plead that Liberty, as a whole, was experiencing price decreases in January 2018.

Defendants' Motion showed that the disclosures of NES and BJS—which the Complaint relies on heavily to try to allege falsity for Liberty's pricing statement—said the same thing as Liberty.  Mot. at 16-17.  In response, Plaintiff no longer contends these disclosures of other companies support a claim.  *See* Opp. at 14-16.  That leaves Plaintiff only with anecdotes from two alleged former lower-level Liberty employees.  *See* Opp. at 15-16.

Yet, the Opposition does not explain how FE1's and FE2's allegation that some Liberty customers received discounts supports a reasonable inference that Liberty as a whole was decreasing prices at the time of the IPO.  The Third Circuit's decision earlier this month in *In re Newell Brands* is instructive.  The plaintiff there claimed the defendant company misled investors by concealing pricing conflicts between its brick-and-mortar division and its e-commerce division, pointing to two specific examples of pricing conflicts that led to discounts and negatively impacting the company's margins.  *In re Newell Brands, Inc. Sec. Litig.*, --- F. App'x ---, 2020 WL 7040968, at *2 (3d Cir. Dec. 1, 2020).  The court upheld dismissal for failure to plead falsity because allegations of "extensive promotional discounting" were insufficient to allege "the amount of such discounts, the adverse financial impact of such discounts, or when the adverse impact was felt by Newell."  *Id.* at *5.  "Without information to support that the pricing conflicts had a material financial effect on Newell," the plaintiff failed to plead a false or misleading statement.  *Id.*

The same is true here.  FE1 and FE2 were multiple levels below senior management, offer only anecdotes (from Texas, where only a fraction of Liberty's fleets were located) rather than across-the-board data, and did not allege that any of Liberty's five largest customers—on whom

Liberty depended for over half of its revenue—received discounts.[7]  Mot. at 17-18 & n.18.  In

these circumstances, Plaintiff has failed to plead facts giving rise to a plausible inference that

Liberty, as a whole, was experiencing overall price decreases at the time of the IPO.

Plaintiff cites no case holding that anecdotal confidential witness allegations like those in

the Complaint were sufficient to state a claim.  *See* Opp. at 15-16.  Plaintiff's only attempt to

address the cases cited in the Motion is to urge the Court to ignore them because they involved

claims under Section 10(b),[8] but Plaintiff does not attempt to distinguish the cases on the facts

regarding what inferences can reasonably be drawn from the FE1 and FE2 allegations in the

Complaint.  *Compare* Mot. at 17, *with* Opp. at 16.

Nor can Plaintiff avoid dismissal by asserting there is a "question of fact," Opp. at 15,

regarding whether Liberty was cutting prices nationwide.  It is Plaintiff's burden to plead sufficient

facts to plausibly allege that Liberty's statements were untrue.  The Complaint contains no such

allegations, including from any former employee who would be in a position to know about

nationwide pricing.  Plaintiff's anecdotes regarding Liberty engaging in price competition are not

"sufficient factual matter" (*Iqbal*, 556 U.S. at 678) to permit the court to reasonably infer anything

about Liberty's overall pricing.

---

[7]   Contrary to Plaintiff's suggestion, Defendants did not argue that FE1 and FE2 being based in
Texas was the only reason Plaintiff failed to plead facts from which the Court could infer they
would have company-wide information.  *Compare* Mot. at 17-18, *with* Opp. at 15.

[8]   Plaintiff also accuses Defendants of citing "not the court's holding, but rather . . . merely the
court's summary of one of the defendants' arguments" in *In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832, 854-55 (N.D. Tex. 2005).  Opp. at 16.  Plaintiff neglects to mention that
following the quote Defendants cited in the Motion, the *Alamosa* court stated that "[t]he Court
agrees and adopts Defendants' argument on the issue." *Alamosa*, 382 F. Supp. 2d at 855.  *Alamosa*
thus supports Defendants' argument that conditions that employees claim to have seen in the field
do not reasonably give rise to company-wide inferences.

### C. Plaintiff fails to allege a violation of Item 303 of Regulation S-K.

Plaintiff argues that Liberty violated Item 303—which only requires disclosure of "known trends" that are "reasonably expect[ed to] have a material . . . unfavorable impact on net sales or revenues or income from continuing operations"—by failing to disclose a purportedly rapid increase in fracking capacity and decreasing prices. Opp. at 13-14. For the reasons explained herein and in the Motion, Plaintiff has not adequately pled falsity for the predicate facts regarding capacity and pricing. The Item 303 claim fails for this reason alone.[9] *See* Mot. at 14 n.14, 19 n.20.

Separately, the Opposition fails to support an Item 303 claim for two other reasons. First, Plaintiff does not identify any well-pled allegations that Liberty management ***knew*** of any undisclosed fracking oversupply or decreasing prices at the time of the IPO.[10] *Slater*, 719 F.3d at 1197 (Item 303 requires that a trend be "presently known to management"). Second, the Opposition's argument of some adverse trend also makes no sense in light of Liberty's strong financial performance leading up to and following the IPO. Plaintiff's only response for how Liberty's revenues and stock price did so well for over a year after the IPO is to assert without citation that net income is "a more meaningful metric" than revenue. Opp. at 14 n.4. Plaintiff's

---

[9]   Plaintiff appears to have abandoned the claim that Liberty violated Item 105 of Regulation S-K, as the Opposition does not mention it. In any event, Liberty did not violate Item 105 for the reasons explained in the Motion. The Item 105 claim should be dismissed with prejudice.

[10]   As discussed above (*supra* at 7-8), Plaintiff relies principally on a public *Houston Chronicle* article for the allegation that there was too much fracking supply at the time of the IPO. But that article was published after the IPO, so Plaintiff cannot rely on the article to contend that any purported trend that the article allegedly revealed was known at the time of the IPO. *See* Compl. ¶¶ 50, 64. Plaintiff's reliance on BJS's July 2017 disclosure as revealing a trend is inconsistent with his argument elsewhere in the Opposition that what BJS said is irrelevant because BJS spoke six months before Liberty did. *Compare* Opp. at 14, *with* Opp. at 8. Regardless, what BJS disclosed is consistent with what Liberty said. *See* Mot. at 13-14, 16-17.

effort to dismiss Liberty's undisputed revenue growth leading up to and following the IPO is telling. Opp. at 14 n.4; *cf.* Mot. at 5-7. Revenue is a direct measure of the demand for what a company is selling, and Plaintiff's allegations concern demand. Plaintiff also suggests that looking at Liberty's income is appropriate but ignores that Liberty's operating income increased from $63.0 million in Q4 2017 to $68.6 million in Q1 2018 to $114.2 million in Q2 2018.[11] Ex. D (3/13/2018 8-K) at 4; Ex. E (5/7/2018 8-K) at 9; Ex. F (8/2/2018 8-K) at 9. This undisputed post-IPO performance precludes the theory that there was some adverse trend regarding supply and demand dynamics and/or decreasing prices that Liberty was required to disclose in January 2018. Such "trends," if true, would have caused Liberty to do worse, not better, after going public. There cannot have been a known trend at the time of the IPO that was reasonably expected to adversely affect Liberty's financial results when it is undisputed that revenue and operating income both increased significantly following the offering.

## II. Dismissal should be with prejudice.

Plaintiff has already amended once and declined to amend again to address (i) the deficiencies Defendants raised when the parties conferred pursuant to the Court's pre-motion letter process, or (ii) the deficiencies identified in Defendants' Motion. Plaintiff also has not moved for leave to amend further. In these circumstances, dismissal should be with prejudice. *MHC Mut. Conversion Fund, L.P.*, 761 F.3d at 1122-23.

---

[11] Plaintiff tries to dismiss Liberty's revenue results by pointing to net income, but the text of Item 303 focuses on disclosure of known trends regarding "net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "[O]perating income is a meaningful metric because it provides insight on profitability and true operating performance based on the historical cost basis of our assets." Ex. A (Prospectus) at 64. By contrast, net income can be skewed for any given period based on "non-recurring expenses." *Id.*

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: December 16, 2020                          Respectfully submitted,

*/s/ Lee F. Johnston*                              */s/ William Leone*
Lee F. Johnston, No. 27897                         William Leone, No. 11403
HAYNES AND BOONE, LLP                              NORTON ROSE FULBRIGHT US LLP
1050 17th Street, Suite 1800                       1225 17th Street, Suite 3050
Denver, Colorado 80265                             Denver, Colorado 80202
Phone: 303.382.6200                                Phone: 303.801.2750
Fax: 303.382.6210                                  Fax: 303.801.2777
lee.johnston@haynesboone.com                       william.leone@nortonrosefulbright.com

R. Thaddeus Behrens                                Brian S. Weinstein
Daniel H. Gold                                     Alexander Bystryn
Matthew A. McGee                                   DAVIS POLK & WARDWELL LLP
Benjamin G. Goodman                                450 Lexington Avenue
HAYNES AND BOONE, LLP                              New York, New York 10017
2323 Victory Avenue, Suite 700                     Phone: 212.450.4972
Dallas, Texas 75219                                Fax: 212.701.5972
Phone: 214.651.5000                                brian.weinstein@davispolk.com
Fax: 214.651.5940                                  alexander.bystryn@davispolk.com
thad.behrens@haynesboone.com
daniel.gold@haynesboone.com                        *Attorneys for the Underwriter Defendants*
matt.mcgee@haynesboone.com
benjamin.goodman@haynesboone.com

*Attorneys for Liberty, the Individual*
*Defendants, and the Riverstone Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 16, 2020, a copy of the foregoing document was filed and

served via the CM/ECF system on all parties of record.

                                        */s/ Lee F. Johnston*
                                        Lee F. Johnston

                                        *Attorney for Liberty, the Individual Defendants, and*
                                        *the Riverstone Defendants*