IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00946-RBJ

CIPRIANO CORREA, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

LIBERTY OILFIELD SERVICES, INC.,
CHRISTOPHER A. WRIGHT,
MICHAEL STOCK,
CARY D. STEINBECK,
WILLIAM F. KIMBLE,
PETER A. DEA,
N. JOHN LANCASTER, JR.,
BRETT STAFFIERI,
KEN BABCOCK,
JESAL SHAH,
MORGAN STANLEY & CO. LLC,
GOLDMAN SACHS & CO. LLC,
WELLS FARGO SECURITIES, LLC,
CITIGROUP GLOBAL MARKETS INC.,
J.P. MORGAN SECURITIES LLC,
EVERCORE GROUP L.L.C.,
PIPER SANDLER & CO.,
TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC,
HOULIHAN LOKEY CAPITAL, INC.,
INTREPID PARTNERS, LLC,
PETRIE PARTNERS SECURITIES, LLC,
SUNTRUST ROBINSON HUMPHREY, INC.,
R/C ENERGY IV DIRECT PARTNERSHIP, L.P., and
R/C IV LIBERTY HOLDINGS, L.P.,

    Defendants.

---

## ORDER ON DEFENDANTS' MOTION TO DISMISS

---

This is a securities class action against fracking services company Liberty Oilfield Services, Inc. ("Liberty Oilfield"), its officers and directors, and its underwriters based on a registration statement with allegedly false or misleading statements. Plaintiff Cipriano Correa brings claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. Before the Court is defendants' motion to dismiss. ECF No. 64. For the reasons below, the motion is GRANTED as to plaintiff's Section 12(a)(2) claim and DENIED as to his Section 11 and Section 15 claims.

## I. FACTUAL BACKGROUND

I draw the following facts from plaintiff's amended complaint and assume them to be true for purposes of this motion. The complaint also references a Houston Chronicle article, as well as three documents that defendants attach to their motion to dismiss: Liberty Oilfield's January 11, 2018 prospectus (which encompasses the registration statement at issue here), ECF No. 64-2; a July 28, 2017 registration statement filed by BJ Services, Inc. with the Securities and Exchange Commission ("SEC"), ECF No. 64-3; and a January 9, 2018 registration statement filed by Nine Energy Service, Inc. with the SEC, ECF No. 64-4. Defendants in their motion also cite to Form 8-K documents filed by Liberty Oilfield with the SEC, ECF Nos. 64-5, 64-6, 64-7, and 64-8; and Liberty Oilfield stock price data from Yahoo Finance, ECF No. 64-9. I may consider the news article and registration statements for Liberty Oilfield, BJ Services, and Nine Energy because they are referenced in the complaint, and neither party disputes their authenticity. *Cty. of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002). I may also consider the Liberty Oilfield 8-K forms because they are official documents filed with the SEC. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013). I do not consider the Yahoo Finance stock price data.

## A.  The parties

Liberty Oilfield is a holding company that provides hydraulic fracking services to oil and gas exploration and production companies in North America.  ECF No. 52 at ¶16.  Liberty Oilfield operates primarily in basins in Texas, Colorado, Wyoming, and North Dakota, which are among the most active fracking basins in the country.  *Id.* at ¶63.

Defendants Morgan Stanley & Co, LLC; Goldman Sachs & Co. LLC; Wells Fargo Securities, LLC; Citigroup Global Markets Inc.; J.P. Morgan Securities LLC; Evercore Group LLC; Piper Sandler & Co.; Tudor, Pickering, Holt & Co. Securities, LLC; Houlihan Lokey Capital, Inc.; Intrepid Partners, LLC; Petrie Partners Securities, LLC; and Suntrust Robinson Humphrey, Inc. all acted as underwriters of Liberty Oilfield's IPO.  *Id.* at ¶¶28–39.  They are referred to as the "underwriter defendants."  *Id.* at ¶40.

Riverstone Holdings LLC ("Riverstone") is a private equity firm that controls R/C Energy IV Direct Partnership, L.P. and R/C IV Liberty Holdings, L.P. (collectively "the Riverstone defendants").  Immediately before Liberty Oilfield's IPO the Riverstone defendants had a 49.7% ownership interest in Liberty Oilfield.  Immediately after the IPO they owned 29.5% of its Class A common stock and 65.1% of its Class B common stock, and they held 44.4% of its aggregate voting power.  *Id.* at ¶¶41–43.

Individual defendants Christopher Wright, Liberty Oilfield's CEO, and Michael Stock, its CFO, both signed the company's registration statement.  *Id.* at ¶¶17–18.  Cary Steinbeck, William Kimble, Peter Dea, John Lancaster, Jr., Brett Staffieri, Ken Babcock, and Jesal Shah have been directors at Liberty Oilfield since January 2018.  *Id.* at ¶¶19–22.  Lancaster, Staffieri, Babcok, and Shah are also partners at Riverstone.  Riverstone nominated each of them to Liberty

Oilfield's board. *Id.*

Plaintiff Cipriano Correa purchased Liberty Oilfield common stock pursuant and traceable to the Liberty Oilfield registration statement during the purported class period. He represents himself and all other similarly situated to him. *Id.* at ¶15; *see also* ECF No. 43-2.

### B.  The fracking industry and Liberty Oilfield's IPO

Fracking involves the high-pressure injection of sand, water, and chemicals into shale rocks to extract oil and natural gas. The amount of fracking capacity is measured by the number of active fleets (consisting of all the equipment necessary to conduct fracking) and the amount of pumping horsepower that the fleets generate. *Id.* at ¶¶46–48. The American fracking industry experienced a downturn from 2014 into 2017. It then began to see a major revival starting in mid-2017 and continuing into 2018. To capitalize on rising demand, existing fracking companies built new fleets and reactivated idle ones. New fracking companies also emerged. *Id.* at ¶¶49–53. Two companies involved in the industry, BJ Services and Nine Energy Services, issued registration statements in July 2017 and January 2018 respectively in relation to their own IPOs. Both disclosed the rapid increase of fracking capacity supply in the industry, and both indicated that this rapid increase was lowering prices for fracking services. *Id.* at ¶¶54–56.

In mid-2017 the fracking industry's oversupply began to impact Liberty Oilfield. Two of the company's employees in Texas reported as much. One said that "we had to tighten up pricing quite a bit just to keep our work going, because there was a lot of competition out there." He indicated that he was hearing about excess fracking supply from high-level officials at Liberty Oilfield by late 2017, and that the company was giving discounts and lowering prices as a result. *Id.* at ¶¶58–59. Another employee reported that in late 2017 "everybody was pretty

much undercutting themselves [to get work]" due to the oversupply of fracking services in Texas. He also said that around August or September 2017 Liberty Oilfield asked its vendors and suppliers to cut their prices because it anticipated excess supply would continue pushing down prices through 2018. *Id.* at ¶¶60–62.

Liberty Oilfield's final registration statement filed with the SEC was declared effective on January 11, 2018. Liberty Oilfield common stock began trading on the New York Stock Exchange on January 12, 2018. It filed its final prospectus for the IPO, which encompasses the registration statement, on January 16, 2018. The company's IPO closed on January 17, 2018. *Id.* at ¶64. Liberty Oilfield sold about 14.3 million shares of its common stock at $17.00 per share. It made net proceeds of around $220 million. *Id.* at ¶65. However, the stock price eventually fell to $2.48 per share by April 3, 2020, the date of this lawsuit. Supply continued to outstrip demand in the fracking industry after the IPO. *Id.* at ¶78.

**C. The registration statement and allegedly false or misleading statements**

Liberty Oilfield's registration statement and its purportedly false or misleading statements or omissions are the core of this case. The statement is over sixty pages long, so I include only the parts relevant to my analysis here. The company made various declarations about the fracking industry and its own operations in the January 11, 2018 document. For example, in the "Summary" section it states

> We are a rapidly growing independent provider of hydraulic fracturing services to onshore oil and natural gas exploration and production ("E&P") companies in North America. We have grown organically from one active hydraulic fracturing fleet (40,000 HHP [hydraulic horsepower]) in December 2011 to 19 active standard fleets (760,000 HHP) in December 2017. The demand for our hydraulic fracturing services exceeds our current capacity, and we expect, based on discussions with customers, to deploy three additional standard fleets (120,000 HHP), as well as upgrade four existing standard fleets to high pressure fleets (40,000 HHP), by the end of the second quarter of 2018, for a total

of 22 active fleets . . .

ECF No. 64-2 at 6.

In a section called "Industry Trends and Market Recovery" the registration statement

goes on to say,

> While our industry experienced a significant downturn from late 2014 through the first half of 2016, we significantly increased our capacity while maintaining full utilization. We performed approximately 50% more hydraulic fracturing stages in 2015 than in 2014 and approximately 20% more hydraulic fracturing stages in 2016 than in 2015. This trend has continued into 2017. During the downturn, total U.S. marketable fracturing capacity declined between 40% and 60%. In contrast, over 95% of our capacity was active and deployed during this period. We believe our utilization reflects the strong partnerships we have built with our customers and we believe these partnerships will continue to support the demand for our services as we deploy two new fleets and one previously acquired fleet that we are currently upgrading to our specifications by the second quarter of 2018.
> . . .
> Overall demand and pricing for hydraulic fracturing services in North America has [sic] declined from their highs in late 2014 as a result of the downturn in hydrocarbon prices and the corresponding decline in E&P activity. While the pricing for our hydraulic fracturing services declined substantially, negatively affecting our revenue per average active HHP, and has not returned to its 2014 highs, the industry witnessed an increase in demand for these services beginning in the third quarter of 2016 and continuing into 2017 as hydrocarbon prices have recovered somewhat, and we are currently experiencing price increases and increases in our revenue per average active HHP. We expect this demand to continue to increase as E&P companies increase drilling and completion activities. According to Baker Hughes Incorporated's ("Baker Hughes") North American Rig Count, the number of active total rigs in the United States reached a low of 404, as reported on May 27, 2016, but has since increased by more than 130% to 931 active rigs as reported on December 8, 2017. If hydrocarbon prices stabilize at current levels or rise further, we expect to see further increased drilling and completion activity in the basins in which we operate. Should hydrocarbon prices decrease, our pricing and revenue per average active HHP may decrease due to lower demand for our services, negatively affecting our liquidity and financial condition.

*Id.* at 7–8.

Plaintiff alleges that the registration statement is false or misleading because it fails to

disclose the rapid increase in fracking capacity, and the oversupply of fracking capacity relative

to demand, occurring at the time of the IPO.  ECF No. 52 at ¶¶66, 68.  He also alleges that it

failed to disclose the impact that oversupply was having on pricing for both Liberty Oilfield and

the industry overall.  *Id.*  The registration statement instead described industry contraction:

> We believe industry contraction and the resulting reduction in total U.S. marketable
> fracturing capacity since late 2014 will benefit us as industry demand increases.  Industry
> sources report this capacity has declined between 40% and 60% from its peak of
> approximately 17 million HHP in 2014 and approximately 75% of this capacity is
> currently active and deployed.  A number of our competitors have filed for bankruptcy or
> have otherwise undergone substantial debt restructuring, significantly reducing available
> capital and their ability to quickly redeploy fleets.  In contrast, our rigorous preventive
> maintenance program, in addition to scheduled and in-process fleet additions and
> upgrades, has positioned us well to benefit from improving market dynamics.  During the
> recent downturn, many oilfield service companies significantly reduced their employee
> headcounts, which will constrain their ability to quickly reactivate fleets.  Over the same
> period, we retained our high quality and experienced employees, did not conduct lay offs
> and substantially increased our workforce.

ECF No. 64-2 at 8.

That same paragraph is repeated nearly verbatim in a later section of the registration

statement called "Tightening of Supply in the Hydraulic Fracturing Services Market."  *Id.* at 59.

A subsequent paragraph in that section on market tightening states, "[b]ecause demand for new

equipment exceeds active supply, we believe that pricing power has begun to return to the

broader oilfield services sector as well as the hydraulic fracturing industry.  We are currently

experiencing price increases, and believe that this trend will continue."  *Id.*  Plaintiff alleges that

this last statement was false because "supply exceeded demand in late 2017 and early 2018," as

evinced by registration statements issued by Nine Energy and BJ Services and a Houston

Chronicle article.  ECF No. 52 at ¶¶50–52, 69–70.  The statement about Liberty Oilfield

"experiencing price increases" was also purportedly false because Liberty Oilfield was actually

lowering prices at the time.  *Id.* at 70.

Plaintiff also takes issue with the risk language included in the registration statement. He alleges that Liberty Oilfield "merely provided boilerplate risk statements about potential contingent future problems that may occur," instead of disclosing the oversupply of fracking capacity and its negative impact on pricing. *Id.* at ¶¶75–76.

## II. PROCEDURAL BACKGROUND

This case was filed on April 3, 2020. ECF No. 1. The Court approved Cipriano Correa as lead plaintiff in the matter in August 2020. ECF Nos. 41, 42, 48. Plaintiff Correa filed the operative complaint later that month. ECF 52. On October 8, 2020 defendants moved to dismiss the action on 12(b)(6) grounds. ECF No. 64. The matter is ripe for review.

## III. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pled allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), conclusory allegations are not entitled to be presumed true. *Iqbal*, 556 U.S. at 681. However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

If the parties rely on materials found outside the four corners of the complaint, the court

has the discretion to convert a motion to dismiss to one for summary judgment. If it does so the court must inform the parties and permit them to meet all factual allegations with countervailing evidence. *See* Fed. R. Civ. P. 12(d); *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 713 (10th Cir. 2005). The court may consider evidence beyond the complaint without converting a motion to dismiss to one for summary judgment if the documents are central to the claims, referred to in the complaint, and if the parties do not dispute their authenticity. *See City of Santa Fe*, 311 F.3d at 1035. In addition, the Tenth Circuit has advised that courts may consider certain other documents beyond the complaint in securities cases such as this one:

> In a securities case, we may consider, in addition to the complaint, documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit. When there are allegations that certain disclosures were not made in publicly available documents, we may look to those documents to see whether such disclosures were in fact made. And if those documents conflict with allegations in the complaint, we need not accept those allegations as true.

*Slater*, 719 F.3d at 1196 (internal citations omitted).

## IV. ANALYSIS

Plaintiff alleged three claims in his amended complaint: (1) violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants minus the Riverstone defendants; (2) violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against the underwriter defendants; and (3) violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, against the individual defendants and the Riverstone defendants. ECF No. 52 at ¶¶98–117. Plaintiff does not contest dismissal of the Section 12(a)(2) claim due to lack of standing. ECF No. 71 at 1 n.1. That claim is dismissed without prejudice. I address only the Section 11 and Section 15 claims.

### A. **Section 11 claim**

Section 11 "imposes strict liability for material misstatements or omissions in a stock

offering's registration statement or prospectus." *Slater*, 719 F.3d at 1196 (citing *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997)). "Plaintiffs pleading a § 11 claim must identify (1) a misrepresentation or an omission, that is (2) material." *Id.* (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)). Liability attaches to "every person who signed the registration statement" and to "every underwriter." 15 U.S.C. § 77k(a)(1), (a)(5).

Because Section 11 is a strict liability provision, a plaintiff's burden for a prima facie showing is low. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "Plaintiffs 'need not allege scienter, reliance, or loss causation'" for Section 11 claims. *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1233 (10th Cir. 2014), *as amended nunc pro tunc* (Nov. 12, 2014) (quoting *Morgan Stanley*, 592 F.3d at 359).

As the statute's text indicates, a party may be liable under Section 11 for both affirmative statements and omissions. "Liability for violating § 11 of the Securities Act arises when a registration statement is shown either to have (1) contained an untrue statement of material fact, (2) omitted a material fact required to be disclosed, or (3) omitted a material fact necessary to make other statements not misleading." *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1156 (D. Colo. 2012). An omission without a duty to disclose is not a basis for liability, however. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1125 (10th Cir.1997). "[A] duty to disclose arises only where both the statement made is material, and the omitted fact

is material to the statement in that it alters the meaning of the statement." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (citation omitted).

"The meaning of materiality in a § 11 Securities Act claim is identical to that in a § 10-b Exchange Act claim for securities fraud." *Slater*, 719 F.3d at 1197. A statement is material only if "a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119. Materiality also depends on the information that already exists in the market: "[U]nless the statement significantly altered the total mix of information available, it will not be considered material." *Id.* (citation and internal quotation marks omitted). Materiality is a mixed question of law and fact that is typically reserved for the trier of fact. Nonetheless, courts do "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial." *McDonald*, 287 F.3d at 997 (quoting *Grossman*, 120 F.3d at 1118).

The statements and omissions that form the basis of plaintiff's Section 11 claim are: (1) that the registration statement falsely claimed demand exceeded supply; (2) that it falsely claimed Liberty Oilfield was experiencing price increases; and (3) that it omitted to disclose that there was an oversupply in fracking capacity at the time of the IPO, and that the oversupply was leading to a negative impact on prices. I analyze each separately.

1. The statement on demand exceeding supply

The first statement plaintiff takes issue with is the following: "[b]ecause demand for new equipment exceeds active supply, we believe that pricing power has begun to return to the broader oilfield services sector as well as the hydraulic fracturing industry." ECF No. 64-2 at 59. According to plaintiff this statement is false or misleading because there was an oversupply of

capacity at the time, and so demand did not exceed supply.  But as defendants point out, plaintiff has essentially rewritten the statement to be about supply and demand in the industry generally, instead of supply and demand for *equipment*.  ECF No. 64 at 9; *see also* ECF No. 52 at ¶69.

Plaintiff does not allege sufficient other facts to indicate that this statement is false or misleading.  Plaintiff's allegations about oversupply in the industry relate to the demand and supply for fracking services more broadly, not about oversupply of new equipment.  Though it may seem like semantics, especially since fracking capacity overall could be closely linked to equipment, this distinction is important.  Given the low bar for establishing a prima facie case of Section 11 liability, I must read Liberty Oilfield's registration statement as it is written, not adopt an improperly broad rewriting suggested by plaintiff.  Defendants rightly point to other information in its own registration statement and the BJ Services registration statement suggesting that this statement about supply and demand of equipment was truthful.  *See* ECF Nos. 64-2 at 60–61 (discussing the company's "newbuild" fleets); 64-3 at 43 ("Based on demand for new equipment exceeding active supply . . . .").  Plaintiff has thus not met his burden of alleging that this specific statement is false or misleading.

### 2.  The statement on Liberty Oilfield experiencing price increases

Plaintiff next points to Liberty Oilfield's statement in its prospectus that "[w]e are currently experiencing price increases . . . ."  ECF No. 64-2 at 59.  Plaintiff claims that this statement is false because at the time of the IPO, Liberty Oilfield's prices were actually decreasing.  The complaint alleges that former employees confirmed the company was lowering prices, giving discounts, and asking its suppliers to lower prices.  ECF No. 52 at ¶¶58–62.  Here plaintiff has alleged enough to surpass the 12(b)(6) standard for a Section 11 claim.  Plaintiff

points to an unequivocal statement that the company's prices were increasing, while also alleging specific facts that indicate its prices were doing the opposite.

Defendants argue that plaintiff does not plead "any facts" regarding its pricing, such as Liberty's average price at the time of the IPO or how that compared with average prices for prior periods. ECF No. 64 at 16. First, plaintiff does plead facts regarding its pricing, namely that former employees and company officials knew of the alleged oversupply and knew that Liberty Oilfield was lowering prices as a result. Second, there is no requirement for plaintiff to plead the specific types of facts that defendants argue are missing. That type of evidence is more properly sought from Liberty Oilfield itself in discovery, at a later stage of litigation. Plaintiff is not required to have that information at hand when addressing a motion to dismiss. Liberty Oilfield may ultimately come forward with documents or testimony proving that its prices were actually increasing, as the registration statement says, and plaintiff's claim may ultimately fail. But such disputes are to be resolved on summary judgment or at trial, not now.

Defendants also attempt to undercut plaintiff's reliance on former employee statements by arguing that the Court cannot reasonably infer they would know about "company-wide market conditions." ECF No. 64 at 17. I disagree. On a motion to dismiss I am obligated to draw all reasonable inferences in plaintiff's favor, and it is reasonable for me to infer that trends about which employees on the ground were hearing were company-wide, particularly since some of them were coming from high-level Liberty Oilfield officials. Defendants also contend these employees were based only in Texas, which undermines their credibility on company and industry trends. I come to the opposite conclusion. Seven of Liberty Oilfield's nineteen fleets were based in Texas during this period, which demonstrates that Texas was one of the largest

fleet bases for the company, representing much of its capacity and sales. Thus, employees' sense on the ground there could very well be representative of broader trends. *Id.* I conclude plaintiff has sufficiently pled that the statement regarding Liberty Oilfield's increasing prices at the time of the IPO was false or misleading.

3. The omission about the oversupply of fracking capacity and its impact on pricing

The bulk of plaintiff's Section 11 claim centers around what the Liberty Oilfield registration statement does *not* say—namely, that it failed to disclose the oversupply in fracking capacity when the IPO was issued, and that this oversupply was depressing prices and would continue to do so until demand increased to absorb the excess supply. ECF No. 52 at ¶66. According to plaintiff, instead of disclosing the reality of expanding supply in the industry, the registration statement "touted Liberty Oilfield's in a supposedly-contracting industry." *Id.* at ¶67. Indeed, the registration statement mentions "industry contraction" and "the resulting reduction in total U.S. marketable fracturing capacity since 2014." ECF No. 64-2 at 8. It also includes an entire section called "Tightening of Supply in the Hydraulic Fracturing Services Market," and it mentions that "[i]ndustry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014." *Id.* at 59.

Plaintiff has sufficiently pled that the omission of the industry's oversupply and its effect on prices was false or misleading. Having read the relevant parts of the registration statement altogether and in context, I find that no reasonable investor could conclude anything other than that the fracking industry was contracting, with supply decreasing. In contrast to what the registration statement states, plaintiff alleges that the fracking industry was experiencing an

expansion of supply, instead of contraction. He points to numerous sources such as a news article and registration statements from two other companies to support his allegations. *See* ECF Nos. 54 at ¶¶50–56; 54-1; 64-3 at 28 [BJ Services Registration Statement] ("[A]ctivity must increase significantly before excess service capacity can be substantially absorbed and a pricing recovery takes place."); 64-4 at 25–26 [Nine Energy Registration Statement] ("Significant increases in overall market capacity have also caused active price competition and led to lower pricing and utilization levels for our services and products. The competitive environment has intensified since the recent industry downturn that began in late 2014, which caused an oversupply of, and reduced demand for, oilfield services . . . ."). Plaintiff also alleges that this oversupply was leading to a decrease in prices across the industry, based on these same sources as well as the price depression he alleges Liberty Oilfield itself was experiencing.

These omissions are actionable in part because Liberty Oilfield had a duty to disclose these facts under Item 303 of Form S-K. "Failure to comply with an SEC regulation in the documents accompanying a stock offering can also trigger liability under § 11 of the Securities Act." *Slater*, 719 F.3d at 1197 (citing 15 U.S.C. § 77k). Item 303 of Regulation S-K is one such trigger of § 11 liability. Item 303 requires disclosure in offering documents of, among other things, "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(b)(1)(i).[1] It also requires disclosure of any "known trends or uncertainties that have had or that are reasonably likely to have a material

---

[1] This citation is to the current version of the statute. At the time of Liberty Oilfield's IPO, this identical language was found at 17 C.F.R. § 229.303(a)(1).

favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* § 229.303(b)(3)(ii).[2] "In interpreting the scope of Item 303, courts have relied on guidance from the SEC, which explains that a duty to disclose arises 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Slater*, 719 F.3d at 1197 (quoting *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835 (May 18, 1989)).

Plaintiff has alleged that this oversupply trend was known to management. His complaint indicates that at least one former employee stated he was told about the oversupply by Allen Penman, Liberty Oilfield's Cibolo District Manager, and Jim Brady, its Vice President of Operations. ECF No. 52 at ¶58. The trend was also likely to have material effects on the company's financial condition. As plaintiff has alleged, the oversupply led to price decreases, which in turn could lead to decreased revenue, company value, and stock value. The registration statement itself demonstrates the importance of disclosing this trend pursuant to Item 303 when it says, "[w]e face intense competition that may cause us to lose market share and could negatively affect our ability to market our services and expand our operations." ECF No. 64-2 at 18.

Similarly, these omissions are also actionable under Section 11 because they are material. A reasonable investor deciding whether to participate in Liberty Oilfield's IPO would consider it important that the fracking industry was experiencing an oversupply, because such an oversupply could depress the value of her potential stock purchases over time. The materiality of the oversupply's impact on prices is likewise obvious. Even if defendants could plausibly raise a

---

[2] Formerly at 17 C.F.R. § 229.303(a)(3)(ii).

dispute that these trends were not material, this Court could not resolve such a dispute at the motion to dismiss stage. The omissions are not "so obviously immaterial that no reasonable investor would consider them important," as required for dismissal *Oppenheimer*, 838 F. Supp. 2d at 1161 (internal quotation marks omitted); *see also Grossman*, 120 F.3d at 1118.

In their motion defendants advance two arguments to support their position that these omissions are not actionable under Section 11. The first is that the statements allegedly rendered false or misleading by the omissions are mere opinions and predictions. The second is that they are statements about the future protected by the "bespeaks caution" doctrine. ECF No. 64 at 18–19. Neither argument holds water.

Defendants first contend that Liberty Oilfield stated a belief that it would benefit from industry contraction and future pricing improvements. They write that Liberty Oilfield divulged the bases for its opinions, and that the complaint contains no well-pled allegations about the company's inquiry or knowledge about the bases for its opinions. The problem is that defendants emphasize the wrong part of the registration statement for their argument. True, the registration statement contains an opinion when it says, "*[w]e believe* industry contraction and the resulting reduction in total U.S. marketable fracturing capacity . . . *will benefit us* as industry demand increases." ECF No. 64-2 at 8 (emphasis added). If plaintiff were contesting whether Liberty Oilfield was correct in predicting that it would benefit from these supposed trends, that would not be actionable. But he does not. He instead disputes the veracity of the underlying trends of industry contraction and capacity reduction on which the prediction relies.

In *Omnicare* the U.S. Supreme Court addressed the distinction between statements of fact and statements of opinion in the context of Section 11 liability. It noted that while generally

Section 11 imposed liability only for untrue statements of fact, there are two circumstances in which liability for opinion statements may lie. The first occurs when the statement-holder's perspective on her own belief is untrue (i.e., when she says, "I believe X" when in fact she does not believe X). *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184–85 (2015). The second, relevant here, occurs when statements of belief "contain embedded statements of fact" that "may be read to affirm not only the speaker's state of mind . . . but also an underlying fact." *Id.* at 185. "Accordingly, liability under § 11's false-statement provision would follow . . . not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue." *Id.* at 185–86. Here plaintiff alleges that the supporting facts in Liberty Oilfield's statement of belief are untrue. They are thus statements of fact, not opinions, even though they are embedded in a predictive opinion. Defendants' attempt to recharacterize them as opinions themselves is unavailing.

Defendants' argument that the industry trend statements are forward-looking statements protected by the "bespeaks caution" doctrine fails for similar reasons. "[T]he 'bespeaks caution' doctrine stands for the 'unremarkable proposition that statements must be analyzed in context' when determining whether or not they are materially misleading." *Grossman*, 120 F.3d at 1120 (quoting *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994), *abrogation on other grounds recognized by Heinze v. Tesco Corp.*, 971 F.3d 475 (5th Cir. 2020)). Forward-looking statements are not considered material where "documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue." *Id.* at 1119. Defendants claim that because the registration statement contained cautionary language about volatility of supply and demand, and that its expectations regarding supply, demand, and pricing

may not come true, any forward-looking statements are unactionable. ECF No. 64 at 19. I disagree. The bespeaks caution doctrine applies only to affirmative, forward-looking statements, not to misleading statements concerning "present factual conditions." *Grossman*, 120 F.3d at 1123. Here, the statements that plaintiff points to as false or misleading as a result of the material omissions are about the present, not the future. Liberty Oilfield did not write that the industry was *going* to contract, or that a reduction in U.S. marketable fracking capacity *would occur* going forward. Its statements can only accurately be read as describing industry contraction or "tightening" that had been occurring since 2014 and was ongoing. Nor is defendants' attempt to argue that they *did* inform investors about excess fracking supply convincing. Defendants point to Liberty Oilfield's statement that "75% of capacity is currently active," arguing this communicated that 25% of capacity was not active and thus in excess. No reasonable investor would have read it this way in the context of its entire paragraph. *See* ECF No. 64-2 at 8 (quoted in Section I.C above). The registration statement instead communicated that presently the industry was contracting, and fracking capacity was decreasing.

Even if plaintiff were disputing the veracity of forward-looking statements, the risk factors outlined in the registration statement would not be sufficient under the bespeaks caution doctrine. All of the cautionary statements to which defendants point are vague and qualified. The prospectus says that "volatility of oil and natural gas prices may" affect demand; that its operations are "subject to inherent risk . . . beyond [its] control;" and that it "may" lose market share based on intense competition, among other warnings. ECF No. 64-2 at 18. None of the statements in the risk section of the prospectus comes close to explicitly stating what plaintiff alleges here—that fracking capacity was expanding, not contracting, and that it had already, in

fact (not hypothetically) impacted Liberty Oilfield's operations and prices. The cautionary statements do not insulate the registration statement overall from being false or misleading.

As a final point, defendants argue that Liberty Oilfield's revenues and stock prices performed well for over a year after the IPO, and that these numbers are inexplicable if plaintiff's claims about an unfavorable market were true. ECF Nos. 64 at 3; 75 at 8. This amounts to an attempt by defendants to transform their motion to dismiss into one for summary judgment by selectively bringing in new facts. The Court cannot entertain such an argument until after discovery is complete. Furthermore, even if true this claim is irrelevant to whether plaintiff has established a prima facie case of Section 11 liability, which imposes strict liability for false or misleading statements. If Liberty Oilfield's consistent stock price following the IPO goes to anything, it goes to damages.

"Congress adopted § 11 to ensure that issuers 'tell[ ] the whole truth' to investors. For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192 (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., 2 (1933)). Plaintiff alleges that Liberty Oilfield has done exactly that—mislead investors by omitting essential information from the prospectus. Analyzing the various statements in the registration statement in context, as the law requires, I conclude that the omissions on industry oversupply and its impact on pricing are actionable under Section 11. Plaintiff has thus stated a claim under 15 U.S.C. § 77k. Defendants' motion to dismiss is DENIED as to the Section 11 claim.

**B.  Section 15 claim**

Plaintiff also brings a claim pursuant to Section 15 of the Securities Act of 1933 (15

U.S.C. § 77o).  Under that section, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator."  *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304–05 (10th Cir. 1998).  The Tenth Circuit has held that to state a prima facie case of "control person" liability, a plaintiff must establish (1) a primary violation of a securities law, and (2) "control" over the primary violator by the alleged controlling person.  *Id.*

In this case plaintiff has pled both elements sufficiently.  As discussed above, plaintiff has sufficiently pled a primary violation of the securities laws under Section 11.  And he has also pled that the individual defendants and the Riverstone defendants exercised "control" over the primary violator, Liberty Oilfield.  *See* ECF No. 52 at ¶¶114–117.  He alleges that each of them was a director, senior officer, or major shareholder of Liberty Oilfield.  He also alleges that they each signed or authorized the signing of the registration statement, consented to being named in it as a Director Nominee, or otherwise participated in facilitating the IPO process.  *Id.*  Nowhere in their motion do defendants contest these allegations.  I conclude that plaintiff has sufficiently pled a violation of Section 15.  The motion to dismiss is DENIED as to this claim.

## ORDER

1. Defendants' motion to dismiss is DENIED with respect to the Section 11 and 15 claims.

2. Defendants' motion to dismiss is GRANTED with respect to the Section 12(a)(2) claims against the underwriter defendants.  The Court dismisses that claim without prejudice, and all the underwriter defendants are dismissed from the case.


DATED this 12th day of July, 2021.

BY THE COURT:

R. Brooke Jackson
United States District Judge