# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Case No. 1:20-cv-00946-RBJ

CIPRIANO CORREA, Individually and on Behalf of All Others Similarly Situated,

　　Plaintiff,

v.

LIBERTY OILFIELD SERVICES INC., et al.,

　　Defendants.

---

## UNDERWRITER DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

---

Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Wells Fargo Securities, LLC, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Evercore Group L.L.C., Piper Sandler & Co., Tudor, Pickering, Holt & Co. Securities, LLC, Houlihan Lokey Capital, Inc., Intrepid Partners, LLC, Petrie Partners Securities, LLC, and SunTrust Robinson Humphrey, Inc. (n/k/a Truist Securities, Inc.) ("Underwriter Defendants"), by and through their undersigned counsel, hereby file the Underwriter Defendants' Answer to Plaintiff's Amended Class Action Complaint ("Complaint"), filed August 31, 2020 (Dkt. No. 52) (the "Complaint"), filed by Lead Plaintiff Cipriano Correa ("Plaintiff") in the above-captioned action (the "Action").

This Answer is based on the Underwriter Defendants' investigation to date, and they reserve the right to amend this Answer as their investigation continues and during the course of litigation. This Answer restates the allegations in the Complaint (including its footnotes) solely for the convenience of the Court and the parties. Unless specifically stated otherwise, the Underwriter Defendants' answer to any footnote from a paragraph

within the Complaint is included within the answer to the paragraph that contained the

footnote.  Any allegation not expressly admitted is denied.  Further, the headings and

prefatory material in the Complaint are not substantive allegations to which an answer is

required; to the extent that these items are intended as substantive allegations, the

Underwriter Defendants deny them.

## ANSWER

For their Answer, Underwriter Defendants state as follows:

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the common stock of Liberty Oilfield in the Company's Initial Public Offering ("IPO"), which closed on January 17, 2018, or purchased Liberty Oilfield common stock thereafter in the stock market pursuant and/or traceable to the Company's registration statement and prospectus (together, the "Registration Statement") issued in connection with the IPO during the period from January 12, 2018 to April 3, 2020 (the "Class Period"). [1] This Complaint seeks to recover damages to Class members caused by Defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act").

**ANSWER:** Paragraph 1 purports to state a legal conclusion to which no response

is required.  To the extent a response is required, Underwriter Defendants deny

Paragraph 1, except admit that Liberty Oilfield's IPO closed on January 17, 2018, that

Liberty Oilfield filed a registration statement and prospectus in connection with the IPO,

and that Plaintiff purports to bring claims pursuant to Sections 11, 12, and 15 of the

Securities Act of 1933.

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Liberty Oilfield; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

2.    Liberty Oilfield provides hydraulic fracturing ("fracking") services to oil and gas exploration and production ("E&P") companies in North America. Fracking is a controversial technology involving the high-pressure pumping of sand, water, and chemicals into shale rocks to extract natural gas and oil.

**ANSWER:** Deny Paragraph 2, except admit that Liberty Oilfield provides fracking services to oil and gas exploration and production companies in North America.

3.    Liberty Oilfield sold approximately 14.3 million shares of its common stock at $17 per share in the IPO, and received approximately $220 million in net proceeds. The Underwriter Defendants (defined below) earned approximately $12 million in commissions from the IPO.

**ANSWER:** Deny Paragraph 3, except admit that Liberty offered approximately 14.3 million shares in connection with its IPO at a price of $17 per share and received approximately $220.4 million in net proceeds.

4.    In the Registration Statement, Liberty Oilfield painted a rosy but misleading picture of the state of the fracking industry at the time of the IPO. The Registration Statement said that fracking capacity (*i.e.* supply) had declined significantly since 2014, and that demand for fracking services exceeded supply, a trend that is expected to continue. Additionally, the Registration Statement stated that many of Liberty Oilfield's competitors had gone bankrupt and their fracking fleets were sitting idle – meaning competition in the fracking industry had decreased. Any reasonable investor reading these statements in the Registration Statement would think that it was an opportune time to invest in Liberty Oilfield.

**ANSWER:** Paragraph 4 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 4, except admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

5.    The Registration Statement failed to disclose that, in truth, since mid-2017 there had been a rapid build-up in fracking capacity that was leading to oversupply and depressing the prices that fracking companies, including Liberty Oilfield, could charge for their services. The Registration Statement also failed to warn that the continued increase in fracking capacity would further drive down prices until there was a sufficient increase in demand to absorb the glut of fracking capacity.

**ANSWER:** Deny Paragraph 5.

6. Former Liberty Oilfield employees told Plaintiff's investigator that starting from mid-to-late 2017: (a) there was a precipitous increase in fracking supply as new companies emerged and existing companies started to reactivate previously idle fracking fleets in large number, (b) as a result, Liberty Oilfield had to cut prices and give discounts because of the increasing supply in the fracking industry, and (c) Liberty Oilfield began asking vendors to lower prices in order for Liberty Oilfield to stay competitive.

**ANSWER:** Deny Paragraph 6, including on the basis that Paragraph 6 is based on

unidentified confidential witnesses without any foundation.

7. Indeed, in contrast to Liberty Oilfield's misleading Registration Statement, two other fracking companies that filed registration statements at approximately the same time as Liberty Oilfield both disclosed that there was a significant increase in fracking capacity, and that the oversupply was already having, and would continue to have, an adverse effect on prices until there was enough demand to balance out the supply.

**ANSWER:** Paragraph 7 purports to state a legal conclusion to which no response

is required. To the extent a response is required, Underwriter Defendants deny

Paragraph 7, except deny knowledge or information sufficient to form a belief as to the

disclosures of unnamed fracking companies and admit that Liberty Oilfield, Nine Energy

Services Inc. and BJ Services Inc. each filed a registration statement and refer the Court

to those registration statements for a full and accurate statement of their contents.

8. Approximately one week after Liberty Oilfield's IPO, the Houston Chronicle called 2018 "the year of the fracker" and reported that industry sources project fracking capacity to reach record-new heights in 2018. The same article reported that fracking fleets were being added at an "unprecedented" pace.

**ANSWER:** Deny Paragraph 8, except deny knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 8 concerning unspecified

"industry sources" and "fracking fleets," but admit that the Houston Chronicle published

an article titled "Sand, Water, and horsepower: Welcome to the year of the fracker" and respectfully refer the Court to the article for a full and accurate statement of its contents.

9.      None of the information in ¶¶ 5-8 were included in Liberty Oilfield's negligently- prepared Registration Statement. Instead, the Registration Statement told investors to only rely on the Registration Statement, and not on any outside information.

**ANSWER:** Paragraph 9 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 9, except admit that a registration statement was filed in connection with Liberty Oilfields IPO and respectfully refer the Court to that registration statement for a full and accurate statement of its contents.

10.      As fracking supply continued to outstrip demand, putting further downward pressure on fracking prices, the value of Liberty Oilfield stock has plummeted to $2.48 per share as of April 3, 2020 (the date this lawsuit was filed), representing an 85% drop from the IPO price of $17 per share.

**ANSWER:** Deny Paragraph 10, except admit that Liberty Oilfield's stock closed at $2.48 per share on April 3, 2020, representing an approximately 85% drop in value from its $17 per share IPO price.

### JURISDICTION AND VENUE

11.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 771(a)(2) and 77o.

**ANSWER:** Paragraph 11 relates to Plaintiff's Section 12 claims, which have been dismissed, and contains a characterization of Plaintiff's claims in this Action, to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 11.

12.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

**ANSWER:** Paragraph 12 purports to state a legal conclusion, to which no response is required. To the extent a response is required, Underwriter Defendants refer to the statutes referenced in Paragraph 12 for a full and accurate recitation of their contents.  The Underwriter Defendants do not contest the Court's subject matter jurisdiction.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as the alleged misstatements entered and subsequent damages took place within this judicial district. The Company is also headquartered in this judicial district.

**ANSWER:** Paragraph 13 purports to state a legal conclusion, to which no response is required. To the extent a response is required, Underwriter Defendants Deny Paragraph 13, except refer to the statutes referenced in Paragraph 13 for a full and accurate recitation of their contents and admit that Liberty's principal executive offices are in Denver, Colorado.  The Underwriter Defendants do not contest that venue is proper in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Liberty Oilfield securities in this District.

**ANSWER:** Paragraph 14 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 14.

**PARTIES**

**<u>Plaintiff</u>**

6

15.     Plaintiff purchased Liberty Oilfield common stock pursuant and traceable to the Registration Statement during the Class Period. His PSLRA certification was previously filed with the Court and is incorporated by reference. *See* Dkt. No. 43-2.

**ANSWER:** Paragraph 15 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of Paragraph 15, except admit that Plaintiff filed a purported PSLRA certification.

**Liberty Oilfield Defendants**

16.     Defendant Liberty Oilfield is a holding company that provides fracking services to oil and gas E&P companies through its wholly-owned subsidiary Liberty Oilfield Services New HoldCo LLC ("Liberty LLC"). Defendant Liberty Oilfield is incorporated in Delaware and maintains its principal executive offices at 950 17th Street, Suite 2400, Denver, Colorado 80202. Liberty Oilfield's shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LBRT."

**ANSWER:** Admit Paragraph 16.

17.     Defendant Christopher A. Wright ("Wright") is the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Wright signed the Registration Statement.

**ANSWER:** Admit Paragraph 17.

18.     Defendant Michael Stock ("Stock") is the Company's Chief Financial Officer ("CFO") and was a Director of the Company from February 2017 to January 2018. Defendant Stock signed the Registration Statement.

**ANSWER:** Admit Paragraph 18.

19.     Defendant Cary D. Steinbeck ("Steinbeck") has been a Director of the Company since January 2018.

**ANSWER:** Admit Paragraph 19.

20.     Defendant William F. Kimble ("Kimble") has been a Director of the Company since January 2018.

**ANSWER:** Admit Paragraph 20.

21.    Defendant Peter A. Dea ("Dea") has been a Director of the Company since January 2018.

**ANSWER:** Admit Paragraph 21.

22.    Defendant N. John Lancaster, Jr. ("Lancaster") has been a Director of the Company since January 2018, and is a Partner at Riverstone Holdings LLC ("Riverstone"), a private equity firm. Riverstone nominated Defendant Lancaster to Liberty Oilfield's Board.

**ANSWER:** Admit Paragraph 22.

23.    Defendant Brett Staffieri ("Staffieri") has been a Director of the Company since January 2018, and is a Partner at Riverstone. Riverstone nominated Defendant Staffieri to Liberty Oilfield's Board.

**ANSWER:** Admit Paragraph 23.

24.    Defendant Ken Babcock ("Babcock") has been a Director of the Company since January 2018, and is the Chief Executive Officer of Abaco Energy Technologies LLC, a company formed by Riverstone. Riverstone nominated Defendant Babcock to Liberty Oilfield's Board.

**ANSWER:** Admit Paragraph 24.

25.    Defendant Jesal Shah ("Shah") has been a Director at the Company since January 2018, and is a Principal at Riverstone. Riverstone nominated Defendant Shah to Liberty Oilfield's Board.

**ANSWER:** Admit Paragraph 25.

26.    Defendants Wright, Steinbeck, Kimble, Dea, Lancaster, Staffieri, Babcock, and Shah were identified in the Registration Statement as Director Nominees who will become Directors of the Company when the Company's common stock starts trading. Each of them signed a Consent form agreeing to be identified in the Registration Statement as a Director Nominee.

**ANSWER:** Admit Paragraph 26.

27.    The Defendants named in ¶¶ 17-25 are referred to herein as the "Individual Defendants."

**ANSWER:** Paragraph 27 consists of defined terms that will be used later in the Complaint, to which no response is required.

**Underwriter Defendants**

28.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Morgan Stanley purchased 3,119,118 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 28, except admit that Morgan Stanley was an

underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

29.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Goldman Sachs purchased 2,864,496 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 29, except admit that Goldman Sachs was an

underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

30.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Wells Fargo purchased 1,973,319 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 30, except admit that Wells Fargo was an

underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

31.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Citigroup purchased 1,527,730 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 31, except admit that Citigroup was an underwriter

of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

32.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, J.P. Morgan purchased 891,176 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 32, except admit that J.P. Morgan was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

33.     Defendant Evercore Group L.L.C. ("Evercore") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Evercore purchased 572,899 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 33, except admit that Evercore was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

34.     Defendant Piper Sandler & Co. (F/K/A Piper Jaffray & Co.) ("Piper") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Piper purchased 381,933 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 34, except admit that Piper was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

35.     Defendant Tudor, Pickering, Holt & Co. Securities, LLC (F/K/A Tudor, Pickering, Holt & Co. Securities, Inc.) ("Tudor") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Tudor purchased 381,933 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 35, except admit that Tudor was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

36.     Defendant Houlihan Lokey Capital, Inc. ("Houlihan Lokey") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Houlihan Lokey purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 36, except admit that Houlihan Lokey was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

37.     Defendant Intrepid Partners, LLC ("Intrepid") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Intrepid purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 37, except admit that Interpid was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

38.     Defendant Petrie Partners Securities, LLC ("Petrie") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Petrie purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 38, except admit that Petrie was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

39.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, SunTrust purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

**ANSWER:** Deny Paragraph 39, except admit that SunTrust was an underwriter of Liberty Oilfield's IPO and sold shares of Liberty Oilfield common stock.

40.     Defendants Morgan Stanley, Goldman Sachs, Wells Fargo, Citigroup, J.P. Morgan, Evercore, Piper, Tudor, Houlihan Lokey, Intrepid, Petrie, and SunTrust are referred to herein as the "Underwriter Defendants."

**ANSWER:** Paragraph 40 consists of defined terms that will be used later in the Complaint, to which no response is required.

**Riverstone Defendants**

41.     Defendants R/C Energy IV Direct Partnership, L.P. ("R/C Direct") and R/C IV Liberty Holdings, L.P. ("R/C Liberty") (referred herein collectively as the "Riverstone Defendants") are investment partnerships affiliated with and controlled by Riverstone.

**ANSWER:** Paragraph 41 consists of defined terms that will be used later in the Complaint, to which no response is required.  To the extent a response is required, Underwriter Defendants deny knowledge or information sufficient to form a belief as to

whether R/C Direct and R/C Liberty are investment partnerships affiliated with and controlled by Riverstone.

42.     Immediately prior to the IPO, the Riverstone Defendants had a 49.7% ownership interest in Liberty LLC.

**ANSWER:** Deny Paragraph 42, except admit that, prior to the IPO, R/C Direct owned 14.9% of Liberty Oilfield's shares and R/C Liberty owned 34.8% of Liberty Oilfield's shares.

43.     Immediately after the IPO, the Riverstone Defendants owned 29.5% of Liberty Oilfield Class A common stock, 65.1% of Liberty Oilfield Class B common stock, and held 44.4% of Liberty Oilfield's aggregate voting power.

**ANSWER:** Deny paragraph 43, except admit that the prospectus stated that, immediately after the IPO and excluding Underwriter Defendants' option to purchase additional shares, R/C Direct was expected to own 22.7% of the Liberty Oilfield Class A Common stock and hold 13.3% of the combined voting power and R/C Liberty was expected to own 6.8% of Liberty Oilfield Class A common stock, 65.1% of Liberty Oilfield Class B common stock, and hold 33.3% of the combined voting power and that the actual number of shares received after the closing of the IPO may differ based on the 5-day volume weighted average price of Class A common stock for the 5 trading days after the IPO, and refer the Court to the prospectus for a full and accurate statement of its contents.

44.     The Riverstone Defendants sold 300,541 shares of Liberty Oilfield common stock in the IPO.

**ANSWER:** Deny Paragraph 44, except admit that R/C Direct sold 300,541 shares of Class A common stock.

45.     Liberty Oilfield, the Individual Defendants, the Underwriter Defendants, and the Riverstone Defendants are referred to collectively as "Defendants."

**ANSWER:** Paragraph 45 consists of defined terms that will be used later in the Complaint, to which no response is required.

## DETAILED ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

### Background Information and the State of Fracking Leading Up to Liberty Oilfield's IPO

46. Hydraulic fracturing, or fracking, is an oil and gas extraction technique involving the high-pressure injection of sand, water, and chemicals into shale rocks to extract oil and natural gas.

**ANSWER:** Deny Paragraph 46, except admit that, at a high level, hydraulic fracturing is an oil and gas extraction technique that can involve the high-pressure injection of sand, water, and chemicals into shale rocks to extract oil and natural gas and refer the Court to the registration statement for a more complete description of hydraulic fracturing.

47. The amount of fracking capacity is measured by the number of active fleets (consisting of all the equipment necessary to conduct fracking), as well as the amount of pumping horsepower that these fleets are capable of generating.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to all the ways in which fracking capacity may be measured, except admit that the number of active fleets and pumping horsepower can be used to measure fracking capacity and refer the Court to the registration statement for a more complete description of fracking capacity.

48. The most fertile grounds for fracking are in the western parts of the United States, including Texas, Colorado, Wyoming, and the Dakotas. The Permian Basin and the Eagle Ford Shale in Texas are among the most active fracking sites in the U.S.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the relative suitability for fracking of different U.S. regions, except refer the Court to the

registration statement for a description of the most active basins in North America at the time of the IPO.

49.    Following a three-year downturn, the American fracking industry began to see a major revival starting in mid-2017. To capitalize on rising demand, existing fracking companies built new fleets and reactivated idle ones, and new fracking companies emerged, taking advantage of the industry's low barrier to entry.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to why new fracking companies emerged and admit that the fracking industry experienced a downturn between 2014 and 2016 and began to experience increased demand in the third quarter of 2016 continuing into 2017 and that, over the course of 2016, the number of active rigs increased, and refer the Court to the registration statement for a more complete description of the downturn and the subsequent recovery.

50.    On January 25, 2018, the Houston Chronicle reported in an article titled "Sand, Water, and Horsepower: Welcome to the Year of the Fracker," that fracking supply was poised to set a new record high in 2018 (the "Houston Chronicle Article", attached hereto as Exhibit 1).  According to the Houston Chronicle Article, the previous record of fracking horsepower deployed was 18 million horsepower, set in 2014, but industry sources project that available fracking horsepower would reach 19 million horsepower in 2018.

**ANSWER:** Deny Paragraph 50, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about unspecified fracking supply and industry sources, and admit that the Houston Chronicle published an article titled "Sand, Water, and Horsepower: Welcome to the Year of the Fracker" and respectfully refer the Court to that article for a full and accurate statement of its contents.

51.    An energy analyst at the research firm Evercore ISI told the Houston Chronicle that fracking capacity "just massively increased in a short period of time." The CEO of ProPetro, another fracking company that fracks mainly in Texas' Permian Basin, told the Houston Chronicle that it has been adding fleets and increasing its fracking capacity at an "unprecedented" pace over the last year.

14

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, except admit that the Houston Chronicle published an article titled "Sand, Water, and horsepower: Welcome to the year of the Fracker" and respectfully refer the Court to the article for a full and accurate statement of its contents.

52.    Previously-idle fleets were being rapidly reactivated and put to work. For example, Schlumberger NV, which acquired 20 idle fracking fleets in Texas from Weatherford International in December 2017, told the Houston Chronicle that it intended to spend $100 million to reactivate these 20 fleets. (As a comparison, Liberty Oilfield only had 19 fleets as of December 2017).

**ANSWER:** Deny Paragraph 52 and deny that the Houston Chronicle reported that Schlumberger would reactivate previously idle fleets, except deny knowledge or information sufficient to form a belief as to what Schlumberger told the Houston Chronicle and admit that the Houston Chronicle published an article titled "Sand, Water, and horsepower: Welcome to the year of the Fracker" and respectfully refer the Court to the article for a full and accurate statement of its contents.

53.    Other American fracking companies that sought to go public in late 2017 and early 2018 - approximately the same time as Liberty Oilfield's IPO - recognized and disclosed the rapid increase in the supply of fracking capacity and the adverse effects the oversupply was having, and would continue to have, on pricing.

**ANSWER:** The allegations in Paragraph 53 are based on unidentified companies without any foundation and, on that basis, are denied.  To the extent a further response is required, the Underwriter Defendants deny Paragraph 53, except deny knowledge or information sufficient to form a belief as to statements made by unspecified fracking companies.

54.    Nine Energy Services, Inc., which completed its IPO on January 23, 2018 (one week after Liberty Oilfield's IPO), made this disclosure in its registration statement:

15

**Significant increases in overall market capacity have also caused active price competition and led to lower pricing and utilization levels for our services and products. The competitive environment has intensified since the recent industry downturn that began in late 2014, which caused an oversupply of, and reduced demand for, oilfield services, and we have seen substantial reductions in the prices we can charge for our services.[2]**

**ANSWER:** Deny Paragraph 54, except admit that Nine Energy Services, Inc. purports to have completed its IPO on January 23, 2018 and that Nine Energy Services, Inc. filed a registration statement on January 9, 2018 and respectfully refer the Court to the registration statement for a full and accurate statement of its contents.  Underwriter Defendants deny knowledge or information sufficient to form a belief as to the accuracy of Nine Energy Services, Inc.'s statements about its business.

55.    Similarly, BJ Services Inc., which filed its final registration statement on July 28, 2017 for an aborted IPO made the following disclosure in its registration statement about excess fracking supply currently in the market:

**[A]ctivity must increase significantly before excess service capacity can be substantially absorbed and a pricing recovery takes place. We have observed increased drilling activity and other indications of increased activity and pricing improvements in several of the North American basins, but we believe there remains a significant amount of capacity that must be absorbed before service pricing will become more tightly correlated with higher commodity prices and increased activity.[3]**

**ANSWER:** Deny Paragraph 55, except admit that BJ Services Inc. filed a registration statement on July 28 2017 and respectfully refer the Court to the registration statement for a full and accurate statement of its contents.  Underwriter Defendants deny

---

[2] Nine Energy Services, Inc. final registration statement on Form S-1/A, filed with the SEC on January 9, 2018. Available on SEC's EDGAR database.

[3] BJ Services Inc. final registration statement on Form S-1/A, filed with the SEC on July 28, 2017. Available on SEC's EDGAR database.

knowledge or information sufficient to form a belief as to the accuracy of BJ Services

Inc.'s statements about its business.

56.    Indeed, both Nine Energy and BJ Services accurately disclosed that there
was excess supply in the fracking industry that was having an adverse effect on prices,
and this would continue unless there was increased demand to absorb the excess supply.

**ANSWER:** Deny Paragraph 56, except admit that both Nine Energy and BJ

Services filed registration statements and refer the Court to those registration statements

for a full and accurate statement of their contents.  Underwriter Defendants deny

knowledge or information sufficient to form a belief as to the accuracy of Nine Energy's

or BJ Services' statements about their businesses.

57.    The oversupply in the fracking industry was already affecting Liberty
Oilfield's business and operations starting in mid-2017, half a year before its IPO.

**ANSWER:** Deny Paragraph 57.

58.    FE1 worked as a Frac Services Coordinator at Liberty Oilfield's Cibolo,
Texas frac yard from April 2017 to July 2019, reporting to Allen Penman, Liberty
Oilfield's Cibolo District Manager. He told Plaintiff's investigator that by late 2017, he
was hearing from Penman and Jim Brady, Liberty Oilfield's Vice President of Operations
who reported directly to Defendant Wright, about excess supply in the fracking industry:

> **"There was talks for a while that there was a lot of horsepower out there in
> the industry, especially with a couple of mergers with Schlumberger buying
> up Weatherford's stuff there and then Baker Hughes taking out BJ and their
> operation there...we had to tighten up pricing quite a bit just to keep our
> work going, because there was a lot of competition out there."**

**ANSWER:** Deny Paragraph 58, including on the basis that Paragraph 58 is based

on unidentified confidential witnesses without any foundation, except deny knowledge or

information sufficient to form a belief as to FE1's alleged employment and whether FE1

made the quoted and summarized statements.

17

59.     According to FE1, the excess supply forced Liberty Oilfield to lower prices and give discounts; he noted that Liberty had to "come down on a little bit of discounts to keeping going. We were asking our vendors to come down on pricing too, like our chemical suppliers and everyone else."

**ANSWER:** Deny Paragraph 59, including on the basis that Paragraph 59 is based on unidentified confidential witnesses without any foundation, except deny knowledge or information sufficient to form a belief as to whether FE1 made the quoted and summarized statements.

60.     FE2 worked as a Sand Coordinator at Liberty Oilfield from July 2017 to July 2020. FE2 was based in Odessa, Texas and reported to Jason Rhines, Liberty Oilfield's Odessa District Manager. As Sand Coordinator, FE2's job was to manage the supply of sand for fracking, making sure that they are transported from the supply team to the appropriate fracking fleets when needed.

**ANSWER:** Deny Paragraph 60 on the basis that it is based on unidentified confidential witnesses without any foundation, except deny knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 60.

61.     According to FE2, in late 2017 it was clear that there was too much fracking supply in Texas: "there [was] like over 200 operators or 200 frac companies down there…everybody was just pretty much undercutting themselves [to get work]." For example, FE2 said that Liberty Oilfield had a competitor, Pumpco Energy Services, who for nine years fracked for a customer called XTO. Pumpco in late 2017 had three fleets that were fracking for XTO. Yet, Liberty Oilfield went to XTO and offered a lower price, and was able to win over XTO's business despite XTO's nine-year relationship with Pumpco.

**ANSWER:** Deny Paragraph 61, including on the basis that Paragraph 61 is based on unidentified confidential witnesses without any foundation, except deny knowledge or information sufficient to form a belief as to whether FE2 made the quoted and summarized statements.

62.     FE2 confirmed that starting around August or September 2017, Liberty Oilfield started asking vendors and suppliers, including sand suppliers, to cut prices. FE2

said that they asked suppliers to cut prices until 2019, because Liberty Oilfield anticipated that there would still be excess supply weighing down prices through 2018.

**ANSWER:** Deny Paragraph 62, including on the basis that Paragraph 62 is based on unidentified confidential witnesses without any foundation, except deny knowledge or information sufficient to form a belief as to whether FE2 made the summarized statements.

## Liberty Oilfield and Its Misleading Registration Statement

63.     Founded in 2011, Liberty Oilfield provides fracking service to oil and gas E&P companies in North America. Liberty Oilfield operates primarily in Texas (Permian Basin and Eagle Ford Shale), Colorado (DJ Basin), Wyoming (Powder River Basin), and North Dakota (Williston Basin), all of which are among the most active fracking basins in the U.S.

**ANSWER:** Admit Paragraph 63 and refer the Court to the registration statement for a more complete description of Liberty Oilfield.

64.     On January 2, 2018, after a series of amendments, Liberty Oilfield filed its final registration statement with the SEC on Form S-1/A. The SEC declared the registration statement effective on January 11, 2018. The next day, on January 12, 2018, Liberty Oilfield common stock began trading on the NYSE. Subsequently, on January 16, 2018, Liberty Oilfield filed the final prospectus for the IPO, which forms part of the registration statement. The IPO formally closed on January 17, 2018.[4]

**ANSWER:** Admit Paragraph 64.

65.     In the IPO, Liberty Oilfield sold approximately 14.3 million shares of its common stock at $17.00 per share, for total net proceeds of over $220 million after underwriting fees and discounts.

---

[4] In an IPO, the issuer's shares typically begin trading the day after the SEC declares its registration statement effective. An IPO typically closes the second business day after the start of trading, after the filing of the final prospectus.

**ANSWER:** Deny Paragraph 65, except admit that Liberty Oilfield completed its IPO of 14,640,755 shares of Class A common stock at $17.00 per share and received approximately $220 million in net proceeds.

66.     The Registration Statement was negligently-prepared, and failed to disclose: (a) the oversupply of fracking capacity existing at the time of the IPO, (2) the impact such oversupply was having, and would continue to have, on pricing until there was sufficient increased demand to absorb the supply.

**ANSWER:** Paragraph 66 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 66.

67.     Instead, the Registration Statement touted Liberty Oilfield's prospects in a supposedly-contracting industry:

We believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity since late 2014 will benefit us as industry demand increases. Industry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014 and approximately 75% of this capacity is currently active and deployed. A number of our competitors have filed for bankruptcy or have otherwise undergone substantial debt restructuring, significantly reducing available capital and their ability to quickly redeploy fleets. In contrast, our rigorous preventive maintenance program, in addition to scheduled and in-process fleet additions and upgrades, has positioned us well to benefit from improving market dynamics. During the recent downturn, many oilfield service companies significantly reduced their employee headcounts, which will constrain their ability to quickly reactivate fleets. Over the same period, we retained our high quality and experienced employees, did not conduct lay offs and substantially increased our workforce.

**ANSWER:** Deny Paragraph 67, except admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

68.     This was misleading because it failed to disclose the rapid increase of fracking capacity – a rate of increase industry sources described as "unprecedented" – that began in mid-2017, which was already driving down pricing. It was also misleading

20

because many of the idle fleets were being acquired by other companies and quickly refitted to enter the market. For example, Schlumberger acquired 20 fleets from Weatherford in 2017 (or more than Liberty Oilfield's entire fleet size in December 2017) and was poised to redeploy them in 2018.

**ANSWER:** Deny Paragraph 68, except deny knowledge or information sufficient to form a belief as to statements by unspecified industry sources, whether other companies were acquiring idle fleets, or allegations concerning Schlumberger.

69.     The Registration Statement also falsely claimed that demand exceeded supply and that Liberty Oilfield was experiencing price increases:

> Because demand for new equipment exceeds active supply, we believe that pricing power has begun to return to the broader oilfield services sector as well as the hydraulic fracturing industry. We are currently experiencing price increases, and believe that this trend will continue.

**ANSWER:** To the extent the Court has held that certain allegations in Paragraph 69 fail to state a claim for relief, no response to such allegations is required. To the extent a response is required, Underwriter Defendants deny Paragraph 69, except admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

70.     This was false because, as Nine Energy and BJ Services truthfully disclosed in their registration statements, supply exceeded demand in late 2017 and early 2018, and that was already having an adverse impact on prices. Former Liberty Oilfield employees, FE1 and FE2, both confirmed that Liberty Oilfield recognized the oversupply starting around mid-2017 and began to lower prices, and also asked its suppliers to also lower prices.

**ANSWER:** Deny Paragraph 70 including on the basis that Paragraph 70 is based on unidentified confidential witnesses without any foundation, except deny knowledge or information sufficient to form a belief as to whether FE1 and FE2 made the summarized statements and as to the accuracy of Nine Energy's and BJ Services' statements about their businesses and admit that Nine Energy and BJ Services filed registration statements

21

and respectfully refer the court to those registration statements for a full and accurate statement of their contents.

71.    Liberty Oilfield's Registration Statement told investors not to rely on information that was different from what was presented in the Registration Statement:

> Neither we, the selling shareholder nor the underwriters have authorized anyone to provide you with information different from that contained in this prospectus and any free writing prospectus we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.

**ANSWER:** Deny Paragraph 71, except admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

## **Statutory Framework Applicable to the Registration Statement: Item 303 and Item 105**

72.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, requires disclosure of any known events, uncertainties or trend that had caused, or were reasonably likely to cause, Liberty Oilfield's disclosed financial condition not to be indicative of future results.

**ANSWER:** Paragraph 72 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 72 and refer the Court to Item 303 of Regulation S-K for a full and accurate statement of its contents.

73.    The oversupply of fracking capacity at the time of the IPO was already having a material adverse effect on Liberty Oilfield, forcing it to lower prices and give discounts. It would continue to put downward pressure on prices until there was sufficient increased demand to absorb the excess supply. This was a trend that needed to be disclosed under Item 303.

**ANSWER:** Paragraph 73 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 73.

74.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 requires, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk.

**ANSWER:** Paragraph 74 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 74 and refer the Court to Item 105 of Regulation S-K for a full and accurate statement of its contents.

75.    Unlike Nine Energy and BJ Services, Liberty Oilfield's Registration Statement failed to warn investors of the existing oversupply of fracking capacity, or that such oversupply was having and would continue to have an adverse effect on pricing until there was greater demand to absorb the oversupply.

**ANSWER:** Deny Paragraph 75, except deny knowledge or information sufficient to form a belief as to the accuracy of Nine Energy's and BJ Services' statements about their businesses and admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

76.    Instead, the Registration Statement merely provided boilerplate risk statements about potential contingent future problems that may occur. The Registration Statement included a generic disclosure that industry conditions are influenced by supply and demand (which is true for any business in any industry at any time), but failed to disclose the oversupply that was already present at the time of the IPO, and the impact that such oversupply was already having and would continue to have until mitigated by sufficient increased demand:

> Industry conditions are influenced by numerous factors over which we have no control, including:

> * * *

23

. . . the supply of and demand for hydraulic fracturing and equipment in the United States[.]

**ANSWER:** Deny Paragraph 76, except admit that Liberty Oilfield filed a registration statement and refer the Court to the registration statement for a full and accurate statement of its contents.

77.    Indeed, this is the type of generic and boilerplate discussion that the SEC has specifically deemed inadequate. Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

**ANSWER:** Paragraph 77 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 77, except admit that the Securities and Exchange Commission issued a Statement of the Commission regarding Disclosure of Year 2000 Issues and Consequences by Public Companies, Investment Advisers, Investment Companies, and Municipal Securities Issuers and refer the Court to that statement for a complete and accurate statement of its contents.

**Post-IPO Developments**

78.    The glut of fracking supply persisted after the IPO, as demand did not increase sufficiently to balance out the oversupply. As a result, Liberty Oilfield's stock price has plummeted in value since the IPO. On April 3, 2020, the date that this lawsuit was filed, Liberty Oilfield's stock closed at $2.48 per share, representing an 85% drop in value from its IPO price of $17 per share.

**ANSWER:** Deny Paragraph 78, except admit that Liberty Oilfield's stock closed at $2.48 per share on April 3, 2020, which is approximately 85% less than its $17 per share IPO price**.**

**THE UNDERWRITER DEFENDANTS VIOLATED THE SECURITIES ACT**

79.     Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

**ANSWER:** Paragraph 79 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 79 and refer the Court to Section 11 for a full and accurate statement of its contents.

80.     Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable. 15 U.S.C. § 77l(a)(2).

**ANSWER:** Paragraph 80 relates to Plaintiff's Section 12 claims, which have been dismissed, and purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 80 and refer the Court to Section 12 for a full and accurate statement of its contents.

81.     The Underwriter Defendants offered or sold Liberty Oilfield common stock. The prospectus indicated that Liberty Oilfield engaged each of the Underwriter Defendants to conduct the IPO.

**ANSWER:** Deny Paragraph 81, except admit that Liberty Oilfield entered into the Underwriting Agreement with Morgan Stanley, Goldman Sachs, and Wells Fargo on behalf of the Underwriter Defendants, and refer the Court to the prospectus and to the Underwriting Agreement for a full and accurate statement of their contents.

82.     Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

25

**ANSWER:** Paragraph 82 relates to Plaintiff's Section 12 claims, which have been dismissed, and purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 82 and refer the Court to Sections 11 and 12 for a complete and accurate statement of their contents.

83.     It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, Report of the Business Standards Committee, January 2011, at 13. Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." Id.

**ANSWER:** Deny Paragraph 83, except deny knowledge or information to form a belief as to the unspecified understanding of the underwriting industry and admit that Goldman Sachs published a Report of the Business Standards Committee in January 2011 and refer the Court to that report for a full and accurate statement of its contents.

84.     As gatekeepers, underwriters must independently verify all material facts in offering documents, such as the Registration Statement. To conduct a proper due diligence, underwriters must take an adverse role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

**ANSWER:** Paragraph 84 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 84.

85.     It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

**ANSWER:** Paragraph 85 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 85, except deny knowledge or information to form a belief as to the

26

unspecified understanding of the investment banking industry or the financial

community.

86.     It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for Liberty Oilfield's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

**ANSWER:** Paragraph 86 purports to state a legal conclusion to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 86, except deny knowledge or information to form a belief as to the unspecified understanding of the investment banking industry or the financial community.

87.     In the area of selling securities to investors and performing a reasonable diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, Defendant Goldman Sachs itself published the Report of the Business Standards Committee, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." Id. Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." Id. at 14.

**ANSWER:** Deny Paragraph 87, except admit that Goldman Sachs published a Report of the Business Standards Committee in January 2011 and refer the Court to that report for a full and accurate statement of its contents.

88.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress

27

recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their careful investigation of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, i.e. the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting Liberty Oilfield's IPO. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

**ANSWER:** Paragraph 88 purports to state a legal conclusion to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 88, except admit that the SEC published Release No. 33-7606A and refer the Court to the release for a full and accurate statement of its contents.

89.     Because investment banks have ultimate control over the contents and dissemination of the disclosure document, i.e., the prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

**ANSWER:** Paragraph 89 purports to state a legal conclusion to which no response is required.  To the extent a response is required, deny Paragraph 89.

90.     The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho- hum" exercise of accepting a company's/management's views or its auditor's opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business;

28

and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

**ANSWER:** Paragraph 90 purports to state a legal conclusion to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 90, except deny knowledge or information sufficient to form a belief as to the practices of an unspecified investment bank and admit that the due diligence process requires due diligence by underwriters consistent with the governing legal standards.

91. The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to Liberty Oilfield's IPO. In particular, the Underwriter Defendants, had they performed adequate due diligence, would have discovered that there was a rapid – indeed, unprecedent – increase in the supply of fracking capacity since mid-2017, and that this increase in supply was already causing Liberty Oilfield to lower prices and give discounts. The Underwriter Defendants would have known that the glut in supply would further depress prices unless there was a ramping up of demand to balance the supply.

**ANSWER:** Purports to state a legal conclusion to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 91.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

92. Plaintiff brings this action as a class action on behalf of all persons and entities who purchased the common stock of Liberty Oilfield in the Company's IPO, which closed on January 17, 2018, or purchased Liberty Oilfield common stock thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO during the Class Period.

**ANSWER:** Paragraph 92 contains a description of this litigation to which no response is required. To the extent a response is required, the Underwriter Defendants deny Paragraph 92, except admit that Liberty Oilfield closed its IPO on January 17, 2018 and issued a Registration Statement in connection with the IPO and that Plaintiff purports to bring the claims described in Paragraph 92.

29

93. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Liberty Oilfield or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER:** Paragraph 93 purports to state a legal conclusion as to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 93, except deny knowledge or information sufficient to form a belief as to the number of members of the putative class.

94. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER:** Paragraph 94 purports to state a legal conclusion as to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 94 and deny that this case is appropriate for class treatment.

95. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

**ANSWER:** Paragraph 95 purports to state a legal conclusion as to which no response is required. To the extent a response is required, Underwriter Defendants deny Paragraph 95 and deny that this case is appropriate for class treatment.

96. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Securities Act;

b)       whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)       to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** Paragraph 96 purports to state a legal conclusion as to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 96 and deny that this case is appropriate for class treatment.

97.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Paragraph 97 purports to state a legal conclusion as to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 97 and deny that this case is appropriate for class treatment.

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants Except the Riverstone Defendants

98.       Plaintiff incorporates all the foregoing allegations by reference.

**ANSWER:** Repeat and reincorporate each and every response to the allegations above, as if set forth fully herein.

99.       This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except the Riverstone Defendants.

**ANSWER:** Paragraph 99 contains a description of Plaintiff's claim to which no response is required.  To the extent a response is required, the Underwriter Defendants

31

deny Paragraph 99, except admit that Plaintiff purports to assert a claim under Section 11

of the Securities Act against all Defendants except the Riverstone Defendants.

100.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

**ANSWER:** Deny Paragraph 100.

101.    Defendants named in this Count are strictly liable to Plaintiff and the Class for the misstatements and omissions.

**ANSWER:** Deny Paragraph 101.

102.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

**ANSWER:** Deny Paragraph 102.

103.    By reason of the conduct herein alleged, each Defendant named in this Count violated or controlled a person who violated §11 of the Securities Act.

**ANSWER:** Deny Paragraph 103.

104.    Plaintiff acquired Liberty Oilfield securities pursuant to the Registration Statement.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the

truth of Paragraph 104.

105.    At the time of their purchases of Liberty Oilfield securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

**ANSWER:** Deny Paragraph 105, except deny knowledge or information

sufficient to form a belief as to the knowledge of Plaintiff or other members of the

purported class.

32

106.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected, and within three years of the IPO. It is therefore timely.

**ANSWER:** Paragraph 106 purports to state a legal conclusion as to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 106, except admit that this claim was brought within three years of the IPO.

### COUNT II

### Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants

107.     Plaintiff incorporates all the foregoing allegations by reference.

**ANSWER:** Paragraph 107 relates to Plaintiff's Section 12 claims, which have been dismissed.  To the extent a response is required, Underwriter Defendants repeat and reincorporate each and every response to the allegations above, as if set forth fully herein.

108.     By means of the defective prospectus, the Underwriter Defendants promoted, solicited, and sold Liberty Oilfield common stock to Plaintiff and other members of the Class.

**ANSWER:** Paragraph 108 relates to Plaintiff's Section 12 claims, which have been dismissed.  To the extent a response is required, Underwriter Defendants deny Paragraph 108.

109.     The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Underwriter Defendants owed Plaintiff and the other members of the Class who purchased Liberty Oilfield securities pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

33

**ANSWER:** Paragraph 109 relates to Plaintiff's Section 12 claims, which have been dismissed.  To the extent a response is required, Underwriter Defendants deny Paragraph 109.

110.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the prospectus at the time Plaintiff acquired Liberty Oilfield common stock. Indeed, the Registration Statement told investors to not rely on information different from what was presented in the Registration Statement.

**ANSWER:** Paragraph 110 relates to Plaintiff's Section 12 claims, which have been dismissed.  To the extent a response is required, Underwriter Defendants deny Paragraph 110.

111.    By reason of the conduct alleged herein, the Underwriter Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Liberty Oilfield common stock pursuant to the prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

**ANSWER:** Paragraph 111 relates to Plaintiff's Section 12 claims, which have been dismissed.  To the extent a response is required, Underwriter Defendants deny Paragraph 111.

112.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**ANSWER:** Paragraph 112 relates to Plaintiff's Section 12 claims, which have been dismissed, and purports to state a legal conclusion as to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph

112, except admit that this claim was brought within three years of the effective date of the IPO.

**COUNT III**

**Violations of Section 15 of the Securities Act Against the Individual Defendants and the Riverstone Defendants**

113.   Plaintiff incorporates all the foregoing by reference.

**ANSWER:** Paragraph 113 does not pertain to the Underwriter Defendants.  To the extent a response is required, Underwriter Defendants repeat and reincorporate each and every response to the allegations above, as if set forth fully herein.

114.   This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and the Riverstone Defendants.

**ANSWER:** Paragraph 114 does not pertain to the Underwriter Defendants and contains a description of Plaintiff's claim to which no response is required.  To the extent a response is required, the Underwriter Defendants deny Paragraph 114, except admit that Plaintiff purports to assert a claim under Section 15 of the Securities Act against the Individual Defendants and the Riverstone Defendants.

115.   The Individual Defendants and the Riverstone Defendants were controlling persons of Liberty Oilfield by virtue of their positions as directors or senior officers of Liberty Oilfield, and by their ownership of controlling shares of the Company. The Individual Defendants and Riverstone Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Liberty Oilfield.

**ANSWER:** Paragraph 115 does not pertain to the Underwriter Defendants.  To the extent a response is required, Underwriter Defendants deny Paragraph 115, except deny knowledge or information sufficient to form a belief as to whether the Individual Defendants and Riverstone Defendants each had a series of direct and indirect business

35

and personal relationships with other directors and officers and major shareholders of

Liberty Oilfield.

116.    The Individual Defendants and the Riverstone Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement, their consent to being named in the Registration Statement as Director Nominees, and having otherwise participated in the process which allowed the IPO to be successfully completed.

**ANSWER:** Paragraph 116 does not pertain to the Underwriter Defendants.  To the extent a response is required, Underwriter Defendants deny Paragraph 116.

117.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**ANSWER:** Paragraph 117 does not pertain to the Underwriter Defendants and purports to state a legal conclusion as to which no response is required.  To the extent a response is required, Underwriter Defendants deny Paragraph 117, except admit that this claim was brought within three years of the effective date of the IPO.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A.    determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as class representative;

B.    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

36

C.    awarding Plaintiff and the Class prejudgment and post-judgment interest; and

D.    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**ANSWER:** Deny that Plaintiff or putative class members are entitled to any judgment, damages, recovery, or relief whatsoever.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

**ANSWER:** This paragraph contains a description of Plaintiff's demand, to which no response is required.

## DEFENSES

The Underwriter Defendants state the following defenses and reserve their right to assert other and additional defenses, crossclaims and third-party claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time.  In asserting these defenses, the Underwriter Defendants do not assume any burden of proof, persuasion or production with respect to any issue where the applicable law places the burden upon Plaintiff and members of the putative class.

### FIRST DEFENSE

1.    The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

2.    Plaintiff's claims are barred by the applicable statutes of repose and/or statutes of limitation, including because Plaintiff and members of the putative class were on inquiry notice of the claims giving rise to the Complaint more than one year prior to

the filing of the Complaint and because putative class members' claims will not have been brought until more than three years after the date of the IPO.

## THIRD DEFENSE

3.      Plaintiff's claims fail, in whole or in part, because the registration statement does not contain an untrue statement of material fact and does not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## FOURTH DEFENSE

4.      Plaintiff's claims fail, in whole or in part, because the Underwriter Defendants conducted a reasonable investigation and had reasonable ground to believe and did believe, at the time the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## FIFTH DEFENSE

5.      Plaintiff's claims fail with respect to portions of the registration statement purporting to be made on the authority of experts retained to assist in preparing such documents, including independent auditors, tax specialists, and legal counsel, as to which the Underwriter Defendants had no reasonable grounds to believe, and did not believe, at the time such part of the Offering Documents became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, including that the Underwriter Defendants were entitled to rely on and did rely reasonably and in good faith upon the written opinion of issuer's counsel and other representations and opinions

38

provided to the Underwriter Defendants in connection with the Offering Documents that, subject to the conditions stated therein, the Offering Documents did not violate Section 11 of the Securities Act.

### SIXTH DEFENSE

6.    Plaintiff's claims are barred, in whole or in part, because the alleged misstatements and omissions were not material to the investment decisions of a reasonable investor in view of, inter alia, the total mix of available information and/or did not impact the market price of Liberty Oilfield's common stock.

### SEVENTH DEFENSE

7.    Plaintiff's claims are barred, in whole or in part, because certain alleged misstatements contain expressions of opinion that Plaintiff has not alleged, and cannot prove, were not truly held.

### EIGHTH DEFENSE

8.    Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any cognizable damages, including legally cognizable injury or damages under the Securities Act of 1933, including but not limited to the provisions of 15 U.S.C. § 77k(e).

### NINTH DEFENSE

9.    Plaintiff's claims are barred, in whole or in part, because no act or omission by the Defendants was the cause in fact or proximate cause of any damage alleged by Plaintiff, including because, to the extent that any Plaintiff or member of the alleged class incurred any injury or damage as alleged in the Complaint, which is denied, the injuries allegedly sustained were not caused by any act of omission on the part of the

Defendants because any alleged injuries were the result of superseding, intervening, or independent causes and unrelated to any act or omission on the part of the Underwriter Defendants, and are the proximate result, either in whole or in part, of other factors, including, but not limited to, market-wide phenomena, economic factors, or actions or omissions of persons or entities other than the Defendants. Accordingly, any recovery should be precluded or diminished in proportion to the amount of fault attributable to other factors.

<strong>TENTH DEFENSE</strong>

10. Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, equitable estoppel, waiver, unclean hands and/or other equitable doctrines.

<strong>ELEVENTH DEFENSE</strong>

11. Plaintiff's claims fail, in whole or in part, because Defendants made full and accurate disclosures of all information required to be disclosed by law and did not omit to disclose any statement of fact necessary in order to make the statements made by Defendants not misleading, including because some or all of the matters now claimed by Plaintiff to have been omitted from the registration statement (which the Underwriter Defendants deny) were fully disclosed by Defendants or were otherwise known to and entered the securities market through credible sources; because some or all of those matters were actually or constructively known to Plaintiff and/or its agents, financial representatives, and/or broker-dealers; and because Plaintiff purchased Liberty Oilfield's common stock with actual or constructive knowledge of the risks involved in an investment in Liberty Oilfield's common stock, and thus assumed the risk that the value of the common stock would decline if such risks materialized.

40

**TWELFTH DEFENSE**

12.    Plaintiff's claims are barred, in whole or in part, by the terms, disclaimers, and disclosures in Liberty's SEC filings.

**THIRTEENTH DEFENSE**

13.    Plaintiff's claims are barred, in whole or in part, because the Defendants had no duty to disclose, or cause the disclosure of, the allegedly omitted material information.

**FOURTEENTH DEFENSE**

14.    Plaintiff's claims are barred, in whole or in part, because certain of the alleged misstatements are non-actionable statements of puffery.

**FIFTEENTH DEFENSE**

15.    Plaintiff's claims fail to the extent that they are based on forward-looking statements that were either accompanied by meaningful cautionary language or made without actual knowledge that those statements were false or misleading, pursuant to the "bespeaks caution" doctrine.

**SIXTEENTH DEFENSE**

16.    Liberty Oilfield's common stock did not trade in an efficient market and the fraud on the market theory is not a basis for liability with respect to the claim against the Underwriter Defendants.

**SEVENTEENTH DEFENSE**

17.    Plaintiff's claims are barred, in whole or in part, because, and to the extent that, any relief or recovery would unjustly enrich or constitute a windfall to Plaintiff.

**EIGHTEENTH DEFENSE**

18.    Plaintiff's claims are barred, in whole or in part, by the doctrine of collateral estoppel.

**NINETEENTH DEFENSE**

19.    Plaintiff's claims are barred because one or more parties not named in the Complaint may be indispensable parties to this action, and the Underwriter Defendants reserve the right to seek the joinder of those parties whose absence from the action renders it such that complete relief cannot be granted without the missing party.

**TWENTIETH DEFENSE**

20.    Depending on the evaluation of the discovery record and further legal and factual analyses by the Underwriter Defendants and their counsel, the Underwriter Defendants reserve the right to assert as a defense their reliance on the advice of counsel.

**TWENTY-FIRST DEFENSE**

21.    Plaintiff's claims are barred, in whole or in part, because any alleged damages suffered by Plaintiff, which the Underwriter Defendants deny, are speculative.

**TWENTY-SECOND DEFENSE**

22.    Plaintiff is not entitled to any recovery from the Underwriter Defendants in excess of the amounts allowed under applicable law.

**TWENTY-THIRD DEFENSE**

23.    Plaintiff's claims against each Underwriter Defendant fail to the extent that they seek damages exceeding each Underwriter Defendant's proportionate liability.

## TWENTY-FOURTH DEFENSE

24.    Plaintiff's claims are barred, in whole or in part, insofar as they are based on alleged conduct that concluded before, or began after, Plaintiff's purchases of Underwriter's common stock.

## TWENTY-FIFTH DEFENSE

25.    Plaintiff's claims are barred, in whole or in part, because Plaintiff and members of the alleged class, including those who did not purchase Liberty Oilfield common stock, lack standing to assert federal securities fraud claims against the Underwriter Defendants.

## TWENTY-SIXTH DEFENSE

26.    Plaintiff cannot satisfy the prerequisites set forth in Rule 23 of the Federal Rules of Civil Procedure to maintain this action as a class action.

## TWENTY-SEVENTH DEFENSE

27.    Underwriter Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations.

## TWENTY-EIGHTH DEFENSE

28.    Underwriter Defendants are not liable to Plaintiff or members of the putative class in connection with any purchases of securities offered in the IPO that (i) were not offered in the United States pursuant to the Registration Statement; or (ii) were not sold or purchased in the United States.

## TWENTY-NINTH DEFENSE

29.    The putative class period is overbroad and, therefore, many of the putative class members are not entitled to any recovery.

**THIRTIETH DEFENSE**

30.        Underwriter Defendants are not liable under Section 11 of the Securities

Act for damages in excess of the total price at which the securities underwritten and

distributed by the Underwriter Defendants to the public were offered to the public, and

are not liable for damages that the Plaintiff or putative class could have mitigated or did

mitigate.

**THIRTY-FIRST DEFENSE**

31.        Plaintiff's claims are barred, in whole or in part, because there is another

action pending between the same parties for the same cause of action in the District Court

for the City and County of Denver, Colorado.

**THIRTY-SECOND DEFENSE**

32.        Plaintiff's claims are barred, in whole or in part, because Plaintiff's suit is

"without merit" within the meaning of the last sentence of 15 U.S.C. 33k(e).

**THIRTY-THIRD DEFENSE**

33.        Any amounts to which Plaintiff or the putative class may be entitled must

be set off by any amounts received or benefits gained, including (but not limited to) for

any settlements Plaintiff enters into, or any amounts Plaintiff otherwise receives from any

source, in connection with Plaintiff's alleged losses.

**THIRTY-FOURTH DEFENSE**

34.        The Underwriter Defendants have not knowingly and intentionally waived

any applicable additional defenses, and reserve the right to raise any additional defenses

not asserted herein of which they become aware at any subsequent stage of this action.

The Underwriter Defendants further reserve the right to amend their Answer and

Defenses accordingly and to delete defenses that they determine are not applicable during

the course of discovery.

## THIRTY-FIFTH DEFENSE

35.   The Underwriter Defendants adopt by reference any defense pled by any

other defendant not expressly set forth herein to the extent applicable to any Underwriter

Defendant.

## PRAYER

WHEREFORE, the Underwriter Defendants respectfully request that the Court:

A.   Deny class certification and strike all class allegations from the Complaint;

B.   Render judgment that Plaintiff take nothing by this suit;

C.   Dismiss the Complaint with prejudice;

D.   Award Underwriter Defendants their costs of court and other fees; and

E.   Grant any other just and proper relief to which the Underwriter Defendants
may be entitled.

Dated: August 25, 2021

*/s/ William Leone*
William Leone, No. 11403
NORTON ROSE FULBRIGHT US LLP
1225 17th Street, Suite 3050
Denver, Colorado 80202
Phone: 303.801.2750
Fax: 303.801.2777
william.leone@nortonrosefulbright.com

Brian S. Weinstein
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Phone: 212.450.4972
Fax: 212.701.5972
brian.weinstein@davispolk.com
*Attorneys for the Underwriter Defendants*