# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-CV-00946-RBJ

CIPRIANO CORREA and MARC JOSEPH, Individually and on Behalf of All Others
Similarly Situated,

      Plaintiffs,

v.

LIBERTY OILFIELD SERVICES INC., CHRISTOPHER A. WRIGHT, MICHAEL STOCK,
CARY D. STEINBECK, WILLIAM F. KIMBLE, PETER A. DEA, N. JOHN LANCASTER,
JR., BRETT STAFFIERI, KEN BABCOCK, JESAL SHAH, MORGAN STANLEY & CO.
LLC, GOLDMAN SACHS & CO. LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP
GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, EVERCORE GROUP
L.L.C., PIPER SANDLER & CO., TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC,
HOULIHAN LOKEY CAPITAL, INC., INTREPID PARTNERS, LLC, PETRIE PARTNERS
SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, INC., R/C ENERGY IV
DIRECT PARTNERSHIP, L.P., and R/C IV LIBERTY HOLDINGS, L.P.,

      Defendants.

---

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

---

Lead Plaintiff Cipriano Correa and named plaintiff Marc Joseph ("Plaintiffs"),
individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned
attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following
based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information
and belief as to all other matters based on the investigation conducted by and through Plaintiffs'
attorneys, which included, among other things, a review of Defendants' public documents,

1

conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Liberty Oilfield Services Inc. ("Liberty Oilfield" or the "Company"), analysts' reports and advisories about the Company, interviews with former Liberty Oilfield employees, and information readily obtainable on the Internet. Plaintiffs believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the common stock of Liberty Oilfield in the Company's Initial Public Offering ("IPO"), which closed on January 17, 2018, or purchased Liberty Oilfield common stock thereafter in the stock market pursuant and/or traceable to the Company's registration statement and prospectus (together, the "Registration Statement") issued in connection with the IPO during the period from January 12, 2018 to April 3, 2020 (the "Class Period").[1] This Complaint seeks to recover damages to Class members caused by Defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act").

2.    Liberty Oilfield provides hydraulic fracturing ("fracking") services to oil and gas exploration and production ("E&P") companies in North America. Fracking is a controversial technology involving the high-pressure pumping of sand, water, and chemicals into shale rocks to extract natural gas and oil.

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Liberty Oilfield; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

2

3.      Liberty Oilfield sold approximately 14.3 million shares of its common stock at $17 per share in the IPO, and received approximately $220 million in net proceeds. The Underwriter Defendants (defined below) earned approximately $12 million in commissions from the IPO.

4.      In the Registration Statement, Liberty Oilfield painted a rosy but misleading picture of the state of the fracking industry at the time of the IPO. The Registration Statement said that fracking capacity (*i.e.* supply) had declined significantly since 2014, and that demand for fracking services exceeded supply, a trend that is expected to continue.  Additionally, the Registration Statement stated that many of Liberty Oilfield's competitors had gone bankrupt and their fracking fleets were sitting idle – meaning competition in the fracking industry had decreased.  Any reasonable investor reading these statements in the Registration Statement would think that it was an opportune time to invest in Liberty Oilfield.

5.      The Registration Statement failed to disclose that, in truth, since mid-2017 there had been a rapid build-up in fracking capacity that was leading to oversupply and depressing the prices that fracking companies, including Liberty Oilfield, could charge for their services.  The Registration Statement also failed to warn that the continued increase in fracking capacity would further drive down prices until there was a sufficient increase in demand to absorb the glut of fracking capacity.

6.      Former Liberty Oilfield employees told Plaintiffs' investigator that starting from mid-to-late 2017: (a) there was a precipitous increase in fracking supply as new companies emerged and existing companies started to reactivate previously-idle fracking fleets in large number, (b) as a result, Liberty Oilfield had to cut prices and give discounts because of the

3

increasing supply in the fracking industry, and (c) Liberty Oilfield began asking vendors to lower prices in order for Liberty Oilfield to stay competitive.

7.    Indeed, in contrast to Liberty Oilfield's misleading Registration Statement, two other fracking companies that filed registration statements at approximately the same time as Liberty Oilfield both disclosed that there was a significant increase in fracking capacity, and that the oversupply was already having, and would continue to have, an adverse effect on prices until there was enough demand to balance out the supply.

8.    Approximately one week after Liberty Oilfield's IPO, the Houston Chronicle called 2018 "the year of the fracker" and reported that industry sources project fracking capacity to reach record-new heights in 2018.  The same article reported that fracking fleets were being added at an "unprecedented" pace.

9.    None of the information in ¶¶ 5-8 were included in Liberty Oilfield's negligently-prepared Registration Statement.  Instead, the Registration Statement told investors to only rely on the Registration Statement, and not on any outside information.

10.    As fracking supply continued to outstrip demand, putting further downward pressure on fracking prices, the value of Liberty Oilfield stock has plummeted to $2.48 per share as of April 3, 2020 (the date this lawsuit was filed), representing an 85% drop from the IPO price of $17 per share.

**JURISDICTION AND VENUE**

11.    The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

4

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as the alleged misstatements entered and subsequent damages took place within this judicial district. The Company is also headquartered in this judicial district.

14.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Liberty Oilfield securities in this District.

**PARTIES**

**Plaintiffs**

15.     Lead Plaintiff Cipriano Correa purchased Liberty Oilfield common stock pursuant and traceable to the Registration Statement during the Class Period.  His PSLRA certification was previously filed with the Court and is incorporated by reference. *See* Dkt. No. 43-2.  Named plaintiff Marc Joseph purchased Liberty Oilfield common stock pursuant and traceable to the Registration Statement during the Class Period.  His PSLRA certification was previously filed with the Court and is incorporated by reference. *See* Dkt. No. 1.

5

**Liberty Oilfield Defendants**

16.    Defendant Liberty Oilfield is a holding company that provides fracking services to oil and gas E&P companies through its wholly-owned subsidiary Liberty Oilfield Services New HoldCo LLC ("Liberty LLC"). Defendant Liberty Oilfield is incorporated in Delaware and maintains its principal executive offices at 950 17th Street, Suite 2400, Denver, Colorado 80202. Liberty Oilfield's shares are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LBRT."

17.    Defendant Christopher A. Wright ("Wright") is the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Wright signed the Registration Statement.

18.    Defendant Michael Stock ("Stock") is the Company's Chief Financial Officer ("CFO") and was a Director of the Company from February 2017 to January 2018. Defendant Stock signed the Registration Statement.

19.    Defendant Cary D. Steinbeck ("Steinbeck") has been a Director of the Company since January 2018.

20.    Defendant William F. Kimble ("Kimble") has been a Director of the Company since January 2018.

21.    Defendant Peter A. Dea ("Dea") has been a Director of the Company since January 2018.

22.    Defendant N. John Lancaster, Jr. ("Lancaster") has been a Director of the Company since January 2018, and is a Partner at Riverstone Holdings LLC ("Riverstone"), a private equity firm. Riverstone nominated Defendant Lancaster to Liberty Oilfield's Board.

6

23. Defendant Brett Staffieri ("Staffieri") has been a Director of the Company since January 2018, and is a Partner at Riverstone. Riverstone nominated Defendant Staffieri to Liberty Oilfield's Board.

24. Defendant Ken Babcock ("Babcock") has been a Director of the Company since January 2018, and is the Chief Executive Officer of Abaco Energy Technologies LLC, a company formed by Riverstone. Riverstone nominated Defendant Babcock to Liberty Oilfield's Board.

25. Defendant Jesal Shah ("Shah") has been a Director at the Company since January 2018, and is a Principal at Riverstone. Riverstone nominated Defendant Shah to Liberty Oilfield's Board.

26. Defendants Wright, Steinbeck, Kimble, Dea, Lancaster, Staffieri, Babcock, and Shah were identified in the Registration Statement as Director Nominees who will become Directors of the Company when the Company's common stock starts trading. Each of them signed a Consent form agreeing to be identified in the Registration Statement as a Director Nominee.

27. The Defendants named in ¶¶ 17-25 are referred to herein as the "Individual Defendants."

**Underwriter Defendants**

28. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Morgan Stanley purchased 3,119,118 shares of Liberty Oilfield common stock, which it then resold to the investing public.

7

29.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Goldman Sachs purchased 2,864,496 shares of Liberty Oilfield common stock, which it then resold to the investing public.

30.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Wells Fargo purchased 1,973,319 shares of Liberty Oilfield common stock, which it then resold to the investing public.

31.    Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO.  In the IPO, Citigroup purchased 1,527,730 shares of Liberty Oilfield common stock, which it then resold to the investing public.

32.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO.  In the IPO, J.P. Morgan purchased 891,176 shares of Liberty Oilfield common stock, which it then resold to the investing public.

33.    Defendant Evercore Group L.L.C. ("Evercore") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Evercore purchased 572,899 shares of Liberty Oilfield common stock, which it then resold to the investing public.

34.    Defendant Piper Sandler & Co. (F/K/A Piper Jaffray & Co.) ("Piper") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Piper purchased 381,933 shares of Liberty Oilfield common stock, which it then resold to the investing public.

35.    Defendant Tudor, Pickering, Holt & Co. Securities, LLC (F/K/A Tudor, Pickering, Holt & Co. Securities, Inc.) ("Tudor") is an investment banking firm that acted as an

8

underwriter of Liberty Oilfield's IPO. In the IPO, Tudor purchased 381,933 shares of Liberty Oilfield common stock, which it then resold to the investing public.

36.    Defendant Houlihan Lokey Capital, Inc. ("Houlihan Lokey") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Houlihan Lokey purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

37.    Defendant Intrepid Partners, LLC ("Intrepid") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Intrepid purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

38.    Defendant Petrie Partners Securities, LLC ("Petrie") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, Petrie purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

39.    Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") is an investment banking firm that acted as an underwriter of Liberty Oilfield's IPO. In the IPO, SunTrust purchased 254,622 shares of Liberty Oilfield common stock, which it then resold to the investing public.

40.    Defendants Morgan Stanley, Goldman Sachs, Wells Fargo, Citigroup, J.P. Morgan, Evercore, Piper, Tudor, Houlihan Lokey, Intrepid, Petrie, and SunTrust are referred to herein as the "Underwriter Defendants."

**Riverstone Defendants**

41.     Defendants R/C Energy IV Direct Partnership, L.P. ("R/C Direct") and R/C IV Liberty Holdings, L.P. ("R/C Liberty") (referred herein collectively as the "Riverstone

9

Defendants") are investment partnerships affiliated with and controlled by Riverstone.

42.    Immediately prior to the IPO, the Riverstone Defendants had a 49.7% ownership interest in Liberty LLC.

43.    Immediately after the IPO, the Riverstone Defendants owned 29.5% of Liberty Oilfield Class A common stock, 65.1% of Liberty Oilfield Class B common stock, and held 44.4% of Liberty Oilfield's aggregate voting power.

44.    The Riverstone Defendants sold 300,541 shares of Liberty Oilfield common stock in the IPO.

45.    Liberty Oilfield, the Individual Defendants, the Underwriter Defendants, and the Riverstone Defendants are referred to collectively as "Defendants."

## DETAILED ALLEGATIONS OF DEFENDANTS' VIOLATIONS OF THE SECURITIES ACT

**Background Information and the State of Fracking leading up to Liberty Oilfield's IPO**

46.    Hydraulic fracturing, or fracking, is an oil and gas extraction technique involving the high-pressure injection of sand, water, and chemicals into shale rocks to extract oil and natural gas.

47.    The amount of fracking capacity is measured by the number of active fleets (consisting of all the equipment necessary to conduct fracking), as well as the amount of pumping horsepower that these fleets are capable of generating.

48.    The most fertile grounds for fracking are in the western parts of the United States, including Texas, Colorado, Wyoming, and the Dakotas.  The Permian Basin and the Eagle Ford Shale in Texas are among the most active fracking sites in the U.S.

49.    Following a three-year downturn, the American fracking industry began to see a

10

major revival starting in mid-2017. To capitalize on rising demand, existing fracking companies built new fleets and reactivated idle ones, and new fracking companies emerged, taking advantage of the industry's low barrier to entry.

50. On January 25, 2018, the Houston Chronicle reported in an article titled "Sand, Water, and Horsepower: Welcome to the Year of the Fracker," that fracking supply was poised to set a new record high in 2018 (the "Houston Chronicle Article", attached hereto as Exhibit 1). According to the Houston Chronicle Article, the previous record of fracking horsepower deployed was 18 million horsepower, set in 2014, but industry sources project that available fracking horsepower would reach 19 million horsepower in 2018.

51. An energy analyst at the research firm Evercore ISI told the Houston Chronicle that fracking capacity "just massively increased in a short period of time." The CEO of ProPetro, another fracking company that fracks mainly in Texas' Permian Basin, told the Houston Chronicle that it has been adding fleets and increasing its fracking capacity at an "unprecedented" pace over the last year.

52. Previously-idle fleets were being rapidly reactivated and put to work. For example, Schlumberger NV, which acquired 20 idle fracking fleets in Texas from Weatherford International in December 2017, told the Houston Chronicle that it intended to spend $100 million to reactivate these 20 fleets. (As a comparison, Liberty Oilfield only had 19 fleets as of December 2017).

53. Other American fracking companies that sought to go public in late 2017 and early 2018 - approximately the same time as Liberty Oilfield's IPO - recognized and disclosed the rapid increase in the supply of fracking capacity and the adverse effects the oversupply was

11

having, and would continue to have, on pricing.

54.     Nine Energy Services, Inc., which completed its IPO on January 23, 2018 (one

week after Liberty Oilfield's IPO), made this disclosure in its registration statement:

> **Significant increases in overall market capacity have also caused active price competition and led to lower pricing and utilization levels for our services and products. The competitive environment has intensified since the recent industry downturn that began in late 2014, which caused an oversupply of, and reduced demand for, oilfield services, and we have seen substantial reductions in the prices we can charge for our services.[2]**

55.     Similarly, BJ Services Inc., which filed its final registration statement on July 28,

2017 for an aborted IPO made the following disclosure in its registration statement about excess

fracking supply currently in the market:

> **[A]ctivity must increase significantly before excess service capacity can be substantially absorbed and a pricing recovery takes place. We have observed increased drilling activity and other indications of increased activity and pricing improvements in several of the North American basins, but we believe there remains a significant amount of capacity that must be absorbed before service pricing will become more tightly correlated with higher commodity prices and increased activity.[3]**

56.     Indeed, both Nine Energy and BJ Services accurately disclosed that there was

excess supply in the fracking industry that was having an adverse effect on prices, and this

would continue unless there was increased demand to absorb the excess supply.

57.     The oversupply in the fracking industry was already affecting Liberty Oilfield's

business and operations starting in mid-2017, half a year before its IPO.

58.     FE1 worked as a Frac Services Coordinator at Liberty Oilfield's Cibolo, Texas

---

[2] Nine Energy Services, Inc. final registration statement on Form S-1/A, filed with the SEC on January 9, 2018.  Available on SEC's EDGAR database.

[3] BJ Services Inc. final registration statement on Form S-1/A, filed with the SEC on July 28, 2017.  Available on SEC's EDGAR database.

12

frac yard from April 2017 to July 2019, reporting to Allen Penman, Liberty Oilfield's Cibolo District Manager. He told Plaintiff's investigator that by late 2017, he was hearing from Penman and Jim Brady, Liberty Oilfield's Vice President of Operations who reported directly to Defendant Wright, about excess supply in the fracking industry:

> "There was talks for a while that there was a lot of horsepower out there in the industry, especially with a couple of mergers with Schlumberger buying up Weatherford's stuff there and then Baker Hughes taking out BJ and their operation there...we had to tighten up pricing quite a bit just to keep our work going, because there was a lot of competition out there."

59. According to FE1, the excess supply forced Liberty Oilfield to lower prices and give discounts; he noted that Liberty had to "come down on a little bit of discounts to keeping going. We were asking our vendors to come down on pricing too, like our chemical suppliers and everyone else."

60. FE2 worked as a Sand Coordinator at Liberty Oilfield from July 2017 to July 2020. FE2 was based in Odessa, Texas and reported to Jason Rhines, Liberty Oilfield's Odessa District Manager. As Sand Coordinator, FE2's job was to manage the supply of sand for fracking, making sure that they are transported from the supply team to the appropriate fracking fleets when needed.

61. According to FE2, in late 2017 it was clear that there was too much fracking supply in Texas: "there [was] like over 200 operators or 200 frac companies down there…everybody was just pretty much undercutting themselves [to get work]." For example, FE2 said that Liberty Oilfield had a competitor, Pumpco Energy Services, who for nine years fracked for a customer called XTO. Pumpco in late 2017 had three fleets that were fracking for XTO. Yet, Liberty Oilfield went to XTO and offered a lower price, and was able to win over

13

XTO's business despite XTO's nine-year relationship with Pumpco.

62.    FE2 confirmed that starting around August or September 2017, Liberty Oilfield started asking vendors and suppliers, including sand suppliers, to cut prices.  FE2 said that they asked suppliers to cut prices until 2019, because Liberty Oilfield anticipated that there would still be excess supply weighing down prices through 2018.

**Liberty Oilfield and its Misleading Registration Statement**

63.    Founded in 2011, Liberty Oilfield provides fracking service to oil and gas E&P companies in North America.  Liberty Oilfield operates primarily in Texas (Permian Basin and Eagle Ford Shale), Colorado (DJ Basin), Wyoming (Powder River Basin), and North Dakota (Williston Basin), all of which are among the most active fracking basins in the U.S.

64.    On January 2, 2018, after a series of amendments, Liberty Oilfield filed its final registration statement with the SEC on Form S-1/A. The SEC declared the registration statement effective on January 11, 2018.  The next day, on January 12, 2018, Liberty Oilfield common stock began trading on the NYSE.  Subsequently, on January 16, 2018, Liberty Oilfield filed the final prospectus for the IPO, which forms part of the registration statement.  The IPO formally closed on January 17, 2018.[4]

65.    In the IPO, Liberty Oilfield sold approximately 14.3 million shares of its common stock at $17.00 per share, for total net proceeds of over $220 million after underwriting fees and discounts.

66.    The Registration Statement was negligently-prepared, and failed to disclose: (a)

---

[4] In an IPO, the issuer's shares typically begin trading the day after the SEC declares its registration statement effective. An IPO typically closes the second business day after the start of trading, after the filing of the final prospectus.

14

the oversupply of fracking capacity existing at the time of the IPO, (2) the impact such oversupply was having, and would continue to have, on pricing until there was sufficient increased demand to absorb the supply.

67.    Instead, the Registration Statement touted Liberty Oilfield's prospects in a supposedly-contracting industry:

> We believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity since late 2014 will benefit us as industry demand increases. Industry sources report this capacity has declined between 40% and 60% from its peak of approximately 17 million HHP in 2014 and approximately 75% of this capacity is currently active and deployed. A number of our competitors have filed for bankruptcy or have otherwise undergone substantial debt restructuring, significantly reducing available capital and their ability to quickly redeploy fleets. In contrast, our rigorous preventive maintenance program, in addition to scheduled and in-process fleet additions and upgrades, has positioned us well to benefit from improving market dynamics. During the recent downturn, many oilfield service companies significantly reduced their employee headcounts, which will constrain their ability to quickly reactivate fleets. Over the same period, we retained our high quality and experienced employees, did not conduct lay offs and substantially increased our workforce.

68.    This was misleading because it failed to disclose the rapid increase of fracking capacity – a rate of increase industry sources described as "unprecedented" – that began in mid-2017, which was already driving down pricing.  It was also misleading because many of the idle fleets were being acquired by other companies and quickly refitted to enter the market.  For example, Schlumberger acquired 20 fleets from Weatherford in 2017 (or more than Liberty Oilfield's entire fleet size in December 2017) and was poised to redeploy them in 2018.

69.    The Registration Statement also falsely claimed that demand exceeded supply and that Liberty Oilfield was experiencing price increases:

> Because demand for new equipment exceeds active supply, we believe that

15

pricing power has begun to return to the broader oilfield services sector as well as the hydraulic fracturing industry. We are currently experiencing price increases, and believe that this trend will continue.

70. This was false because, as Nine Energy and BJ Services truthfully disclosed in their registration statements, supply exceeded demand in late 2017 and early 2018, and that was already having an adverse impact on prices. Former Liberty Oilfield employees, FE1 and FE2, both confirmed that Liberty Oilfield recognized the oversupply starting around mid-2017 and began to lower prices, and also asked its suppliers to also lower prices.

71. Liberty Oilfield's Registration Statement told investors not to rely on information that was different from what was presented in the Registration Statement:

**Neither we, the selling shareholder nor the underwriters have authorized anyone to provide you with information different from that contained in this prospectus and any free writing prospectus we have prepared. We take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.**

**Statutory Framework Applicable to the Registration Statement: Item 303 and Item 105**

72. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, requires disclosure of any known events, uncertainties or trend that had caused, or were reasonably likely to cause, Liberty Oilfield's disclosed financial condition not to be indicative of future results.

73. The oversupply of fracking capacity at the time of the IPO was already having a material adverse effect on Liberty Oilfield, forcing it to lower prices and give discounts. It would continue to put downward pressure on prices until there was sufficient increased demand to absorb the excess supply. This was a trend that needed to be disclosed under Item 303.

74. In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 requires, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant

16

factors that made the offering risky or speculative and that each risk factor adequately describe the risk.

75. Unlike Nine Energy and BJ Services, Liberty Oilfield's Registration Statement failed to warn investors of the existing oversupply of fracking capacity, or that such oversupply was having and would continue to have an adverse effect on pricing until there was greater demand to absorb the oversupply.

76. Instead, the Registration Statement merely provided boilerplate risk statements about potential contingent future problems that may occur. The Registration Statement included a generic disclosure that industry conditions are influenced by supply and demand (which is true for any business in any industry at any time), but failed to disclose the oversupply that was already present at the time of the IPO, and the impact that such oversupply was already having and would continue to have until mitigated by sufficient increased demand:

> Industry conditions are influenced by numerous factors over which we have no control, including:
>
> *        *        *
>
> . . . the supply of and demand for hydraulic fracturing and equipment in the United States[.]

77. Indeed, this is the type of generic and boilerplate discussion that the SEC has specifically deemed inadequate. *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

17

**Post-IPO Developments**

78.    The glut of fracking supply persisted after the IPO, as demand did not increase sufficiently to balance out the oversupply. As a result, Liberty Oilfield's stock price has plummeted in value since the IPO.  On April 3, 2020, the date that this lawsuit was filed, Liberty Oilfield's stock closed at $2.48 per share, representing an 85% drop in value from its IPO price of $17 per share.

**THE UNDERWRITER DEFENDANTS VIOLATED THE SECURITIES ACT**

79.    Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement.  15 U.S.C. § 77k(a)(5).

80.    Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable.  15 U.S.C. § 77l(a)(2).

81.    The Underwriter Defendants offered or sold Liberty Oilfield common stock.  The prospectus indicated that Liberty Oilfield engaged each of the Underwriter Defendants to conduct the IPO.

82.    Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

83.    It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13. Underwriters

18

"assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

84.     As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement.  To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process.  In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

85.     It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

86.     It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for Liberty Oilfield's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

87.     In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers."  Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors.  There is much literature that supports the premise of investment banks being gatekeepers.  For example, Defendant Goldman Sachs itself published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an

19

underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

88.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting Liberty Oilfield's IPO. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

89.    Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading.  This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

90.    The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied.  The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value.  The due diligence process is just the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

91.    The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to Liberty Oilfield's IPO.  In particular, the Underwriter Defendants, had they performed adequate due diligence, would have discovered that there was a rapid – indeed, unprecedent – increase in the supply of fracking capacity since mid-2017, and that this increase in supply was already causing Liberty Oilfield to lower prices and give discounts. The

21

Underwriter Defendants would have known that the glut in supply would further depress prices unless there was a ramping up of demand to balance the supply.

**PLAINTIFF'S' CLASS ACTION ALLEGATIONS**

92.    Plaintiffs brings this action as a class action on behalf of all persons and entities who purchased the common stock of Liberty Oilfield in the Company's IPO, which closed on January 17, 2018, or purchased Liberty Oilfield common stock thereafter in the stock market pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO during the Class Period.

93.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Liberty Oilfield or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.    Plaintiff's' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

95.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22

96.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Securities Act;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 11 of the Securities Act Against All Defendants Except the Riverstone Defendants**

98.     Plaintiffs incorporates all the foregoing allegations by reference.

99.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except the Riverstone Defendants.

100.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

101.    Defendants named in this Count are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

102.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

103.    By reason of the conduct herein alleged, each Defendant named in this Count violated or controlled a person who violated §11 of the Securities Act.

104.    Plaintiffs acquired Liberty Oilfield securities pursuant to the Registration Statement.

105.    At the time of their purchases of Liberty Oilfield securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

106.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected, and within three years of the IPO. It is therefore timely.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants**

107.    Plaintiffs incorporates all the foregoing allegations by reference.

24

108.    By means of the defective prospectus, the Underwriter Defendants promoted, solicited, and sold Liberty Oilfield common stock to Plaintiffs and other members of the Class.

109.    The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Underwriter Defendants owed Plaintiff and the other members of the Class who purchased Liberty Oilfield securities pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

110.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the prospectus at the time Plaintiffs acquired Liberty Oilfield common stock.  Indeed, the Registration Statement told investors to not rely on information different from what was presented in the Registration Statement.

111.    By reason of the conduct alleged herein, the Underwriter Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Liberty Oilfield common stock pursuant to the prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiffs and the other members of the Class who hold the securities issued pursuant to the prospectus have the right to rescind and recover the

25

consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

112.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**COUNT III**
**Violations of Section 15 of the Securities Act Against the Individual Defendants and the Riverstone Defendants**

113.    Plaintiffs incorporates all the foregoing by reference.

114.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and the Riverstone Defendants.

115.    The Individual Defendants and the Riverstone Defendants were controlling persons of Liberty Oilfield by virtue of their positions as directors or senior officers of Liberty Oilfield, and by their ownership of controlling shares of the Company. The Individual Defendants and Riverstone Defendants each had a series  of direct and indirect business and personal relationships with other directors and officers and major shareholders of Liberty Oilfield.

116.    The Individual Defendants and the Riverstone Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement, their consent to being named in the Registration Statement as Director Nominees, and having otherwise participated in the process which allowed the IPO to be successfully completed.

26

117. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of ~~himself~~ themselves and the Class, prays for judgment and relief as follows:

A. determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B. awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

C. awarding Plaintiffs and the Class prejudgment and post-judgement interest; and

D. awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demands a trial by jury.

Dated: _____ ~~August 31, 2020~~            ——————Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence Rosen*
Laurence Rosen
Yu Shi
275 Madison Ave., 40th Floor
New York, NY 10016

27

Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
yshi@rosenlegal.com

*Counsel for ~~Lead~~ Plaintiffs and the Class*

28

## CERTIFICATE OF SERVICE

I, Laurence Rosen, an attorney, hereby certify that on August 31, 2020_____, I caused a true and correct copy of the foregoing "SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS" to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record denoted on the Electronic Mail Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on August 31, 2020_____.

/s/Laurence Rosen
Laurence Rosen

29