IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:20-cv-00946-RM-NYW

CIPRIANO CORREA, et al., Individually and on Behalf of All Others Similarly Situated,

   Plaintiffs,

v.

LIBERTY OILFIELD SERVICES INC., et al.,

   Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

Plaintiffs' Motion for Class Certification ("Motion") essentially argues the Court should

certify a class simply because Plaintiffs bring Securities Act claims. That is not the law: Plaintiffs

are entitled to no presumptions and are required to present *evidence* proving each of the Rule 23

requirements for class certification. Engaging in the required "rigorous analysis," which the

Motion does not do, reflects that Plaintiffs' multi-year class cannot be certified because Plaintiffs

have not proven that issues common to the class predominate over a multitude of individual issues.

The Motion ignores at least three aspects of this case that make it different from many

Securities Act cases and fundamentally impact Rule 23(b)(3)'s demanding predominance analysis.

*First*, unlike the typical case that focuses on alleged misrepresentations and omissions of

*non-public, internal* company information, Plaintiffs' theory here is that the offering documents

for Liberty's January 2018 IPO misled investors by failing to disclose *industry* information and

trends, which were *publicly available* at the time of the IPO and throughout the proposed class

period. This theory, and the evidence of varying public information known by different Liberty

investors, raises key individualized issues that cannot be proven on a class-wide basis. One such

issue is whether and to what extent each investor knew the allegedly omitted information when

purchasing Liberty stock, a central liability issue. Another is whether each investor was on actual notice of the alleged misstatements and omissions by virtue of the publicly available information more than one year before this lawsuit was filed, barring their claims by the statute of limitations. If the answer to either is "yes" for a specific investor, that investor's claims fail. These investor knowledge and limitations issues are inherently individualized in this case.

*Second*, unlike in many stock-drop cases, Liberty performed well following the IPO and its stock price stayed above the $17 IPO price for nearly a year. This undisputed fact creates individual issues about whether each investor has any cognizable injury because those who sold their stock above $17 (as the evidence reflects many did) have no damages as a matter of law. Whether each investor has any cognizable injury (as required to even be part of the proposed class) is a significant issue on the facts of this case that cannot be determined without individual evidence.

*Third*, Plaintiffs seek to certify a class of Liberty stock purchasers extending through April 2020, over two years post-IPO. This proposed class definition exacerbates the individualized investor knowledge issues that impact liability as the mix of public industry information and individualized knowledge evolved over time. It also creates individual standing issues because each investor must trace its shares to the IPO, which cannot be done on a class-wide basis (if at all) once non-IPO shares were eligible to enter the market by July 2018. The length of the proposed class period further implicates individual issues of reliance because investors who purchased after Liberty issued an earnings statement covering twelve months following the IPO must prove they relied on the alleged misstatement or omission to establish liability.

Because of the individualized nature of these fundamental issues, trial of the proposed class representatives' claims would not resolve the claims of any other putative class member. Rather,

any attempt at adjudication by representation would devolve into mini-trials necessitating individual evidence as to each putative class member. Plaintiffs' Motion should be denied.

## STATEMENT OF RELEVANT FACTS

### I.    Liberty's IPO and Plaintiffs' Claims.

Liberty provides hydraulic fracturing services to oil and natural gas exploration and production companies. ECF No. 110 at § 4.1. It went public in January 2018 with the total sale of approximately 14.6 million shares at an offering price of $17 per share. *Id*. at §§ 4.17-4.19. The shares sold to the public were a small portion of the 69,654,058 shares outstanding post-IPO. Ex. B (Prospectus) at 16. The remaining shares held by pre-IPO owners were subject to a customary 180-day lockup (until July 11, 2018) from sale into the public market. *Id*. at 129.

Most of the early holders of Liberty's public stock were the type of sophisticated institutional investors that conduct significant company and industry research before making investments, such as Fidelity, BlackRock and Cerberus entities. Ex. A (Allen Report) at ¶¶ 56-63. In contrast, Plaintiffs bought Liberty stock based on unidentified online articles without reviewing any of Liberty's public filings or statements and without investment advice. Ex. C (Interrogatory responses) at 3; Ex. D (Correa Depo.) at 10:3-12:8, 13:4-15; Ex. E (Joseph Depo.) at 17:13-24.

Despite not having read the offering documents, Plaintiffs assert they were misled and seek to represent a class of those who purchased Liberty stock pursuant and/or traceable to the offering documents from January 12, 2018 through April 3, 2020. Mot. at 1. Plaintiffs' theory of liability is that the offering documents "failed to disclose that the fracking industry was adding capacity at an unprecedented rate at the time of Liberty's IPO, leading to oversupply and negatively impacting the prices that fracking companies, including Liberty, could charge for their services." *Id*. at 3.

This is an unusual theory because it is based on the alleged omission of purported industry-wide trends rather than internal company non-public information. Ex. A (Allen Report) at ¶¶ 14-15.

## II. There Was Significant Publicly Available Information About Industry Supply, Demand and Pricing Around the Time of the IPO.

The fracking and oilfield services industries are widely followed by industry analysts, market participants and the popular press. Ex. A (Allen Report) at ¶¶ 17-23. There was accordingly a significant amount of publicly available information about supply and demand for fracking services at the time of the IPO and throughout the putative class period. *Id*. at ¶¶ 16-45.

For example, Plaintiffs themselves allege that the so-called "truth" Liberty should have disclosed was publicly available at and around the time of the January 2018 IPO. Plaintiffs allege that two other companies seeking to go public around the same time, Nine Energy Services, Inc. ("NES") and BJ Services Inc. ("BJS"), publicly disclosed in their offering documents that there had been increases in the supply of fracking capacity and adverse effects on pricing as a result. Second Am. Compl. ("Compl.") ¶¶ 53-56. They also point to a January 25, 2018 *Houston Chronicle* article, published a week after the IPO, which they claim reported an "unprecedented" buildup of fracking capacity. Compl. ¶¶ 50-52.

There were also numerous analyst reports issued prior to and around the time of the IPO that discussed supply, demand and pricing dynamics. Ex. A (Allen Report) at ¶¶ 28-33. These analyst reports generally viewed the fracking market as being undersupplied leading to improving pricing, while recognizing the inherent risk that pricing could be hurt if supply increases overshot the increasing demand. *Id.*[1] One analyst was particularly "cautious on frac services stocks,"

---

[1] *See, e.g.*, Ex. F (Evercore 2/6/18) at 1 ("Resilient rig count and service intensity gains have already led to severe HHP under supply within the tightest OFS subsector. This serves to bolster

reasoning that while "[n]ear term supply/demand for the frac services sub-sector within OFS should remain tight" and it "expect[ed] pricing to improve in 1H18 at least," its analysis suggested that fleet additions would drive down market utilization "impl[ying] pricing could stall or modestly decline vs expectations of an increase through 2018." Ex. L (Cowen 2/7/18) at 1, 3.

The two named Plaintiffs did not know about any of this publicly available information because they did not do any research about the fracking industry (before or after buying Liberty stock) and did not invest in other companies in the industry. Ex. D (Correa Depo.) at 21:13-15, 22:10-23:11, 23:25-24:5; Ex. E (Joseph Depo.) at 17:13-18:2, 24:16-25:1.

Many of Liberty's institutional investor stockholders, in contrast, would have scrutinized this public information about increasing capacity and the risks to pricing, including the so-called "truth" as disclosed by NES. Ex. A (Allen Report) at ¶¶ 56-66. For example, at least 46 of Liberty's institutional stockholders as of March 31, 2018 also owned NES stock. *Id.* at ¶ 65 & App. E.[2]

---

pricing power in 2018 …. Within the peer group, lack of pricing discipline and the potential to 'overbuild' pressure pumping equipment also represent risks to broader market conditions."); Ex. G (Morgan Stanley 2/6/18) at 4 (referencing "currently increasing industry pricing (up 5-15% per competitors)" with "the potential for industry pricing pressure" as "bears point to announced capacity expansions leading to an oversupplied market"); Ex. H (J.P. Morgan 2/6/18) at 3 ("We expect frac market tightness to persist through 2018 as demand for capacity continues to outstrip supply and supports another leg higher in pricing in 1H18 (we maintain a base case of ~10-15%)."); Ex. I (Wells Fargo 2/6/18) at 8 ("Although market fears are increasing due to growth in newbuild capacity additions, particularly among small and private companies, we continue to believe that the supply/demand balance for the US pressure pumping market remains solid and will increasingly favor the most efficient pressure pumpers like LBRT."); Ex. J (Citi 2/6/18) at 3 ("While there remains the potential for some pricing increases over the course of 2018, given the supply of newbuilds expected to hit the market in the near term, further pricing gains are likely more subdued compared to the pricing gains in 2017."); Ex. K (Goldman 2/6/18) at 12, 16 ("The pressure pumping market remains under-supplied … We expect pressure pumping prices to continue to increase … Should newbuilding accelerate substantially across the industry, investors may become concerned about incremental supply overwhelming demand growth.").

[2] There is no institutional holdings data available for BJS because it did not ultimately go public.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**                   **5**

Almost all of the institutional investors also owned other fracking and oilfield services stocks and would have followed industry research and analysis as part of their investment process. *Id.* at ¶¶ 63, 68 & App. F.

### III.    Liberty's Strong Financial Performance Following the IPO.

Liberty's financial performance continued to be strong post-IPO. It deployed two new fleets in 1Q 2018 and a third in 2Q 2018, confirming market demand for Liberty to add capacity. Ex. M (5/7/2018 8-K) at Ex. 99.1 at 1; Ex. N (8/2/2018 8-K) at Ex. 99.1 at 2. Liberty's revenue increased in 1Q 2018, its first quarter as a public company, hit record levels in 2Q 2018, and continued to significantly exceed pre-IPO levels in 3Q 2018. Ex. M (5/7/2018 8-K) at Ex. 99.1 at 5; Ex. N (8/2/2018 8-K) at Ex. 99.1 at 5; Ex. O (10/31/2018 8-K) at Ex. 99.1 at 5. So did its Annualized Adjusted EBITDA per Average Active Fleet. *Id.*

### IV.    Many Liberty Stockholders Sold Above the $17 Offering Price, Including After the Expiration of the Lockup on July 11, 2018.

Liberty's strong financial performance following the IPO was reflected in its stock price, which stayed above the $17 IPO price for most of 2018. Ex. A (Allen Report) at ¶¶ 70-73 & App. C.

The lockup on sales of non-IPO shares expired on July 11, 2018 (180 days from the date of the Prospectus). Ex. B (Prospectus) at 129. Non-IPO shares were therefore eligible to be sold into the market and commingled with IPO shares in the public float, making it virtually impossible for purchasers to prove their shares were traceable to the IPO. Ex. A (Allen Report) at ¶¶ 74-83.

With the stock trading as high as $23.51 in the months following expiration of the lockup (*Id.* at App. C), it is no surprise that many investors sold their Liberty stock above the $17 IPO offering price. While determining which investors sold and at what price is inherently

individualized, an estimate from the publicly reported data from institutional investors is that approximately 38% of the shares potentially traceable to the IPO were sold for more than $17. Ex. A (Allen Report) at ¶ 73. Those who sold above the $17 IPO price have no cognizable damages as a matter of law, while those who purchased after expiration of the lockup must individually prove they can trace their shares to the IPO to have standing. *Infra* at 16-18.

## V.    Significant Additional Information Entered the Market from Liberty and Others, and as Business Conditions Changed Starting in Late 2018 and Into 2019.

In the second half of 2018, fracking companies and analysts began to identify and report signs of potential softening in the industry. Ex. A (Allen Report) at ¶¶ 36-41. Liberty similarly disclosed these changing conditions. With its 3Q 2018 results, Liberty reported that "[t]he frac pricing environment has been weakening modestly in the second half of 2018 as pressure pumping supply that was built for expected Permian completions growth outstripped the flattening completions growth curve." Ex. O (10/31/2018 8-K) at Ex. 99.1 at 1. Similarly, at a November 28, 2018 energy conference, Liberty explained it was seeing "a small oversupply in frac services due to horsepower that was built in anticipation of the growing U.S. completions count. And pricing softened." Ex. A (Allen Report) at ¶ 39. On February 5, 2019, Liberty disclosed its 4Q 2018 results were affected by "an oversupply of staffed frac fleets entering the fourth quarter which, combined with additional reduction in customer activity, led to a reduction of pricing for frac services." Ex. P (2/6/2019 8-K) at Ex. 99.1 at 2. These disclosures—made more than one year before this lawsuit was filed—mirror what Plaintiffs claim Liberty should have disclosed at the IPO. Liberty repeated similar disclosures each of the next three quarters in 2019. Ex A (Allen Report) at ¶ 12. While Liberty's stock price generally declined in 2019—consistent with the rest of the industry and

declining commodity prices—none of these disclosures about an oversupply and impact on pricing were followed by an immediate stock price drop. *Id.* at ¶¶ 12, 51-55 & App. C.

Many members of the putative class were undoubtedly aware of Liberty's and others' disclosures through their industry research and monitoring of their Liberty investment. Ex. A (Allen Report) at ¶¶ 62-63, 67-68. The named Plaintiffs, in contrast, did not attend industry conferences, regularly read Liberty's quarterly press releases, or otherwise monitor the fracking industry. Ex. D (Correa Depo.) at 20:13-21:12, 23:25-24:5; Ex. E (Joseph Depo.) at 24:1-25:1.

Plaintiff Joseph sold his 250 Liberty shares on November 8, 2019, at which time he did not believe that Liberty had misled him in any way. Ex. E (Joseph Depo.) at 22:25-23:3, 27:5-29:1, 44:17-45:13. Around this same time, analysts were reporting that "[i]t is no secret the hydraulic fracturing market is oversupplied today" with "total industry utilization down from 1H18 peak in the mid-70% range to likely the mid-to-low 60% range during 2H19." Ex. Q (BoA 10/23/19) at 5.

On February 5, 2020, Liberty reported its results for 4Q and full year 2019, which were down amidst a challenging macroeconomic environment. Ex. R (2/6/2020 8-K) at Ex. 99.1 at 1-2. As part of its discussion of a challenging outlook, Liberty again referenced an oversupply of frac fleets that was having an impact on pricing. *Id.* This earnings release was followed by a stock price drop. Ex. A (Allen Report) at ¶ 12 & App. C.

As is typical after any significant stock price drop, plaintiffs' law firms began issuing press releases announcing investigations into Liberty and asking Liberty stockholders to visit their websites to serve as potential named plaintiffs. *E.g.*, Ex. S (3/16/20 Rosen press release). Plaintiffs saw one of these press releases and reached out to now-lead counsel. Ex. D (Correa Depo.) at 24:20-26:15; Ex. E (Joseph Depo.) at 25:5-18. At the time they decided to get involved in this

lawsuit, neither Plaintiff had any basis to believe that Liberty had misled anyone. Ex. D (Correa Depo.) at 34:8-35:7, 36:15-37:13; Ex. E (Joseph Depo.) at 27:5-29:1.

## ARGUMENT

### I.    Plaintiffs Bear the Burden of Proving the Requirements for Class Certification.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).[3] Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

Plaintiffs "must demonstrate, under a strict burden of proof," that each of the requirements for class certification is met. *Tabor v. Hilti, Inc.*, 703 F. 3d 1206, 1228 (10th Cir. 2013). A district court must conduct a "rigorous analysis" to determine whether this burden has been met. *Vallario v. Vandehey*, 554 F.3d 1259, 1266-67 (10th Cir. 2009). This analysis frequently "overlap[s] with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. While Plaintiffs cite old case law to suggest the Court should err on the side of class certification (Mot. at 5), that is not the law. A court errs in "[r]elaxing" or "shifting" the burden of proof to defendants or "liberally constru[ing]" the requirements by resolving doubts "in favor of certification." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

### II.    Plaintiffs Have Not Proven that Common Issues Predominate Over Individual Ones.

To obtain certification under Rule 23(b)(3), it does not suffice for Plaintiffs to merely prove the existence of one or more common issues. The predominance requirement "is far more demanding." *Id*. at 1220. It "tests whether proposed classes are sufficiently cohesive to warrant

---

[3] Internal citations are omitted and emphasis is added unless otherwise indicated.

adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Court must accordingly "consider how a trial on the merits would be conducted if a class were certified." *XTO Energy*, 725 F.3d at 1220. This requires consideration of individualized issues arising not only in a plaintiff's *prima facie* liability case, but also from defenses and in determining damages. *Id.*; *Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 400 (D. Colo. 2014).

As a threshold matter, Plaintiffs fail to meet their evidentiary burden. The party seeking certification "must" satisfy the predominance requirement through "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs ignore that requirement. Without citing any evidence, Plaintiffs assert in conclusory fashion that predominance is met because they allege the offering documents contained misrepresentations. Mot. at 10-12. This exact approach was found to be insufficient to certify a Securities Act class in *In re Kosmos Energy Ltd. Securities Litigation*. 299 F.R.D. 133, 151-52 (N.D. Tex. 2014) (rejecting plaintiff's invitation to "presume that the proposed class is certifiable simply because of the securities law provisions pursuant to which this case was filed"). Plaintiffs' failure to offer evidence "ought to end the Court's predominance inquiry," *id.*, and is itself grounds to deny the Motion.[4]

Engaging in the rigorous evidentiary analysis required by the case law further demonstrates the insufficiency of Plaintiffs' superficial approach to their burden of proving the demanding predominance requirement. There are significant issues in this case that are not "common" because

---

[4] Plaintiffs' contention that predominance is "readily met" in "certain" securities cases says nothing about the facts in this securities case. Importantly, the district court cases they cite to suggest that predominance is established whenever a plaintiff alleges common misrepresentations all pre-date recent Supreme Court decisions like *Wal-Mart* and *Comcast* that make clear that a plaintiff must prove every Rule 23 element and is entitled to no presumptions. *See* Mot. at 10-12.

determining the answer as to the proposed class representatives will not determine the answer as to the rest of the putative class members "in one stroke." *Wal-Mart*, 564 U.S. at 350. These inherently individualized issues mean this case cannot be adjudicated by representation. It would necessarily devolve into "a series of individual mini-trials which the predominance requirement is intended to prevent." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006).

### 1. Individualized inquiries are necessary to determine each investor's knowledge of the alleged misrepresentations and omissions.

Defendants are not liable under Section 11 to persons who knew at the time they purchased Liberty shares of the alleged untruths or omissions in the offering documents. 15 U.S.C. § 77k(a). Investor knowledge is accordingly "a central issue" for liability on a Section 11 claim. *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986).

"Because of its potential to defeat liability, investor knowledge is a relevant consideration during class certification." *Kosmos*, 299 F.R.D. at 152. To preclude certification, evidence of investor knowledge of the allegedly misstated or omitted information need not rise to the level of proof required on the merits. *New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*, 477 F. App'x 809, 813 (2d Cir. 2012); *Kosmos*, 299 F.R.D. at 152-53. Rather, a court should deny class certification if "individual knowledge inquiries *might* be necessary" to determine potential class members' knowledge. *New Jersey Carpenters*, 477 F. App'x at 813 (affirming denial of class certification); *Kosmos*, 299 F.R.D. at 152-53 (denying class certification).

Proof of public information is a sufficient basis for determining that individual knowledge inquiries might be necessary, precluding class certification.[5] For example, in *Kosmos* there was

---

[5] *See, e.g.*, *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006) (reversing order certifying a class because "widespread knowledge" from press reports and industry sources

evidence that "negative news" about expected oil production was presented through conference calls, press releases, or news reports at various times throughout the putative class period. 299 F.R.D. at 153. The court denied class certification because such publicly-available information is "more than adequate" evidence that investors' knowledge is not uniform and therefore is not susceptible to common proof because each disclosure provides "opportunities during the putative class period . . . for potential class members to have acquired varying levels of knowledge regarding the Registration Statement's false and misleading statements." *Id.*

Similarly, in *Vignola v. Fat Brands, Inc.*, the court denied certification where "the allegedly omitted information that rendered the Offering Documents allegedly misleading was public," making it "likely that, before investing, some purchasers came upon, or discovered or were exposed to this allegedly omitted information." 2020 WL 1934976, at *5 (C.D. Cal. Mar. 13, 2020). The plaintiffs did not "proffer[] a viable method by which to test knowledge on a class-wide basis with common proof," and accordingly failed "to carry their burden to affirmatively demonstrate that common issues predominate over individualized lack of knowledge issues." *Id.*

The same is true here, where Plaintiffs' claim is that Liberty's offering documents misrepresented and failed to disclose information about supply, demand and pricing in the fracking industry. The evidentiary record reflects there was voluminous publicly available information

---

"would precipitate individual inquiries as to the knowledge of each member of the class"); *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (denying class certification because, in light of media coverage, "the extent of knowledge . . . will vary from shareholder to shareholder," requiring "an individual inquiry for each shareholder"); *In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010) (denying class certification based on individual knowledge issues arising from analyst communications, an investor presentation, and other public information), *order withdrawn*, 2010 WL 11500136 (S.D. Tex. June 17, 2010).

about these topics at the time of the IPO. Ex. A (Allen Report) at ¶¶ 16-31. Indeed, Plaintiffs themselves point to public disclosures by other companies and a public newspaper article as supposedly revealing the truth that Plaintiffs say Liberty concealed. *Supra* at 4. The evidence and these allegations doom Plaintiffs' ability to pursue their claims on class-wide basis because they raise inherently individualized issues about what each investor knew and when.

In addition to the opportunity for varying investor knowledge, which by itself is sufficient to make class certification inappropriate, the evidentiary record reflects that investors actually had differing knowledge of the allegedly omitted information. Plaintiffs admit they did not review publicly available information about the fracking industry before deciding to purchase Liberty stock. *Supra* at 3, 5. Other Liberty investors, however, were sophisticated institutions that conduct industry research and review public information before making investment decisions. Ex. A (Allen Report) at ¶¶ 56-63. Indeed, many also invested in other oilfield services companies, including NES, and would have reviewed NES's public disclosures that Plaintiffs themselves claim told the truth about industry conditions. *Id.* at ¶¶ 64-69. Plaintiffs have not provided any way to litigate the issue of investor knowledge on a class-wide basis. Nor can they. On this record, investor knowledge is an inherently individualized inquiry requiring evidence from each shareholder.

The individualized nature of investor knowledge is exacerbated when considering investors who purchased later in the proposed class period, which stretches through April 2020, over two years after the IPO. Additional public information about supply, demand and pricing continued to emerge over this time period, including Liberty's own disclosures about "an oversupply of frac fleets" that "led to a reduction of pricing for frac services," and analyst reports indicating that the oversupply was "no secret." *Supra* at 7-8. Some investors, like the named Plaintiffs, did not review

this information while other investors certainly did. *Supra* at 5-6, 8. Any attempt to determine liability as to any particular investor would have to account for what each investor knew at the time of each investment decision. It is not an issue that can be tried on a representative basis.

The question is not whether the evidence proves that particular investors had knowledge of the alleged omissions. Rather, the Court should deny class certification because the evidence reflects that each investor's knowledge is a significant liability issue and requires individualized evidence given variances between what each investor knew and when concerning the alleged misstatements and omissions. *New Jersey Carpenters*, 477 F. App'x at 813; *Vignola*, 2020 WL 1934976, at *5; *Kosmos*, 299 F.R.D. at 152-53; *Superior Offshore*, 2010 WL 2305742, at *5.

### 2. Individualized inquiries are necessary to determine whether the one-year statute of limitations bars each investor's claims.

The "necessity for individualized statute-of-limitations determinations" further "weighs against class certification." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). Each investor's claim must have been filed within one year after that investor discovered, or should have discovered, the alleged untrue statement or omission. 15 U.S.C. § 77m. The question of when an investor actually discovered the alleged untrue statement or omission will vary based on differing investor knowledge of the publicly available industry information.[6]

For example, individualized evidence is needed to determine which investors were aware in early 2018 of the publicly-discussed increase in fracking supply as companies sought to meet

---

[6] Defendants believe and preserve the argument that all class members' claims are time-barred because they were on *inquiry notice* more than a year before this suit was filed in April 2020 due to the extensive public information about Plaintiffs' claims and were otherwise aware of information concerning pricing in the fracking industry before they purchased Liberty's stock. Plaintiffs will presumably disagree, creating the need to litigate the separate issue of *actual notice*¸ which will be highly individualized.

increasing demand. *Supra* at 4-5. It will similarly be inherently individualized to determine which investors were aware in real time of Liberty's November 28, 2018 disclosure at an energy industry conference about an oversupply in frac services and softening pricing, and which investors actually reviewed Liberty's February 2019 press release with similar disclosures. *Id.* Particularly in a case like this one involving varied public information at different points in time with investors of varying sophistication, "whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006). Because limitations will be a central issue at any trial, it contributes to the mix of individualized issues that make class certification inappropriate. *See, e.g.*, *Johnson v. Kansas City S. Ry. Co.*, 208 F. App'x 292, 296-97 (5th Cir. 2006) (affirming denial of certification based on, among other things, individualized statute of limitations issues); *Miller v. Farmers Ins. Grp.*, 2012 WL 8017244, at *17 (W.D. Okla. Mar. 22, 2012) ("As the statute of limitations defense will require the court to determine who knew about the claims practice and when they knew it, the court concludes that the statute of limitations affirmative defense raises individualized issues which will predominate over the common issues and also makes class certification of this action inappropriate.").

### 3. Individualized inquiries are necessary to determine whether each investor has any cognizable injury and to determine damages.

Individualized inquiries are also required to determine whether each investor has any cognizable injury and, if so, to determine damages. While "the presence of certain 'non-injured' individuals within a plaintiff class does not necessarily defeat predominance," the presence of "large numbers" of non-injured class members is "a flaw that may defeat predominance." *Ramsay*

*v. Frontier, Inc.*, 2020 WL 8834796, at *5 (D. Colo. Sept. 23, 2020), *adopted*, 2021 WL 651021 (D. Colo. Feb. 19, 2021). Class certification is properly denied where the plaintiffs seek to include those who "have no claim" under the relevant statute. *J.B. v. Valdez*, 186 F.3d 1280, 1290 (10th Cir. 1999); *see Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 604 (D. Colo. 1990) (denying certification where "[t]he proposed class could easily contain thousands of people who sustained no injury").

This issue of large numbers of non-injured investors exists here due to Liberty's strong performance post-IPO. Investors who sold their stock above the $17 IPO price have no damages as a matter of law under the statute.[7] Liberty's stock price stayed above $17 for almost a year after the IPO and traded as high as $23.90. Ex. A (Allen Report) at App. C. One would expect that many stockholders would have sold above $17, and analysis of the Form 13-F data publicly reported by large institutional investors confirms that was the case. *Id.* at ¶¶ 70-73. Individualized inquiries are required to determine which investors fall into this large group that has no injury.

Plaintiffs appear to recognize the problem of large numbers of uninjured shareholders because they purport to exclude from the class "persons who suffered no compensable losses." Mot. at 1-2. But Plaintiffs cannot sidestep the predominance problem because their proposed exclusion would itself require mini-trials to determine who is and is not a member of the class. "If the court must undertake individualized inquiries in order to determine whether a person is a member of the class, the class is not appropriate." *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 556 (D. Colo. 2014). Individualized issues predominate when "whether a claimant actually falls

---

[7] For stockholders who sold their stock before commencement of the lawsuit, damages are capped at the difference between "the price at which the security was offered to the public" and the sales price, 15 U.S.C. § 77k(e), meaning that those who sell above the offering price have no damages.

within the class definition" cannot be determined with common proof. *See Lyall v. City of Denver*, 319 F.R.D. 558, 567 (D. Colo. 2017) (denying class certification on this basis); *see also Wendell H. Stone Co., Inc v. Five Star Advert., LLC*, 2021 WL 1080398, at \*3 (D. Colo. Mar. 17, 2021); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 304 F.R.D. 601, 606 (D. Colo. 2015); *Donaca*, 303 F.R.D. at 397. That is the case here, where there is no way to determine whether a Liberty investor "suffered no compensable losses" without individualized fact-finding.

The predominance problem is even more pronounced because even selling Liberty shares below $17 does not establish injury where the investor acquired both IPO and non-IPO shares. An investor must prove the shares for which Securities Act damages are sought "were those sold in an offering covered by the false registration statement." *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000). Accordingly, an investor would have to prove that a specific sale of Liberty stock for less than $17 was of IPO shares rather than non-IPO shares. This is particularly challenging where the investor has commingled IPO and non-IPO shares. *See, e.g.*, *Pierce v. Morris*, 2006 WL 2370343, at \*4 (N.D. Tex. Aug. 16, 2006) ("Global's commingling of its stock renders the Court unable to determine which of Global's shares are offering shares and thus support Plaintiffs' damages assertion and overall claim."). Consider a hypothetical investor that purchased 100 Liberty shares in the IPO for $17.00 in January 2018, purchased 100 more shares in the open market for $15.99 in December 2018, sold 150 shares for $17.50 in February 2019, and sold the remaining 50 shares for $14.17 in March 2019. *See generally* Ex. A (Allen Report) at App. C. It would require individual and fact-specific evidence for that investor to attempt to prove the 50 shares sold in March 2019 below the IPO price are traceable to the IPO. Whether viewed as an individual issue in proving harm or an individual issue of damages, Plaintiffs have not provided a

common methodology allowing for these issues to be addressed without individual proof. *XTO Energy*, 725 F.3d at 1220 ("[T]he extent to which material differences in damages determinations will require individualized inquiries" is part of the predominance analysis.).

### 4.  Individualized inquiries are necessary to determine Section 11 standing.

Section 11 standing is strictly limited to investors who prove the shares they purchased "were those sold in an offering covered by the false registration statement." *Joseph*, 223 F.3d at 1159; *see* 15 U.S.C. § 77k(a). This tracing requirement can be "difficult to meet" but it represents the "condition Congress has imposed" for less stringent Securities Act liability requirements. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013).

In the modern securities market, all publicly trading shares are held in a "fungible mass," making it "virtually impossible" to trace shares back to a particular offering once non-offering shares have entered the market. *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494-97 (5th Cir. 2005); *In re Century Aluminum*, 729 F.3d at 1107; Ex. A (Allen Report) at ¶¶ 74-80. As a result, federal courts routinely hold that plaintiffs who acquired their shares after non-offering shares have entered the market lack standing under Section 11. *See, e.g.*, *Krim*, 402 F.3d at 491-92.

Here, Plaintiffs' proposed class includes not only direct purchasers in the January 2018 IPO, but also so-called aftermarket purchasers who purchased "in the stock market pursuant and/or traceable to Liberty's registration statement and prospectus" all the way through April 3, 2020. Mot. at 1. But non-IPO shares were sold into the market and commingled with IPO shares after the lockup period expired in July 2018. *Supra* at 6-7. Plaintiffs offer no evidence of how they can demonstrate who purchased IPO rather than non-IPO shares, let alone in one stroke using common proof for the entire class. If it is even possible for such aftermarket purchasers to trace their shares

to the IPO, it would require individualized proof that destroys predominance. *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 117-18 (S.D.N.Y. 2004), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006) (tracing is "a necessarily individualized inquiry" that would "fragment the class action into myriad mini-trials").[8] Plaintiffs' proposed class therefore cannot be certified.[9]

### 5. Individualized inquiries are necessary to determine investor reliance.

Plaintiffs' proposed class also raises individualized issues of reliance. Investors that purchased stock after Liberty "made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement" must prove they bought "relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission." 15 U.S.C. § 77k(a); *e.g.*, *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 199-200 (S.D.N.Y. 2016) (dismissing claims after earning statement for this reason). Liberty released such an "earning statement" by April 30, 2019.[10] Because the proposed class includes purchasers who will be

---

[8] *See Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 2151838, at *7 (D. Ariz. July 17, 2009) ("Plaintiffs have not provided any information regarding how class members can or will trace their aftermarket stock. Individual questions regarding standing to assert a Section 11 claim would, therefore, overwhelm the questions common to the class if all aftermarket purchasers are included."); *cf. In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 281 F.R.D. 134, 147 (S.D.N.Y. Feb. 6, 2012) (recognizing that if plaintiffs had sought to include aftermarket purchasers in the class, as they do here, there would be "tracing problems that necessitate individualized inquiries and defeat the predominance requirement of Rule 23(b)(3)").

[9] At a minimum, any class should be limited to investors who purchased Liberty stock prior to the expiration of the lockup on July 11, 2018. *See, e.g.*, *In re IPO Sec. Litig.*, 227 F.R.D. at 120.

[10] Ex. T (2/28/2019 10-K) at F-1-F-3 (covering earnings for 2018); Ex. U (4/30/2019 8-K) at Ex. 99.1 at 5-7 (covering earnings for 1Q 2019). Liberty's registration statement was effective on January 11, 2018. ECF No. 110 at § 4.16. A Section 11 "earning statement" can be satisfied through a combination of multiple SEC filings. *See* 17 C.F.R. § 230.158.

required to prove reliance, an inherently individualized inquiry,[11] it cannot be certified. *E.g.*, *Halliburton v. Erica P. John Fund, Inc.*, 573 U.S. 258, 265-66 (2014) (class not certifiable if individual reliance is an issue).

## CONCLUSION

Plaintiffs have not carried their burden of proving that common issues predominate, and the evidentiary record reflects that this case cannot be tried on a representative basis. Defendants therefore respectfully request that the Court deny the Motion in its entirety.

Dated: January 14, 2022                              Respectfully submitted,

/s/ Daniel H. Gold                                   /s/ William Leone
R. Thaddeus Behrens                                  William Leone, No. 11403
Daniel H. Gold                                       NORTON ROSE FULBRIGHT US LLP
Matthew A. McGee                                     1225 17th Street, Suite 3050
SHEARMAN & STERLING LLP                              Denver, Colorado 80202
2828 N. Harwood Street, Suite 1800                   Phone: 303.801.2750
Dallas, Texas 75201                                  william.leone@nortonrosefulbright.com
Phone: 214.271.5777
thad.behrens@shearman.com                            Brian S. Weinstein
dan.gold@shearman.com                                Matthew R. Brock
matt.mcgee@shearman.com                              DAVIS POLK & WARDWELL LLP
                                                     450 Lexington Avenue
Lee F. Johnston, No. 27897                           New York, New York 10017
Benjamin G. Goodman                                  Phone: 212.450.4972
HAYNES AND BOONE, LLP                                brian.weinstein@davispolk.com
1050 17th Street, Suite 1800                         matthew.brock@davispolk.com
Denver, Colorado 80265
Phone: 303.382.6200                                  *Attorneys for the Underwriter Defendants*
lee.johnston@haynesboone.com
benjamin.goodman@haynesboone.com

*Attorneys for Liberty, the Individual*
*Defendants, and the Riverstone Defendants*

---

[11] Plaintiffs do not offer any basis by which reliance could be established with common proof. On the contrary, Plaintiffs' own testimony reflects that some investors purchased Liberty stock without even reading the offering documents. *Supra* at 3.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**                              **20**

## CERTIFICATE OF SERVICE

I certify that on January 14, 2022, a copy of the foregoing document was filed and served via the CM/ECF system on all parties of record.

/s/ Daniel H. Gold
Daniel H. Gold

*Attorney for Liberty, the Individual Defendants, and the Riverstone Defendants*