# EXHIBIT D



Deposition of:
## Cipriano Correa

*December 10, 2021*

In the Matter of:

## Correa, Cipriano Et Al  Vs. Liberty Oilfield Services Inc. Et Al

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

_____

CIPRIANO CORREA, et al.,            )

individually                        )

and on behalf of all others         )

similarly situated,                 )

                                    )

                    Plaintiffs,     )

                                    )

v.                                  )No. 1:20-cv-00946-RM-NYW

                                    )

LIBERTY OILFIELD SERVICES, INC.,    )

et al.,                             )

                                    )

                    Defendants.     )

_____

DEPOSITION OF CIPRIANO CORREA

_____

9:00 a.m.

December 10, 2021

Brawley, California

Reported By:  Judy Robinson, CCR #2171

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

LAURENCE ROSEN, ESQ.

YU SHI, ESQ.

THE ROSEN LAW FIRM, PA

275 Madison Avenue, 40th Floor

New York, New York, 10016

212.686.1060

lrosen@rosenlegal.com

yushi@rosenlegal.com

FOR LIBERTY OILFIELD SERVICES, INC., THE INDIVIDUAL DEFENDANTS,

AND THE RIVERSTONE DEFENDANTS:

DANIEL H. GOLD, ESQ.

R. THADDEUS BEHRENS, ESQ.

MATTHEW A. MCGEE, ESQ.

SHEARMAN & STERLING, LLP

2828 North Harwood Street, Suite #1800

Dallas, Texas 75201

214.271.5777

dan.gold@shearman.com

BENJAMIN G. GOODMAN, ESQ.

HAYNES AND BOONE

2323 Victory Avenue, Suite #700

Dallas, Texas 75219

214.651.5000

benjamin.goodman@haynesboone.com

FOR THE UNDERWRITER DEFENDANTS:

MATTHEW BROCK, ESQ.

BRIAN WEINSTEIN, ESQ.

DAVIS POLK & WARDWELL, LLP

450 Lexington Avenue

New York, New York 10017

212.450.4972

matthew.brock@davispolk.com

brian.weinstein@davispolk.com

Also Present:   Christian Ruiz de Chavez, Videographer

Page 3

                          I N D E X
WITNESS                 EXAMINATION                    PAGES
CIPRIANO CORREA

                        BY MR. GOLD ............... 5-50


                        E X H I B I T S


NO.          PAGE      DESCRIPTION


Exhibit 1    14        Certification and Authorization of
                       Named Plaintiff Pursuant to Federal
                       Security Laws

Exhibit 2    16        PLAINTIFFS00009, a Page from the
                       Merrill Lynch Brokerage Statement
Exhibit 3    25        Press Release Document, dated 3/16/20
Exhibit 4    26        Press Release Document, dated 4/3/20
Exhibit 5    26        Press Release Document, dated 5/22/20
Exhibit 6    29        PLAINTIFFS000010, Retention Agreement
Exhibit 7    41        Notice of Motion of Cipriano Correa
                       to Appoint Lead Plaintiff and Approve
                       Lead Plaintiff's Selection of Counsel

Page 4

BE IT REMEMBERED the deposition of CIPRIANO CORREA was taken on December 10, 2021, at 9:00 a.m., at 125 South 309th Street, Federal Way, Washington, 98003, before Judith A. Robinson, CCR, Notary Public in and for the State of Washington, residing at Federal Way, Washington.

Whereupon, the following proceedings were had, to-wit:

VIDEOGRAPHER:  The time on the record is 9:33 a.m., Pacific time.  Today's date is December 10th, 2021.

My name is, Christian Ruiz de Chavez.  I am the videographer representing Veritext.  The court reporter today is, Judy Robinson, representing Veritext as well.

This begins the videotaped deposition of Cipriano Correa in the matter of Correa Cipriano, et al., versus Liberty Oilfield Services, et al.

Testifying in the matter -- I mean, excuse me.  I'm sorry.

Will Counsel please, on the record, identify yourselves and state whom you represent, beginning with the questioning attorney, please?

MR. GOLD:  Dan Gold, from Shearman & Sterling, for the Liberty and Riverstone defendants.

MR. ROSEN:  Larry Rosen, from the Rosen Law Firm, on behalf of Mr. Correa, Mr. Joseph, and all the other class members.

VIDEOGRAPHER:  Counsel on Zoom?

Page 5

MR. BROCK:  Matthew Brock, with Davis Polk & Wardwell, on behalf of the underwriter defendants.

MR. GOODMAN:  Benjamin Goodman, with Haynes & Boone, LLP, on behalf of the Liberty and Riverstone defendants.

VIDEOGRAPHER:  Thank you, Counsel.  Now the court reporter will swear or affirm our witness, please.

CIPRIANO CORREA,

having been first duly sworn

on oath was examined

and testified as follows:

E X A M I N A T I O N

BY MR. GOLD:

Q    Thank you.  Good morning, Mr. Correa.

A    Good morning.

Q    Do you understand that the oath you took requires you to answer my questions truthfully and to the best of your ability?

A    Yes.

Q    Can you do that?

A    Yes.

Q    Have you been deposed before?  Have you -- have you given a deposition before?

A    No.

Q    Have you ever given testimony in court?

Page 6

A    No.

Q    Have you ever sued anyone before?

A    No.

Q    Have you ever been sued?

A    No.

Q    Have you ever been charged with a crime?

A    Let me take that back.  I -- I haven't, but my daughter was sued one time.  Well, it went to the insurance.  You know, we were there for -- I mean, later on, it was an accident, so I don't know if that counts.

Q    Okay.  Thank you.  Have you ever been charged with a crime?

A    No.

Q    The court reporter who's -- who's here remotely is going to be writing down everything that -- that any of us say.  I'll ask that you answer my questions out loud.  If you -- if you nod your head yes or no, I may know what you're answering, but we want to make sure the court reporter gets it so the Court will have an accurate reflection of your testimony.  Will you do that?

A    Yes.

Q    If I ask you a question you don't understand, will you please let me know?

A    Yes.

Q    Thank you.  Is there anything about your physical,

Page 7

mental, or emotional condition that would not allow you to answer questions fully today?

A    No, other than I'm nervous.  And sometime I'm -- I'm a little hard of hearing, so I sometime need you need to speak up.

Q    Yeah.  If you can't -- if for any reason you can't hear me, please do ask me to speak up.

A    Okay.

Q    Thank you.  I see you have two doc -- some -- some documents in front of; is that correct?

A    Yes.

Q    What are those?

A    The documents about the case, certification and -- and about the Court.

Q    How -- how many documents do you have with you?

A    One, two, three, four.

Q    All right.  Can we -- going one by one, could you please identify what each of them is?

A    This is -- the first one is a Certification and on -- Authorization of the Name of the Plaintiff Pursuit and Federal Security Loan.  The first one is a Certification and Authorization of the Name -- of the Name of Plaintiff Pursuant to the Federal Security Loan.

Q    What's the -- what's the next one?

A    In the United States District Court for the District of Columbia.

Page 8

Q    Hold on.

A    Well, I'm sorry.  Colorado.  Declaration of Cipriano Correa in Support of the Class Certification.

Q    Thank you.  And the third one?

A    Plaintiff Objection and Response to the Liberty and Riverstone Defendant First Set of Inter --

Q    Interrogatories.

A    That's it.

Q    Thank you.  Thank you.  And then the last one?

A    Second Amendment Class Action Complaint For Violation of the Federal Security Law.

Q    Thank you.  Mr. Correa, are you -- are you currently employed?

A    Part time.

Q    What do you do?

A    I work at a mesquite feed lot and do odds and end job. I'm semi-retired.

Q    How long have you been semi-retired?

A    Since June 4th of 2021.

Q    Recently?

A    Yeah, recently.

Q    Congratulations.

A    I did not like it.  That's why I went back to work.

Q    I'm glad you found something to do.  What did you do before semi-retiring in June of 2021?

Page 9

A    I worked for a power plant.

Q    And what did you do for the power plant?

A    I was a mechanic, a senior mechanic.

Q    Approximately how long have you done that?

A    Almost 35 years.

Q    Did you have any formal education after high school?

A    No.  Other than going to -- to the school that they sent me for mechanical and stuff and that.  That's about it.

Q    Got it.  Thank you.  Do you have any -- have you taken any courses or training related to investing in the stock market?

A    No.

Q    Do you do a lot of investing in the stock market?

A    Not really.

Q    Approximately how often do you buy or sell stock?

A    Maybe once or twice a year.

Q    And when you -- when do buy or sell stock, are you doing that just for yourself individually?

A    Yes.

Q    You do -- you don't have a company or -- or something like that that you're investing for?

A    No, no.

Q    Do you have an investment advisor?

A    No.

Q    And I -- I take it that you don't have people or any

Page 10

kind of staff that help you research and pick stocks?

A    No.

Q    How did you first hear about Liberty OilField Services?

A    Through MSN, and I went into the money internet.  I was just looking, and it came up.

Q    Okay.  When -- when you refer to MSN, is that a website?

A    Yes, the internet.

Q    And you -- you were -- you were on the internet, and you saw something about Liberty?

A    Yes.

Q    Is it -- is it okay with you if I refer to Liberty Oilfield Services as Liberty?  That will be easier for everyone?

A    Yes.

Q    Thank you.  What -- what did you see online about Liberty?

A    That it was a good investment, they analyzed the same to buy, and they were predicting that the stock would be up -- up to $30.

Q    Who was predicting that?

A    The analysts, I guess, that -- that look at the company at Liberty, they're the ones.

Q    And in this particular article on the -- on the website that you saw, do you know who the author was?

A    No, sir.

Page 11

Q    Is there anything else about that article that you recall?

A    Just headline news, you know, that they were talking about Liberty.

Q    Anything else?

A    No, sir.

Q    So you saw -- why did you decide to buy Liberty stock?

A    Well, said that it would go another $10 dollars, so, you know, it was my chance to make a little money.

Q    Other than the -- this -- this website article that you saw predicting that the stock would go up, were there any other reasons that you bought Liberty stock?

A    That the -- it was a good company to buy, reading their -- their -- what they were predicting.

Q    What their -- what this analysis was predicting?

A    And what Liberty -- and Liberty too, on the news.

Q    Okay.  So you told me about this -- this report that you saw.  Was there anything else -- was there something from Liberty that you reviewed prior to purchasing stock?

A    Just that it was a good company, you know, that the -- they -- that everything was working for them.

Q    What -- what I'm trying to figure out is whether you saw or researched or read anything other than the one website article that you told us about.  Was there anything else?

A    No.

Page 12

Q    What did you -- other than what you've already told us this morning, did you know anything else at that time that you bought Liberty stock about Liberty?

A    No.

Q    So you didn't -- you did not review any of Liberty's filings with the Securities and Exchange Commission before purchasing Liberty stock, correct?

A    Not that I remember.

Q    Did you do any research about fracking companies?

A    If there's an article that comes up and I'm just browsing through the internet, I'll stop and -- and read it.

Q    But prior to purchasing Liberty stock, other than this one article you've told us about already, did you review anything about fracking companies or the fracking industry generally?

A    There was times that I have because I heard fracking was another big thing was coming up.  But what article and everything, I don't remember.

Q    The -- the times you generally recall seeing things, do you know if that was before you purchased Liberty stock?

A    Yes, it was before.

Q    And what do you recall seeing?

A    That that was the next best thing for oil.

Q    And were these other articles that you saw online?

A    Yes.

Page 13

Q    You -- are -- do you recall any additional details about those articles?

A    No.

Q    I asked you earlier if you had an investment advisor, and you told me no.  Did you have an investment advisor at the time you purchased Liberty stock?

A    Not advisor, no.  I mean, I'm through Merrill Lynch in my direct account, and that's -- I can go in and buy and sell, but...

Q    You have a brokerage account through which you can buy and sell securities?

A    Through Merrill Lynch, yes.

Q    But did anyone from Merrill Lynch provide you advice on what to buy or sell?

A    No.

Q    Mr. Correa, if you could -- one of the documents you have in front of you, the one that's titled Certification, it's his copy of -- if you put that on --

Mr. Correa, do any of the four documents you have in front of you that you identified earlier, do they have any handwriting on them?

A    No.

MR. ROSEN:  This has his name and address, his address.  That's why I --

MR. GOLD:  That's an unredacted version?

Page 14

MR. ROSEN:  Yeah, yeah.  Not that it's a big deal.

MR. GOLD:  Yep.

MR. ROSEN:  But, you know, I just -- I just want to give him -- let him keep his own copies of stuff.

MR. GOLD:  Sure.

BY MR. GOLD:

Q    Why don't -- why don't -- I'm sorry.  You were looking -- I interrupted.  You were looking through in response to my question of whether any of the -- that four documents that you brought with you had handwriting, this one signature.

MR. ROSEN:  There was, like, notes, whether you made notes or not?

A    Notes, let me double-check.  A signature, no.

BY MR. GOLD:

Q    Okay.  If you'd like, you can just set those aside.

And I'm going to hand you what's been marked as Exhibit 1.  Just for the record, it's a document entitled Certification and Authorization of Named Plaintiff Pursuant to Federal Security Laws.

(Exhibit No. 1 was marked.)

BY MR. GOLD:

Q    Is that -- is that a -- another copy of one of the documents you brought with you?

A    Yes.

Q    What is your understanding of -- of this document?

Page 15

A    I don't understand the question.

Q    If you'll flip to the second page of the certification that's marked as Exhibit 1, do you see there's a signature?

A    Uh-huh.

Q    Is that your signature?

A    Yes.

Q    Okay.  Did -- did you sign this document either -- either in person or electronically?

A    Electronic.

Q    And it -- and it has a date of a signing, May 31st, 2020?

A    Yes.

Q    So you -- you signed Exhibit 1, and my question is, -- is what is it?

A    It's -- it is a certification for us to move to the next test that --

MR. ROSEN:  Take your time to read it.  Take your time to read it.

WITNESS:  (Complies)

A    Yeah.

MR. ROSEN:  Take as much time as you want.  Read the whole thing.

WITNESS: (Complies)  I'm asking that Rosen Law Firm -- to -- I'm giving them permission, I guess that's the word, to file an action to recover any damage or losses that

Page 16

I --

MR. ROSEN:  Finish -- finish reading the rest of it and see.

WITNESS:  And that I'm going to serve as a representative.

BY MR. GOLD:

Q    Is there a -- is there a portion of this document that lists your transactions in Liberty Securities?

A    Repeat the question.

Q    Is there a portion of this certification marked as Exhibit 1 that lists when you bought Liberty stock?

A    Yes.

Q    It lists here that you bought 1,000 shares on February 7th, 2018, at a price of $21.38; is that correct?

A    Yes.

Q    And did you review this document carefully before you signed it?

A    Yes.

Q    And did you understand that it was signed under penalty of perjury?

A    Yes.

(Exhibit No. 2 was marked.)

BY MR. GOLD:

Q    Mr. Correa, I'm handing you what's been marked as Exhibit 2, and once you have had a chance to look at the

Page 17

document, my question's going to be, what is Exhibit 2?

A    From Merrill Lynch, and it's where I bought -- bought

the stock, the day and how much and what it was worth.

Q    Is this a -- a page from an account -- a page of an

account statement from the Merrill Lynch brokerage account that

you told us about earlier?

A    Yes.

Q    What kind of account is this?

A    It's a direct -- a direct account where I can buy

stocks and sell without going -- without -- without call -- I

can go on the internet, log into my Merrill Lynch, and then I

can buy and sell when I want to.

Q    Okay.  Is it your personal account?

A    I guess, yes, it is.

Q    Is it a -- is it any kind of retirement account, like,

a 401(k) or something like that?

A    It's a -- let me step back.  It's through Merrill

Lynch.  It's my 401(k).  That money from my -- that was coming

out of my paycheck to invest into the 401, and then I set up a

direct account where I can transfer money from my 401 to my

direct, and then I could handle what to buy and what not to buy

and when to sell.

Q    Okay.  So is this -- money came out of your 401(k)

account and now is in this direct brokerage account?

A    Yes.

Page 18

Q    And this actually is -- is this a screen shot maybe from your phone?  Is that --

A    From my iPad.

Q    All right.  And for -- and for the record, this -- this document is Bates labeled Plaintiff's 000009.  I'm just referring to the little numbers on the bottom.

A    Down on --

Q    And so this also -- this document also lists your purchase of Liberty's stock; is that correct?

A    Yes.

Q    And in -- in -- and in the Quantity column, is shows 1,000 shares?

A    Yes.

Q    And then on -- on the left-hand side under Description, it shows a unit price of 2123700?

A    Yes.

Q    Is that -- is that the price at which you purchased the stock?

A    Yes.

Q    If you look back at Exhibit 1, the Certification, that lists the purchase price at $21.38.  And Exhibit 2 from Merrill Lynch lists the purchase price at $21.37?

A    Yes.

Q    Do you know which is correct?

A    No.

Page 19

Q    Do you know, the inform -- if you look at Exhibit 1,
the certification, do you know where that information came from?

A    No.

MR. ROSEN:  I'm just guessing he included the
commission, because if you look at the commission, it's --

MR. GOLD:  Well, I -- I'm asking for the witness's
testimony, not yours.

MR. ROSEN:  Sure.

A    But that's what I was going to say.  It could it -- it
depended on the commission of $8.95 on the Exhibit 2.

BY MR. GOLD:

Q    Well, there -- where -- do you know where -- do you
know where the $2.38 came from?

A    The --

Q    The $2 the 21 -- I'm sorry.  The $21.38 price per share
listed on Exhibit 1, is that information that -- that you
provided?

A    I provided to Rosen Law Firm Exhibit 2, and that's --
Exhibit 1, that's what the price they put there.  I don't -- I
don't --

Q    Yeah.  That -- that -- that's a perfectly acceptable
answer.

A    I don't know.

Q    Have you sold any of the thousand shares of Liberty
stock that -- that you purchased?

Page 20

A     No.

Q     Why not?

A     Because I was hoping I could recover my money.

Q     Do you continue to believe that Liberty is a good investment?

A     No.

Q     Do you know whether Liberty stock has traded above your purchase price since the time you bought it?

A     No.

Q     Does existence of this lawsuit play any role in your decision to continue holding Liberty stock?

A     No.

Q     After buying Liberty stock, did you start reviewing the company's SEC filing?

A     No.

Q     When I -- when I use the -- when I said "SEC," did you understand that I was referring to the Security and -- and Exchange Commission?

A     Yes.

Q     Okay.  Just wanted to check.  Thank you.

Did you start reading Liberty's quarterly earnings press releases?

A     Now and then.

Q     Did you listen to any of Liberty's quarterly investor conference calls?

Page 21

A    No.

Q    You said that now and then you would read some -- some Liberty press releases.  Can you describe -- describe for me how and when you would review those?

A    Maybe once a year when the quarters were coming out seeing they were going to make the quarter or not, like, it was not -- just now and then.

Q    So that's not something you would do every quarter?  It's something you would do now and then?

A    Yes.

Q    Do you know which press releases you reviewed?

A    No.

Q    Since February of 2018, have you invested in any other fracking companies?

A    No.

Q    Since 20 -- since February of 2018, have you invested in any other oil field services companies?

A    Yes.

Q    Which ones?

A    COP.  It's a Conquer -- Conquer -- I think it's called Conquer.  I just know the COP, Exxon, BP.  What is it?  British Petroleum and -- and Phillips 66.

Q    The first one you mentioned, COP, do you know if that is the stock symbol or a shorthand?

A    It's a symbol.  I can't pronounce the -- CON --

Page 22

MR. ROSEN:  Chesapeake?

WITNESS:  No.

    A    And Chesapeake too, that's another one that I'm -- I
lost my ass on that one, but --

BY MR. GOLD:

    Q    We -- we can look up COP and figure it out.

MR. ROSEN:  I'll look it up right now.  Conoco.

WITNESS:  Conoco, that's right.

BY MR. GOLD:

    Q    Thank you.  Do you have any investment in -- in a
company named ProPetro Holdings?  ProPetro Holdings?

    A    No.

    Q    What about Halliburton?

    A    No.

    Q    FTS International?

    A    No.

    Q    Next Tier Oilfield Solutions?

    A    No.

    Q    Patterson UTI Energy?

    A    No.

    Q    ROC?

    A    No.

    Q    Schlumbergers (what?)?

    A    No.

    Q    Superior Energy Services?

Page 23

A    No.

Q    Basic Energy Services?

A    No.

Q    Calfrac Well Services?

A    No.

Q    Weatherford International?

A    No.

Q    Nine Energy Services?

A    No.

Q    BJ Services?

A    No.

Q    Have you done anything to follow the fracking or oil field services industry?

A    Just now and then to see what the quarters -- what -- whether it's going to be missed all or not.

Q    What do you mean by that?

A    I mean, when their quarters came out that they did good or dividends are going to come out good or -- or they missed it and, you know, that's about it.  I -- I don't really get involved too heavy on them.

Q    And are you -- and you -- are you referring, in your answer to the questions, to the -- the companies you told me about that you had investments in?

A    Yes.

Q    What about the -- the industry more generally?  Do you

Page 24

do any research about what's going on in the -- the fracking industry?

A    Not in the fracking.

Q    And was the same true since February of 2018?

A    Yes.

Q    Did you attend -- since February of 2018, have you attended industry conferences?

A    No.

Q    Do you keep track of -- or since February of 2018, have you kept track of oil and gas commodity prices?

A    Yes.

Q    Tell me about that.

A    I just watch it.  Okay.  The barrel of oil is whatever price, you know, $20 a barrel.  A week later, it's up to 30, you know.  I say, naturally, it goes high.  The stock -- the companies are going up.  Their stock is going to go high.

Q    The companies, their stocks seem to move in connection with oil and gas prices?

A    Yes.

Q    How did you first become involved in this lawsuit?

A    I was in the internet reading on oil, and I seen where -- that there was an article where they were suing Liberty.

Q    Who was suing Liberty?

A    Rosen Law Firm.

Q    So you were online, and you saw an article or -- or

Page 25

maybe a press release for a lawsuit against Liberty?

A    Yes.

Q    Do you know when you saw that?

A    No, I can't -- I can't remember.

(Exhibit No. 3 was marked.)

BY MR. GOLD:

Q    I'm handing you what's been marked as Exhibit 3.

MR. ROSEN:  You can go ahead and read it.  Take -- take a couple minutes.

BY MR. GOLD:

Q    Any -- any time I give you a document, please take as much time as you need to -- to review it before I ask you questions about it.

A    Yes.  Can I write on these on the --

Q    No --

A    Oh.

Q    Those are -- those are actually the official court copies.

A    Okay.

Q    So no one can write on those.  Have you had a chance to review that?

A    Yes, sir.

Q    Do you know if that is an article and press release that you saw?

A    I'm not exactly sure, but I think it is.

Page 26

Q    Something like that?

A    Something like this, yes.

(Exhibit Nos. 4 and 5 were marked.)

BY MR. GOLD:

Q    I'm going to -- I'm going to give you two more documents to look at.  I've marked -- this is marked as Exhibit 4.  And this one is marked as Exhibit 5.  And -- and take as much time as you'd like to look at them, and let me know if -- if looking at these refreshes your memory as to whether one of them is the article or press release you remember seeing online about the Rosen Law Firm suing Liberty.

A    If I can recall, I think it was Exhibit 3 is what I remember seeing online.

Q    Exhibit 3, and is that the one that's dated March 16th?

A    Yes.

Q    All right.  So you were online.  You saw an article or a press release from the Rosen Law Firm about suing Liberty.  Perhaps Number -- perhaps what we've marked as Exhibit 3.

Tell me what happened next.

A    I went ahead and clicked on this web.  Yeah.  Right here, "If you purchased shares of Liberty Oilfield, please visit the firm website," and that's what I clicked on.  If I -- if I remember.  I mean, I'm pretty sure that's what I did, and -- and then I just filled out the --

Q    Okay.  So regardless for what it -- whether this is the

Page 27

exact article, you saw something online from the Rosen Law Firm

about suing Liberty, and you clicked on a link to -- is that

correct?

    A    Yes.

    Q    And then what -- what did you do then?  You clicked on

the link and what happened?

    A    What I can remember is, this -- this page came out to

fill out your name, when you purchased the stock.  I don't

recall how it went, but -- and then I submitted it.

    Q    Prior to that, have you heard of the Rosen Law Firm?

    A    No.

    Q    What happened next after you submitted your information

through that form?

    A    I don't recall when, but someone -- and I don't

remember neither of that -- I'm pretty sure I put my email on

that and my phone number, you know, all the things.  And I think

they contacted me through email.

    Q    Do you know if a lawsuit had already been filed at that

time?

    A    No.

    Q    Bad question.  Are -- did -- are you saying -- when you

answered no, are you saying you don't know whether a lawsuit has

been filed or you believe a lawsuit has not been filed?

    A    Before I read this?

    Q    Correct.

Page 28

A    No.  I did not know until I went --

Q    You didn't know?  I'm sorry.  I didn't mean to
interrupt you.

So you -- when you clicked on that link, you did not
know whether a lawsuit had been filed?

A    No.

Q    After someone reached out to you from the Rosen Law
Firm by email, what happened next?

A    I really don't remember what they did.  They discussed
this -- if I'm not mistaken, they discussed the case telling me
about it and what's going to happen.

Q    Earlier, we looked at Exhibit 1, the Certification --

A    Uh-huh.

Q    -- that you signed that was dated May 31st, 2020?

A    Uh-huh, yes.

Q    Can you -- does that help you place in time at all when
this email or these discussions were?

A    No.

Q    Does it -- do you recall if it was a matter of days in
between when you clicked on the link and when you signed the
Certification, or was it months?  I'm just trying to get a --
your best estimate of the time.

A    I really don't remember.  I don't know.

Q    Fair enough.  Did you review any documents before
deciding to get involved in the lawsuit?

Page 29

A    Other than what Rosen, you know -- what they wrote about them.  That's the only thing.  I read to click on, you know, and then I clicked on the website to join.

Q    Does it -- did you -- other than the press release with the -- the link that you clicked on, did you review anything else --

A    No.

Q    Before -- before --

A    No.

Q    -- deciding to get involved in the lawsuit?

A    No.

Q    Do you have a signed -- or do you have a -- a letter or an agreement with -- with the Rosen Law Firm regarding them representing you in this case?

A    Other than this Certification, and I -- I'm not too sure.

(Exhibit No. 6 was marked.)

BY MR. GOLD:

Q    I'm handing you what's been marked as Exhibit 6.  And for the record, it is a document entitled Retention Agreement.  And it's Bates label Plaintiff's 000010 through 11.

MR. ROSEN:  Mr. Correa, take -- take five minutes and read this through thoroughly so you know what it is.

WITNESS:  Okay.

BY MR. GOLD:

Page 30

Q    Have you had a chance to thoroughly review Exhibit 6?

A    Yes.

Q    Have you seen that document before?

A    Yes, I probably have.

Q    What is your understanding of this document?

A    That they were representing me and that I would -- at no charge if -- if they don't win, I'm not going to get charged.

Q    What -- what is your understanding of how the Rosen Law Firm is paid if they do win?

A    Well, there's a percentage that they get.

Q    Did you negotiate that percentage?

A    No.

Q    Let's take a look back at Exhibit 1, the Certification. If you look at the portion right below where it lists your name and -- and there's some redacted information about you.  The section marked, "Plaintiff Certifies that," do you see that?

A    Oh, yes.

Q    By the little black box?

A    Yes.

Q    It says, "Plaintiff certifies that, 1, plaintiff has review the Complaint and authorized its filing."

Do you see that?

A    Yes.

Q    What complaint are you referring to in this Certification that you sent?

Page 31

A    To recover damage that -- that the stock went -- to recover my money and not only to me but to other invest -- investors that are in this lawsuit.

Q    Have you, yourself, filed a complaint as of May 31st, 2020, when -- when you signed the certification?

A    Well, other than going into the web and filling out the -- you know, the -- the document.  I guess that's what you called them.

Q    Have you reviewed a court filing that made allegations against the defendants?

A    Are you talking about these other --

Q    Sure.  So something that -- one of the documents you brought with you was titled Second Amended Complaint.

A    It's one right here. (indicating)

Q    And at the time you signed your Certification, had you reviewed a formal --

A    I'm pretty sure, yes.

Q    -- document -- document that looked like that?

A    Yes.

Q    Was it -- who had -- who was the plaintiff who filed the Complaint that you think you reviewed before signing the Certification?

A    What do -- what do you mean?  I mean...

Q    Do you -- do you understand you are the plaintiff --

A    Yes.

Page 32

Q    -- in this lawsuit?

A    Okay.  I'm the plaintiff.

Q    The plaintiff is the person who's bringing the lawsuit.
Do you understand that?

A    Yes.

Q    All right.  So the -- you told me you thought you had
reviewed a -- a complaint prior to signing your certification,
and my question is, who was the -- the plaintiff?  Who was the
person who had brought that lawsuit, if you know?

A    Rosen Law Firm.  I mean...

Q    Are you aware that there was a similar case filed by
another Liberty share -- Liberty shareholder in state court?

A    At what time?

Q    At -- at the time you signed -- at the time you decided
to get involved in this lawsuit, were you aware that there was a
law -- a similar lawsuit that had been filed in -- in state
court?

A    Yes.  Joseph, if that's the same.

Q    I'm sorry.  I don't want to interrupt.

        MR. ROSEN:  He's confused.  I -- no.  I mean, you
don't -- it's okay to say you don't know or you don't
understand.  Don't feel obligated.

        WITNESS:  No.  I understand that.  I just --

        MR. ROSEN:  So -- so -- so -- if -- and you can ask
him to rephrase it or explain the question more clearly.

Page 33

Just, it's -- you know, I don't want you to speculate or feel obligated to answer a question if you don't know exactly the answer or you're not comfortable.

WITNESS:  Yeah.  Explain it to me again.

BY MR. GOLD:

Q    You mentioned Mr. Joseph.  Who is that?

A    He's the guy that -- the second that's filing another lawsuit too.

Q    At the time you signed your certification, did you review a lawsuit that is filed on Mr. Joseph?

A    No.

Q    Are you aware that separate and apart from the lawsuit that you and Mr. Joseph have, the one we're here today about, there's another lawsuit in state court brought by a different Liberty shareholder?

A    No.

Q    Have you ever spoken with Mr. Joseph?

A    No.

Q    Have you ever had any communications with him?

A    No.

Q    Who are you suing in this lawsuit?

A    Liberty.

Q    Anybody else?

A    And Riverstone.  I'm pretty sure there's several, but I just can't remember.

Page 34

Q    Why are you suing Liberty?

A    To recover my losses.

Q    What is it that you believe Liberty did wrong?

A    That they were -- that the demand for frack -- fraction -- fracking was there.  The supply was there, and the demand for that was there, and actually it wasn't.  It was -- prices were dropping.  The supply was -- or the supply -- so...

Q    At the time you decided to get involved in this lawsuit, did you know anything about supply or demand or pricing?

A    On fracking or what?

Q    With respect to Liberty.

A    No.

Q    At the time you decided to get involved in the lawsuit, what basis did you have to think that -- that there was merit in suing Liberty?

A    Explain.

Q    Yeah.  You -- you -- you -- the Liberty stock price has gone down, and you lost money, correct?

A    Yes.

Q    I assume you lost money on other stocks?

A    Yes.

Q    Okay.  Sometimes prices go up?  Sometimes they go down?

A    Yes.

Q    Would you agree with me that you're not going to file a

Page 35

lawsuit against a company simply because its stock price went down?

A    As long as the company don't mislead or -- that's...

Q    That's a yes?  You're not going to sue -- sue only because the stock price went down?  There would have to be something else?

A    Yes.

Q    And you mentioned misleading, right?

A    Yes.

Q    Do you believe that Liberty mislead you?

A    Yes.

Q    In what way?

A    That the demand of fracking -- fraction -- of fracking was going to be there and this company could do real good, and in the mean time, it was going down, the prices and everything, and -- and this -- there was so much supply out there.

Q    What did Liberty say or do that mislead you?

A    Just like what I said.  They were saying that the supply was there, and it actually wasn't.

Q    Who --

A    Oh.

            MR. ROSEN:  Do you want to rephrase that?

            WITNESS:  Rephrase that.  Yes, yes, yes.  You got me a little bit.

            Can we take a break?

Page 36

MR. GOLD: Yes, we can.

VIDEOGRAPHER: Off the record, and the time is 10:40 a.m.

(Off the record.)

VIDEOGRAPHER: Back on the record. The time is 10:49 a.m.

Please proceed.

BY MR. GOLD:

Q    Before the break, we were talking about why you're suing Liberty, correct?

A    Yes.

Q    And you were telling me that you thought that Liberty had mislead you?

A    Yes.

Q    At the -- at the time you got involved in the lawsuit in May of 2020, did you believe Liberty had mislead you?

A    Repeat the question again.

Q    At the time you got involved in the lawsuit and signed your -- your Certification in Exhibit 1, May 31st, 2020, did you believe Liberty had mislead you?

A    I went over at -- the court documents.

Q    Prior to reading court documents, did you have any reason to think that Liberty had mislead you?

A    Before I signed the certification too?

Q    Sure.

Page 37

A    Other than doing that -- what was that, Exhibit 3? With the lawsuit on Liberty and seeing their stock go down.

Q    Is it fair to say -- please tell me if it isn't.  Is it fair to say that you knew you -- you knew the stock price had dropped, and prior to seeing information from the Rosen Law Firm, you didn't have any reason to think that Liberty had -- had mislead you?

A    Other than -- than looking at what the stock was dropping, I thought maybe there might be something that they didn't come out and say, and that's why the stock was dropping so much.

Q    So just the stock price declining?

A    Declining, yes.

Q    Okay.  Sitting here today, I think you said that Liberty mislead you about supply; is that correct?

A    I'm just looking on this.

        MR. ROSEN:  So what's -- what's the question, actually?  Because I don't think he can actually answer the question.

        WITNESS:  I don't understand.  That's what I'm trying to --

BY MR. GOLD:

Q    Yeah.  I apologize, and I will rephrase.

A    I was -- go.

Q    Sitting here today, what is it you believe Liberty

Page 38

mislead you about?

A    The demand for fraction -- fracking was going to be there and -- and the price was going to go up.

Q    The price of what was going to go up?

A    Of their stock.

Q    What did you do to prepare for your deposition today?

A    Other than yours today, talking to Mr. Rosen here and reading all the documents.  I mean, I have read them before, but never -- just here and there.

Q    So you -- you met with Mr. Rosen yesterday?

A    Yes.

Q    And you reviewed some documents?

A    Yes.

Q    Were those the doc -- the four documents that you've brought with you today or -- or are they --

A    The four, yes.

Q    Just -- just those four.  Yeah.  Did you have those, or did Mr. Rosen give those to you yesterday?

A    No, I had them.

Q    About how long -- I don't -- I don't want you to tell me what -- what you and Mr. Rosen talked about.  About how long did you and Mr. Rosen talk yesterday?

A    An hour, an hour and half, two hours, but you know.

Q    Was that an in-person meeting, or was it by --

A    In person.

Page 39

Q    Was that the first time you've met Mr. Rosen in person?

A    Yes.

Q    Was it the first time you've spoken with him?

A    In person?

MR. ROSEN:  Or on the phone?

BY MR. GOLD:

Q    Well, I'm -- I'm including on -- I'm trying to distinguish between talking with Mr. Rosen and talking with other people who may work with him.

A    Yes.

MR. ROSEN:  How many phone calls have you and I had --

MR. GOLD:  Yes.

MR. ROSEN:  -- different from, like, say, you and Erica.

WITNESS:  Yes, yes, yes.

MR. GOLD:  Sorry.  Maybe we'll rephrase.

BY MR. GOLD:

Q    I think my -- I think my question was, was yesterday the first time you had spoken with Mr. Rosen either in person or by phone?

A    Well, yesterday was the first time I talked to him in person, and then other times were by phone, you know, several in -- in time, you know.

Q    Prior to any recent phone calls about your deposition,

Page 40

when was the last time you had spoken to him?

A    Couple weeks ago, a week ago.

Q    Did you talk with anyone, other than Mr. Rosen, in connection with preparing for your deposition?

A    Erica.  I think -- I believe her last name is Stone.

        MR. ROSEN:  Yes.

BY MR. GOLD:

Q    Anybody else?

A    I -- I -- I think that's all.  I...

Q    How often do you speak with Erica or Mr. Rosen or anyone else from his firm?

A    Since I filled this out, what was it, in 2020, I can't remember, but 2020, it's been probably what I -- maybe 10.

Q    How much time -- prior to today -- actually, prior to -- prior to yesterday, how much time have you -- would you estimate you've spent on this case?

A    On the phone or emails or viewing document?

Q    Everything combined.

A    Everything combined, 20 to 30 hours.

Q    What have you done?

A    Like what?

Q    You -- you said you spent 20 to 30 hours on the case. Can you tell me what you've done during that time?

A    I mean, we talked about the case, if that's what you -- you know, on the phone.

Page 41

Q     Phone calls?

A     Phone calls, reading emails.  That's about it.  Okay.
And, you know, reading e -- yeah, reading emails.

Q     Have you reviewed documents?

A     Yes.

Q     Do you provide input on court filings be -- before
they're filed?

A     Not before they're filed.

Q     Do you see them afterwards?

A     Yes, what I can recall.

Q     What -- how would describe your role in this case?

A     To make sure that everything is done fair and that --
not only for myself but for the other -- Mr. Joseph and for the
other in -- investors.

Q     And what are you doing to make sure that everything is
there?

A     Talking to Mr. Rosen and Erica Stone.

Q     Are you aware that at some point there was a court
filing requesting that you be appointed as the lead plaintiff?

A     Yes.

          (Exhibit No. 7 was marked.)

BY MR. GOLD:

Q     I'm going to hand you what's marked as Exhibit 7.  Take
-- take your time to look at it.

          My first question is going to be, have you seen it

Page 42

before?

MR. ROSEN:  Just take minute and read the exhibit because he's going to ask you questions about it.  You know, just read the first page and second page and make sure you understand what it is.

WITNESS:  (Complies)

BY MR. GOLD:

Q    Have you had a chance to review Exhibit 7?

A    Yes.

Q    Have you seen that document before?

A    I can't recall.

Q    If you'll turn to -- it's the seventh piece of paper.

A    Okay.  One, two, three, four, five, six, seven.

Q    Yeah.  It's the -- this one says, "Memorandum of points and authorities"?

A    Yes.

Q    And if you look at this -- this paragraph here, it says, "Cipriano Correa, (movement) hereby move this honorable Court for an order, 1," and there's a long sentence, and then -- and it says, "and 2, approving movement selection of the Rosen Law Firm (the Rosen Law Firm as lead Counsel for the class.)"

Do you -- do you see that?

A    Uh-huh, yes.

Q    Did you consider any law firms other than the Rosen Law Firm?

Page 43

A    No.

Q    Why not?

A    Because I'm going back to Exhibit 3.

Q    Is that a -- a press release?

A    Yes, if that's what -- yes.

Q    And what is it about Exhibit 3, the press release from the Rosen Law Firm, that caused you or relates to your decision not to consider other law firms?

A    Seeing what Rosen Law Firm -- what they have done before in the past, and they know what they're taking about and dealing with.  That's why I'm staying with them.  That's why I didn't pursue others --

Q    So -- so --

A    -- and their history.

Q    You told -- you told me earlier that you were not familiar with the Rosen Law Firm before you saw the press release marked as Exhibit 3.  At some point after that, did you become familiar with them?

A    Yes.

Q    How?

A    By going into the web and seeing what they have done in the past, and then, naturally, when they contacted me, you know, after I filled out the -- the questionnaire.

Q    You're -- you reviewed the -- the Rosen Law Firm's website?

Page 44

A    Yes.

Q    So the Ex -- Exhibit 7, which we were just looking at --

A    Oh, this one?

Q    Do you understand that that is a -- a -- a motion that was filed with the Court asking that you being appointed as the lead plaintiff?

A    Yes.

Q    Do you -- do you know if any other Liberty investors sought to be appointed as the lead plaintiff?

A    I know they had Mr. Joseph.  That's why.

Q    After you were appointed by the Court as a lead plaintiff, were there -- was there an additional complaint that was filed with your name on it?

A    Repeat it again, please.

Q    After you were appointed as lead plaintiff, do you know if there was a -- a complaint, a formal document filed with the Court that had you listed as the plaintiff?

A    I'm pretty sure one of these documents.

Q    Yeah, like one of the ones we looked at that you brought with you?

A    Yes.

Q    And are you aware that -- we call that an Amended Complaint, but if it's all right, I'm just going to use that term.

Page 45

Are you aware that that Amended Complaint referenced two former Liberty employees referred to as FE1 and FE2?  Does that sound familiar?

A     No, that doesn't.

Q     How did the defendants respond to the Complaint that you filed?

MR. ROSEN:  Do you understand the question?

WITNESS:  Well, the defendants are the Liberty and --

MR. ROSEN:  Correct.

WITNESS:  I --

MR. GOLD:  I'll ask a different question.

MR. ROSEN:  How -- how did -- how did you feel about being sued?

WITNESS:  Yeah, I mean...

BY MR. GOLD:

Q     I'll ask you a better question.  Do you -- do you recall if -- if Liberty and other defendants filed a motion to dismiss the case?

A     Yes.

Q     What are the -- how did the Court rule on that?

A     They ruled against them.

Q     Did you review the Court's opinion?

A     If there was some documents, yes, I probably did.  I don't -- I don't recall.

Page 46

Q    You don't recall specifically sitting here --

A    Yeah.  I don't recall.

Q    Do you know whether the Court dismissed any portions of the case?

A    Other than Mr. Rosen told me --

Q    Don't tell me what Mr. Rosen said.

A    No, I know.  Other than that, I heard there was one.

Q    I apologize for interrupting you.  I --

A    No, I understand.

Q    I just don't want to ask any questions about your conversations with Mr. Rosen.

A    Okay.

Q    So I apologize.  One of the documents you brought with you had a title, Second Amended Complaint?

A    Yes, it's right here (indicating)

Q    Yes.  And you -- you've mentioned Mr. Joseph today a few times, right?

A    Yes.

Q    What is his role in this case?

A    Well, I guess he's trying to recover his money too.

Q    Are you -- do you know whether he is also a lead plaintiff?

A    I think he is.

Q    You do know that he -- regardless of his exact title, you do know that he is a -- a plaintiff in the lawsuit along

Page 47

with you?

A    Yes.

Q    Do you know why he was -- he -- let me step back.

So you were -- he filed the initial Complaint, correct?

A    I believe.

Q    You were appointed by the Court as the lead plaintiff, right?

A    Yes.

Q    Why did Mr. Joseph rejoin the lawsuit as a named plaintiff?

A    I don't know.

Q    Do you know whether this case has been certified as a class action?

A    Yes.

Q    Do you know what it means for case -- I should have asked for this first.  Do you know what it means for a case to be certified as a class action?

A    Yes.

Q    And I'm -- when I say that, I'm referring to a court saying, yes, I'm going to allow you to bring this case as class action.  Do you know if that has happened in this case?

A    Yes.

Q    Are you seeking to represent other people in this case?

A    Yes.

Q    Who are you seeking to represent?

Page 48

A     Well, I'm pretty sure Mr. Joseph and all the other investment -- investors.

Q     All the investors or -- or just some of them?  All Liberty investors or just -- or just some of them?

A     Well, all of the investors in Liberty that are joining this -- this case.

Q     Do you consider yourself a fiduciary in this case?

A     Can you explain what that is or what that means?

Q     Is fiduciary a word that -- that you're -- that you've heard or are familiar with in connection with your role as the lead plaintiff in this case?

A     I don't recall.

Q     Do you believe you have duties to other Liberty investors in connection with your roll in this case?

A     Yes.

Q     How would you describe those?

A     Well, since I'm the leader or the captain, I want to make sure that the other investors get what they have coming just to be fair all the way across.

Q     And what are -- what are you doing as the leader to help accomplish those goals?

A     To talk to Mr. Rosen here and to help them in any which way he asks me to help him.

Q     Anything else?

A     No.  I don't -- I think that's...

Page 49

Q    Do you understand that -- that the defendants in this case asked you to provide them with certain categories of documents?

A    No.

Q    Did you do any kind of search for documents or a collection of documents for purposes of this case?

A    Other than my shares, Exhibit 2.

Q    All right.  So you -- you provided Exhibit 2, the page or screen shot from your Merrill Lynch brokerage account.

Other than collecting that, did you look for or -- or -- or search for any other documents --

A    No.

Q    -- in connection with this case?

Do you have any kind of file, paper or electronic, on -- on Liberty?

A    On my iPad, I have all my stocks from a different company, and I had Liberty because I watch all of them.

Q    And I mean, separate and part from the documents like the one you provided with your brokerage account, do you have any other collection of documents about Liberty?

A    No.

Q    You didn't print off press releases --

A    No.

Q    -- or anything like that?

A    No, no, no.

Page 50

Q    Have you emailed with anyone about -- other than people from the Rosen Law Firm about Liberty?

A    No.

Q    Did you ever, at some earlier point in time, have documents about Liberty other than the brokerage account statement?

A    Before the lawsuit?

Q    Before the lawsuit?

A    I didn't have any -- no, no documents, other than going on my MSN and reading them on the internet.

Q    Yeah.  What I'm trying to -- to figure out is, for an example, did you have some folder of stuff about Liberty, but you lost it or you threw it away before the lawsuit, anything like that?

A    No.

MR. GOLD:  Why don't we take a short break?

VIDEOGRAPHER:  Off the record.  The time is 11:26 a.m.

(Off the record.)

VIDEOGRAPHER:  Back on the record.  The time is 11:31 a.m.

Please proceed.

MR. GOLD:  Mr. Correa, I don't have any further questions at this time.  Thank you for your time this morning.

Page 51

WITNESS:  Thank you, sir.

MR. ROSEN:  No questions from me.

REPORTER:  Okay.

MR. ROSEN:  And anyone else have any questions?  No?

MR. BROCK:  No questions from us --

MR. GOODMAN:  No.

MR. GOLD:  Yeah, I think -- I think we are finished.

VIDEOGRAPHER:  All right.  This -- this concludes today's deposition give by Cipriano Correa.  We are going off the record.  The time is 11:32 a.m. Pacific Time.

(The deposition of Cipriano Correa was concluded at 11:32 a.m.)

(Signature was reserved.)

Page 52

C E R T I F I C A T E

STATE OF WASHINGTON )

)SS.

COUNTY OF KING        )

I, Judith A. Robinson, Certified Court Reporter and an officer of the Court under my commission as a Notary Public, in and for the State of Washington, do hereby certify that the foregoing deposition was transcribed under my direction; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of any of the parties to the action or any attorney or Counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 18th day of December, 2021.

_____

Judith A. Robinson, Notary Public

in and for the State of Washington

residing at Seattle.

My Commission expires November 4, 2024.

CCR License #2171

Page 53

Laurence Rosen, Esquire

lrosen@rosenlegal.com

December 21, 2021

RE: Correa, Cipriano v. Liberty Oilfield Services Inc. Et Al

12/10/2021, Cipriano Correa (#4973504)

The above-referenced transcript is available for

review.

Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

cs-midatlantic@veritext.com

Return completed errata within 30 days from

receipt of testimony.

If the witness fails to do so within the time

allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 54

Correa, Cipriano  v. Liberty Oilfield Services Inc. Et Al

Cipriano Correa (#4973504)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Cipriano Correa                                     Date

Page 55

Correa, Cipriano v. Liberty Oilfield Services Inc. Et Al

Cipriano Correa (#4973504)

ACKNOWLEDGEMENT OF DEPONENT

I, Cipriano Correa, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____    _____

Cipriano Correa                         Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.



_____

NOTARY PUBLIC

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

DocuSign Envelope ID: E9454313-440E-4EDD-B423-05955450F90F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-00946-RM-NYW

CIPRIANO CORREA and MARC JOSEPH, Individually and on Behalf of All Others
Similarly Situated,

      Plaintiffs,

v.

LIBERTY OILFIELD SERVICES INC., CHRISTOPHER A. WRIGHT, MICHAEL STOCK,
CARY D. STEINBECK, WILLIAM F. KIMBLE, PETER A. DEA, N. JOHN LANCASTER,
JR., BRETT STAFFIERI, KEN BABCOCK, JESAL SHAH, MORGAN STANLEY & CO.
LLC, GOLDMAN SACHS & CO. LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP
GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, EVERCORE GROUP
L.L.C., PIPER SANDLER & CO., TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC,
HOULIHAN LOKEY CAPITAL, INC., INTREPID PARTNERS, LLC, PETRIE PARTNERS
SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, INC., R/C ENERGY IV
DIRECT PARTNERSHIP, L.P., and R/C IV LIBERTY HOLDINGS, L.P.,

      Defendants.

---

**ERRATA SHEET – DECEMBER 10, 2021 DEPOSITION OF CIPRIANO CORREA**

---

| Page | Line | From | To | Reason |
|------|------|------|------|--------|
| 7 | 18-20 | This is – the first one is a Certification and on – Authorization of the Name of the Plaintiff Pursuit and Federal Security Loan. | This is – the first one is a Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws. | Transcription error; clarification |
| 7 | 20-22 | The first one is a Certification and Authorization of the Name – of | The first one is a Certification and Authorization of the Name – of | Transcription error; clarification |

DocuSign Envelope ID: E9454313-440E-4EDD-B423-05955450F90F

|  |  | the Name of Plaintiff Pursuant to the Federal Security Loan | the Named Plaintiff Pursuant to Federal Securities Laws |  |
|---|---|---|---|---|
| 7 | 25 | Columbia | Colorado | Misread word |
| 8 | 5-6 | Plaintiff Objection and Response to the Liberty and Riverstone Defendant First Set of Inter -- | Plaintiffs' Objections and Responses to the Liberty and Riverstone Defendants' First Set of Inter -- | Transcription error |
| 8 | 10 | Amendment | Amended | Clarification |
| 12 | 23 | best | big | Transcription error |
| 15 | 16 | test | step | Transcription error |
| 23 | 15 | missed all or not | missed or not | Transcription error |

Executed under penalty of perjury on __1/7/2022_____

DocuSigned by:

*Cipriano Correa*

—————————————————————
4B9C0AEABA2B4EC...

Cipriano Correa

2