# EXHIBIT E



Deposition of:

# Marc Joseph

*December 14, 2021*

In the Matter of:

# Correa, Cipriano Et Al  Vs. Liberty Oilfield Services Inc. Et Al

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO

MARC JOSEPH, Individually and   )
on Behalf of All Others         )
Similarly Situated,             )
                                )
          Plaintiffs,           )
                                )
     vs.                        )   No. 1:20-CV-00946-RBJ
                                )
LIBERTY OILFIELD SERVICES INC., )
CHRISTOPHER A. WRIGHT, MICHAEL  )
STOCK, CARY D. STEINBECK,       )
WILLIAM F. KIMBLE, PETER A. DA, )
N. JOHN LANCASTER, JR., BRETT   )
STAFFIERI, KEN BABCOCK, JESAL   )
SHAH, MORGAN STANLEY & CO., LLC,)
GOLDMAN SACHS & CO., LLC, WELLS )
FARGO SECURITIES, LLC, CITIGROUP)
GLOBAL MARKETS INC., J.P. MORGAN)
SECURITIES LLC, EVERCORE GROUP  )
L.L.C., PIPER SANDLER & CO.,    )
TUDOR, PICKERING, HOLT & CO.    )
SECURITIES, LLC, HOULIHAN LOKEY )
CAPITAL, INC., INTREPID         )
PARTNERS, LLC, PETRIE PARTNERS  )
SECURITIES, LLC, SUNTRUST       )
ROBINSON HUMPHREY, INC., RIC    )
ENERGY IV DIRECT PARTNERSHIP,   )
L.P., and RIC IV LIBERTY        )
HOLDINGS, L.P.,                 )
                                )
          Defendants.           )
                                )
_____)

          VIDEOTAPED DEPOSITION OF MARC JOSEPH

Page 2

Scottsdale, Arizona

December 14, 2021

9:04 a.m.

Reported by:

SHANNON STEVENSON, RPR, CCR

Certificate No. 50461

Page 3

I N D E X

(WITNESS)                                    PAGE    LINE

MARC JOSEPH

    Examination by Mr. Gold............    8       9


* * *


E X H I B I T S

NO.                    DESCRIPTION          PAGE    LINE

8     Handwritten notes                      15       3

9     Certification and Authorization of     18      21

    Named Plaintiff Pursuant to Federal

    Securities Laws

10    Ameritrade Report                      20       1


PREVIOUSLY MARKED EXHIBITS

NO.                    DESCRIPTION          PAGE    LINE

3     Rosen, A Leading Law Firm, Announces   25      12

    Investigation of Securities Claims

    Against Liberty Oilfield Servics Inc.,

    article

6     Retention Agreement                    30      14

Page 4

DEPOSITION OF MARC JOSEPH
commenced at 9:04 a.m. on December 14, 2021, at Courtyard
by Marriott Scottsdale Old Town located at 3311 North
Scottsdale Road, Scottsdale, Arizona, before SHANNON
STEVENSON, Certified Court Reporter, Certificate
No. 50461, for the State of Arizona.

                              * * *

APPEARANCES:
        For Plaintiff:
                THE ROSEN LAW FIRM. P.A.
                By:  Lawerence Rosen, Esq.
                     Yu Shi, Esq.
                275 Madison Avenue
                40th Floor
                New York, New York 10016
                (212) 686-1060
                lrosen@rosenlegal.com

        For Defendants Liberty and Riverstone:
                SHEARMAN & STERLING, LLP
                By: Dan Gold, Esq.
                2828 North Harwood Street
                Suite 1800
                Dallas, Texas 75201
                (214) 271-5821
                dan.gold@shearman.com
                HAYNES BOONE (Virtually)
                By:  Lee R. Johnston, Esq.
                1050 17th Street
                Suite 1800
                Denver, Colorado 80265
                (303) 382-6200

Page 5

APPEARANCES (Continued):

     For Defendants Liberty and Riverstone:
          HAYNES BOONE (Virtually)
          By:  Carrington Giammittorio, Esq.
          2323 Victory Avenue
          Suite 700
          Dallas, Texas 75219
          (214) 651-5256

     For Defendant Underwriters:
          DAVIS POLK & WARDWELL (Virtually)
          By:  Matthew Brock, Esq.
          450 Lexington Avenue
          New york, New York 10017
          (212) 450-3046
          matthew.brock@davispolk.com

Also Present:
          Jim Law, Videographer

Page 6

Scottsdale, Arizona

December 14, 2021

9:04 a.m.


THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:04 a.m. on December 14, 2021.  Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference.  Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record. This is Media Unit 1 of the video-recorded deposition of Marc Joseph taken by the counsel for defendant in the matter of Marc Joseph individually and on behalf of all others similarly situated plaintiffs versus Liberty Oilfield Services Inc., et al., defendants, filed in the United States District Court for the District of Colorado.  Case Civil Action Number 1:20-CV-00946-RBJ.

This deposition is being held at Scottsdale Marriott Old Town located at 3311 North Scottsdale Road, Scottsdale, Arizona.

My name is Jim Law from the firm Veritext and I am the videographer.  The court reporter is Shannon

Page 7

Stevenson from the firm Veritext.  I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance beginning with the noticing attorney.

MR. GOLD:  Dan Gold from Shearman & Sterling for the Liberty and Riverstone defendant.

MR. ROSEN:  Lawrence Rosen on behalf of Mr. Joseph, Mr. Gray and the proposed class.

MR. JOHNSTON:  Lee Johnston, Haynes Boone on behalf of Liberty and Riverstone defendants.

MR. BROCK:  Matthew Brock, Davis Polk & Wardwell on behalf of the underwriters.

MR. SHI:  Yu Shi, The Rosen Law Firm for the plaintiffs.

MS. GIAMMITTORIO:  Carrington Giammittorio, office of Haynes Boone for the Riverstone and Liberty defendants.

THE VIDEOGRAPHER:  Thank you.  Will the court reporter please swear in the witness.

Page 8

MARC JOSEPH,

called as a witness herein, having been first duly sworn,

was examined and testified as follows:

                            *  *  *

          VIDEOGRAPHER:  We may proceed.


                         EXAMINATION

BY MR. GOLD:

     Q    Good morning.  Mr. Joseph, how are you?

     A    Very good, thank you.

     Q    Do you understand that the oath you just took

requires you to answer my questions truthfully to the

best of your ability?

     A    Yes, I do.

     Q    Will you do that?

     A    Yes, I will.

     Q    Is there anything about your physical, mental,

or emotional condition that would prevent you from

understanding my questions today and answering them

truthfully to the best of your ability?

     A    No, there is not.

     Q    The court reporter is taking down everything

that we say, so I'll ask that you answer my questions

audibly.  If you shake your head yes or no, I'll probably

Page 9

understand what you are saying, but it won't be reflected in the court record.  Will you try to answer audibly for me?

A    I understand.

Q    If I ask you a question that you don't understand or is confusing in some way, will you ask me to restate it or reask it?

A    Yes, I will ask you to restate it.

Q    Thank you.

It will be hard for the court reporter if we end up talking over each other, so I will do my best not to talk over you, and if you could do your best to wait for me to finish asking the question, that will work best for the record.  Can you do that?

A    I will do my best not to overtalk you.

Q    Thank you.  And I will do my best not to overtalk you.

Have you been deposed before?

A    No, I have not.

Q    Have you given testimony in court?

A    No, I have not.

Q    Have you ever sued anyone before?

A    No, I have not.

Q    Have you ever been sued?

A    No.

Page 10

Q    Have you ever been charged with a crime?

A    No.

Q    Are you currently employed?

A    I am an author.

Q    Author.  What do you write?

A    Well, I think I'll sell my book to everybody listening.  So my newest book is a children's book just came out this year.  It's called I Don't Want to Turn Three.  It's under my pen name, which is Gramps Jeffrey, J-e-f-f-r-e-y.  You can find the book on Amazon, Target, Barnes and Noble and a hundred other book sites on the internet.  It's a book about parents involved in helping their children learn the difference between me and us and it's learning about responsibility when you are a young child.  So if anyone has any grandchildren or children or nieces or nephews, go up on Amazon and buy it, I Don't Want to Turn Three.

Q    How long have you been an author?

A    I started as an author back in the early 2000s. My first book was called The Secrets of Retailing How to Beat Walmart, and it was written for my business that I was running because our customer base were small and medium-sized businesses who wanted to open up their own stores and run businesses.  The particular book was read by Adriene Huffington, Huffington Post, and she asked me

Page 11

to become a contributor to the Huffington Post, and I've written over a hundred articles for the Huffington Post also on aging and on the homeless and so forth.

Q    You mentioned you were running a business in the early 2000s.  What business was that?

A    It was an internet business that sold wholesale products to moms and pops so they can compete against the big guys.

Q    What was the name of the business?

A    Dollardays.com.

Q    Can you spell that for the court reporter?

A    D-o-l-l-a-r-d-a-y-s.com.

Q    Dollar Days.

And do you still run Dollar Days?

A    No, I'm retired.

Q    When did you retire from running Dollar Days?

A    I retired in 2018.

Q    So from the early 2000s to 2018, did you both run dollar days and write articles as an author?

A    That's correct.

Q    What about prior to running dollar days, what did you do?

A    I was in the retail business.

Q    Doing what?

A    I was in the department store business and also

Page 12

the off-price business.

Q    Do you have any formal education after high school?

A    Yes.  I went to Miami of Ohio in Oxford, Ohio. I got a bachelor's degree in marketing.

Q    Any graduate school?

A    No.

Q    Have you taken any courses in finance or investing?

A    No.

Q    Do you have any formal training or education in the oil and gas industry?

A    No.

Q    Do you have any professional licenses?

A    I am a real estate agent.

Q    Do you do a lot of investing in the stock market?

A    No.  I rely mainly now, at my age, I'm 69 years old.  I now mainly rely on my 401(k) and IRAs.  So I am not doing very much investing anymore.

Q    What about in the past?

A    In the past, just normal investing.

Q    In the time frame of 2018 and 2019, about how often did you buy or sell stocks?

A    Not very often.

Page 13

Q    Could you try to quantify.  Are we talking once a year?  Once every four years?

A    Maybe twice a year.

Q    When you -- during that same time frame when you did buy and sell stock, were you doing so for your individual accounts?

A    Yes.

Q    Do you have an investment advisor?

A    No.

Q    Have you -- during that time frame 2018, 2019, did you have an investment advisor?

A    No.

Q    What did you do to prepare for your deposition today?

A    I reviewed -- I've been reviewing all of the documents that have been going between my lawyer and you back and forth, and so I just reread them all.

Q    Anything else?

A    I met with my lawyer yesterday, that's it.

Q    About -- and I don't want you to tell me what you talked about, so please don't.  About how long did you meet?

A    We met for a couple hours yesterday.

Q    Was it just the two of you?

A    Yes.

Page 14

Q    Have you spoken with anybody else other than
your lawyer in connection with preparing for your
deposition?

A    Well, his law office, I've talked to people up
there a dozen times or so over the course of all these
events.

Q    What about in connection with preparing for
your deposition today, did you speak with others from The
Rosen Law Firm?

A    No.

Q    Do you recall what documents you looked at in
preparing for your deposition?

A    Yes, all the ones that have been filed.

Q    So do you believe you looked at all of the
court filings --

A    Yes.

Q    -- in preparing for your deposition?

A    Yes, I have.

Q    I see you've got sort of a folder with some
papers in front of you.  What are those?

A    These are just my notes.  I wanted to make sure
that I was answering your questions intelligently.

Q    When did you take those notes?

A    I took them -- I started taking them about a
week ago.

Page 15

Q    Okay.  Let's go ahead and mark those as Exhibit 8.

(Deposition Exhibit Number 8 was marked for identification and attached hereto.)

Q    BY MR. GOLD:  And so the notes the handwritten notes that we've marked as Exhibit 8, you testified that you took those you think over the past week; is that correct?

A    That's correct.

Q    Was that based on your review of the documents you were looking at?

A    That's correct.

Q    And I see you also have some other papers over there.

A    Uh-huh.

Q    What are those?

A    This is a certification authorization of named plaintiff pursuant to federal security laws.  This is the one that I signed to initiate everything.  This is the declaration of Marc Joseph in support of class verification, this is the plaintiff's objections and response to the Liberty and Riverstone defendants first set of interrogatories, and this is the second amendment class action complaint for violations of federal securities laws.

Page 16

Q    Thank you for identifying those for us.

Those documents that you just identified, do any of those have any handwriting or notes, or are they just the typewritten pages.

A    These are your typed written pages.

Q    Thank you.

When did you first hear about Liberty Oilfield Services?

A    Well, obviously I bought the stock on 5/21/2018, so I heard about that before that.

Q    Are you able to place in time when prior to your stock purchase you first heard about Liberty Oilfield Services?

A    I would say I heard about it in the spring of 2018.

Q    If I refer to "Liberty Oilfield Services" as just Liberty, would that be okay with you?

A    Absolutely.

Q    Okay.  Why did you decide do buy Liberty stock?

A    I decided to buy Liberty stock because I felt that the fracking industry was another one of the industries which was up and coming.

Q    Why did you feel that way?

A    Just because of, you know, I'm a student of just the news, so, and just following the different

Page 17

industries, I thought that this was a good time to buy.

Q    Do you recall any specific news or articles that influenced your decision do buy Liberty stock?

A    No, I do not.

Q    What kinds of news sources do you typically review?

A    On the internet, I follow Yahoo Finance, I go to the library a couple three times a week, and I read the New York Times and the Wall Street Journal.  In fact, the main library is only a couple blocks away from here.  So I do that.  I subscribe to Business Week, Fortune, And Forbes.

Q    Prior to your decision to buy Liberty stock, did you review any of Liberty's filings with the Securities and Exchange Commission?

A    No, I did not.

Q    Did you review any of Liberty's -- any other press releases or information put out directly by Liberty?

A    Not that I can recall.

Q    What about investor conference calls, did you listen to any of Liberty's quarterly investment conference calls?

A    No, I did not.

Q    Did you do any research about other fracking

Page 18

companies?

A    I really don't recall.

Q    You mentioned thinking, I think -- I think you said the fracking industry was up and coming.  That may or may not have been your exact words.  Is that a fair characterization of what you told me earlier?

A    Yes.

Q    What did you mean by that?

A    Basically when you take a look at the different industries across America, it happened to be one of the industries that I thought was up and coming.

Q    And did you have -- at the time you decided to purchase Liberty stock, did you have any understanding of what would be good -- what kind of conditions would be good for the fracking industry versus bad for the fracking industry?

A    I think I just watched the price of gas.

Q    Did the price of gas in your mind influence the performance of fracking companies?

A    I think it's related.

(Deposition Exhibit Number 9 was marked for identification and attached hereto.)

Q    BY MR. GOLD:  I'm going to hand you what I just marked Exhibit 9, which I believe is one of the documents you have in front of you already in your folder.

Page 19

A    Uh-huh.

Q    Just for the record, would you identify what we've marked as Exhibit 9.

A    Certification and authorization of named plaintiff pursuant to federal securities law.

Q    This is a document you've seen before; correct?

A    That's correct.

Q    What is your understanding of this document?

A    This is my signing of the certification because my signature is on the second page, that I bought the stock on 5/28/2018 for $23.47, and then I sold the stock on 1/18/2019 at $9.02.

Q    Did you carefully review this document before you signed it?

A    Yes, I did.

Q    Did you understand that you were signing it under penalty of perjury?

A    Absolutely.

Q    Did you type in the information here that you read about the date you purchased stock and the number of shares and the price per share?

A    I don't remember if I typed it or -- I don't know the answer to that.

Q    You signed this on April 3rd, 2020?

A    That's correct.

Page 20

(Deposition Exhibit Number 10 was marked for identification and attached hereto.)

Q    BY MR. GOLD:  Mr. Joseph, I'm going to hand you what we're marked as Exhibit 10.  If you could just take a moment to look at Exhibit 10, and then I'll ask -- let me know when you are ready for me to ask you some questions about it.

A    Okay.

Q    Have you seen Exhibit 10 before?

A    Yes.

Q    What is it?

A    It is my confirmation of the trading I did in the stock with Ameritrade.

Q    These are pages from various TD Ameritrade brokerage account statements?

A    Yes.

Q    What kind of account was this?

A    I guess you go to Ameritrade, you place a trade, and they confirm it.

Q    There's a -- there's some redacted information under your name.  Is this an account that you individually own?

A    Yes.

Q    It's not owned by any kind of company or entity?

Page 21

A    No.

Q    If we take a look, you'll see on the bottom right-hand corner there are some numbers.  We call those Bates numbers.  Your lawyers put those on there when they provided us with the documents.

MR. ROSEN:  Six-digit number on the lower right hand.

THE WITNESS:  Plaintiffs 00001?

Q    BY MR. GOLD:  That's to make sure we talk about the same piece of paper.  If you can look at the page that says Plaintiff 00003, the third page.

A    Uh-huh.

Q    Does this page up at the top reflect your purchase of Liberty stock in May of 2018?

A    Yes, it does.

Q    And this lists the purchase price as $23.52 per share; is that correct?

A    That's correct.

Q    And it also identifies that in addition to that you paid a commission or a fee of $6.95?

A    That's correct.

Q    And it does the math and shows the total amount that you paid as $5,886.95?

A    That's correct.

Q    If you look back at Exhibit 9, the

Page 22

certification, that lists your purchase price as $23.47

per share; correct?

          A     That's correct.

          Q     Do you have an understanding of the difference

between the purchase price listed on your certification

marked as Exhibit 9 and the brokerage account statement

marked as Exhibit 10?

          A     It looks like the commission difference of the

$6.95.

          Q     If we do the math and that $6.95 does not

explain the difference, do you have any other

understanding of the discrepancy?

          A     No.

          Q     You bought your stock on the stock exchange;

correct?

          A     Yes.

          Q     So you don't know who was the seller of the

stock in that transaction; correct?

          A     No, I do not.

          Q     Do you -- did you receive stock certificates?

          A     I think it just stayed in my account.

          Q     Do you know what it means for shares to be held

in street name?

          A     No.

          Q     The documents that we've looked at reflect that

Page 23

you sold your 250 shares of Liberty stock on November 8, 2019; correct?

A    That's correct.

Q    Why did you decide to sell your Liberty stock at that point in time?

A    Obviously it was going down in value and didn't look like it was going to be going back up.  It was the end of the year, so I decided to go ahead and just sell the stock and move on.

Q    Why did you think -- why do you say it looked like it was not going to be going back up?

A    Well, I bought it at 23.52, it was down to 9.02 when I sold it, and it just didn't look like it was going back up.

Q    I understand -- I understand the price had declined.  I'm trying to understand, other than the fact that it had declined, by that point, did you have any reason to think that it would not go back up?

A    No.  I just decided to sell.

Q    Did you have an understanding as to why the stock price had declined?

A    No.

Q    Did you know what was going on in 2019 with oil and natural gas prices?

A    Probably did, but I can't recall now.

Page 24

Q    During the time that you owned Liberty stock, did you review Liberty's quarterly earnings press releases?

A    No.

Q    During the time that you owned stock, did you review Liberty's filings with the Securities and Exchange Commission?

A    No.

Q    Did you monitor -- during the time you owned Liberty stock, did you monitor news about Liberty?

A    No.

Q    During the time that you monitored -- during the time you owned Liberty stock, did you monitor news about the fracking industry?

A    No.

Q    Since 2018, have you invested in any other fracking companies?

A    No.

Q    What about oil field services companies?

A    No.

Q    Any companies that provide exploration and production services?

A    No.

Q    Have you attended any industry conferences about the fracking or oil field services industry?

Page 25

A    No.

Q    How did you first become involved in this lawsuit?

A    See it on the certification.

Q    Sitting here today, my question for you is: How did you become involved in this lawsuit?

A    I saw the press release and that there was a lawsuit for those who had lost money in this stock, and that's how I got involved.

Q    I'm going to hand you what has previously been marked as Exhibit 3.

(Deposition Exhibit Number 3 was previously marked for identification and attached hereto.)

THE WITNESS:  Yes, that's it.

Q    BY MR. GOLD:  When you say "yes, that's it," is Exhibit 3 the press release that you just testified about seeing?

A    Yes, this is the press release that I saw.

Q    Okay.  Where did you see that press release?

A    Online.

Q    I'd like to walk through this step by step.  So you saw this press release online and then what happened next?

A    I filled out the information that you see on this other thing.

Page 26

MR. ROSEN:  You are pointing to what, Exhibit --

THE WITNESS:  9.

MR. ROSEN:  The Exhibit 9, certification and authorization form?

THE WITNESS:  Right.

Q    BY MR. GOLD:  So you saw the press release, you went online, filled out the information that's reflected in Exhibit 9, your certification?

A    That's correct.

Q    Why did you decide to do that?

A    Well, I had lost money and it made sense to me that if there is a reason that I lost my money, I was going to become a part of this.

Q    At the time you saw the press release and decided to get involved in this lawsuit, what was your understanding of why you had lost your money?

A    I had no understanding.

Q    You just knew the stock price was down and there was a potential lawsuit and you were interested in participating?

A    Recovering my losses, that's correct.

Q    Had you heard of The Rosen Law Firm prior to seeing the press release?

A    No.  This was the first time I had any contact

Page 27

with Rosen.

        Q    Prior to deciding to get involved in the lawsuit, did you review any documents?

        A    No.

        Q    At the time you decided to get involved in the lawsuit, did you have any basis to believe that Liberty had done something wrong?

        A    Well, I had lost money, so I had to believe that they had done something wrong.

        Q    Is Liberty the only company you've ever invested in?

        A    No.

        Q    Have any of those other investments ever declined in value?

        A    I am sure some have.

        Q    Did you file lawsuits against them?

        A    No.  This is the first.

        Q    Would you agree with me that sometimes stocks go up and sometimes stocks go down?

        A    Of course.

        Q    Would you agree that the mere fact that a company's stock price has gone down does not necessarily mean that they have done something wrong?

        A    I guess I really don't feel comfortable answering that.

Page 28

Q       Why not?

A       I don't see the relevance.

Q       What's relevant and not relevant is for the judge to decide.  I'll ask you to just go ahead and answer my question.

        MR. ROSEN:  Could you repeat the question or have the court reporter reread the question.

        (Record read.)

        THE WITNESS:  I think a company influences everything that goes on within what they control, and so for a price to go down is influenced by a company's decision.

Q       BY MR. GOLD:  My question is:  Do you think that every company whose stock price declines has lied to its shareholders?

A       I think that's too general of a question to answer.

Q       In what way?

A       In that the word "every" means every single company since is the invention of the stock market.  So I think that's too broad.

Q       And that's exactly what I'm trying to ask you.  It's a very broad statement.  Do you think that every company whose stock price has gone down has lied to its investors?

Page 29

A    So the answer is no, not every company.

Q    Thank you.

So after you filled out the information online that's reflected in your certification, what happened next?

A    Well, this was filed.  It was filed on 4/3, the PSLRA certification was filed, and then on August 7, you know, so the initial -- this was initially filed in -- complainant filed in federal court, and then on August 7 --

Q    Can I pause you there.  I want to take it in bite-size pieces?

A    Yeah.

Q    When you say this is filed on April 3rd, 2020, what are you referring to?

A    I'm referring to the PSLRA certification.

Q    The certification being Exhibit 9?

A    That's correct.

Q    Did you also file a complaint?

A    Yeah, complaint was filed also in federal court.

Q    Did you review that complaint before it was filed?

A    I have reviewed the complaint, yes.

Q    Did you review it before it was filed on

Page 30

April 3rd, 2020?

A    Yes.

Q    You reviewed the draft?

A    Yes.

Q    Did you have any -- did you provide any input?

A    I reviewed the draft and I thought it was done fine, so my input was none.

Q    Are you aware that there was a similar case filed in State Court in Colorado prior to your filing of your complaint on April 3rd, 2020?

A    No, I am not aware.

Q    I'm going to hand you what's been previously marked as Exhibit 6.

(Deposition Exhibit Number 6 was previously marked for identification and attached hereto.)

MR. ROSEN:  Take a moment and look at it carefully.

THE WITNESS:  Okay.

Q    BY MR. GOLD:  Have you seen Exhibit 6 before?

A    Yes, I have.

Q    What is it?

A    It is the retention agreement between The Rosen Law Firm and those of us in the suit.

Q    When did you first see the retention agreement marked as Exhibit 6?

Page 31

A     I saw it back along the same time.  I can't give you the exact date, but it was sometime during all the filings.

Q     What's your understanding of how your lawyers are getting paid?

A     They are on a contingency basis, so they get paid once the lawsuit is completed and won.

Q     If you look at the retention agreement Paragraph 2, it says that "Plaintiffs' counsel may apply for a fee of up to 33 1/3 percentage of the recovery plus disbursements, subject to court approval."  Do you see that?

A     Yes, I do.

Q     Did you do anything to negotiate that fee percentage?

A     No, I did not.

Q     Did you have an understanding that you were able to try to negotiate that percentage?

A     I may have had an understanding at the time, but, obviously, I didn't do anything about it.

Q     Did you carefully review Exhibit 6, the retention agreement, before you decided to retain The Rosen Law Firm to represent you and get involved in this lawsuit?

A     Yes, I did.

Page 32

Q    What happened next after you filed the -- your

complaint and the certification?

A    The next event was on August 7 of '20, where

Cipriano Correa was court appointed lead plaintiff with

The Rosen Law Firm.

Q    And in answering my question, are you reviewing

your handwritten notes that we previously marked as

Exhibit 8?

A    Absolutely.

Q    Did you move to be appointed as lead plaintiff?

A    I was appointed as the lead plaintiff in the

initial complaint.

Q    So you filed the initial complaint; correct?

A    Uh-huh.

Q    And I believe you just told me that, I think it

was August of 2020 Mr. Correa moved to be appointed as

lead plaintiff?

A    That's correct.

Q    My question is whether you moved -- whether you

also moved to be appointed as lead plaintiff?  If you

don't understand my question, please let me know.

A    Well, the second amendment filed on

October 13th was filed with my name on it.

Q    I want to take this in steps.  Let's focus

right now on the motion for lead plaintiff appointment in

Page 33

August of 2020.  Did you seek to be appointed as lead plaintiff at that time?

    A    I was already on the complaint, so I don't think it was necessary for me to do that.

    Q    Did you have an understanding at that time as to what it means to be appointed the lead plaintiff?

    A    I would say yes.

    Q    What was your understanding at that time?

    A    That Cipriano was going to be the lead plaintiff.

    Q    If the court record reflects that you did not move to be appointed as lead plaintiff, do you have an understanding of why you did not --

        MR. ROSEN:  It's a compound question.  And you say "if the court," so it's compound, number one; and, number two, it's hypothetical.  Are you saying if the reflect records.  If you want to tell him what the record reflects.

    Q    BY MR. GOLD:  I'll represent to you that you did not move to be appointed as lead plaintiff, Mr. Correa did.  Do you have an understanding as to why?

    A    No.

    Q    At some point did you come -- at some point prior to today, did you become aware that you were not appointed as the lead plaintiff in this case?

Page 34

A    Yes.

Q    When was that?

A    As you know, the second amendment was filed with my name on it on October 13th, so probably before that time.

Q    Can you tell me when in time you learned that you had not been appointed as the lead plaintiff?

A    I don't remember.

Q    After Mr. Correa was appointed the lead plaintiff in August of 2020, did you -- and prior to the filing of the second amended complaint that you referenced, did you have any ongoing involvement in this lawsuit?

A    Well, I know -- yes, because, you know, on July 12, '21, the Court denied defendants' motion to dismiss, so I was very carefully monitoring all that.

Q    And how were you monitoring that?

A    Again, I have constant contact with The Rosen Law Firm, mainly talked with Erica Stone and Yu Shi, I've talked several time with Lawrence also.

Q    So after Mr. Correa was appointed as the lead plaintiff, you continued to communicate with The Rosen Law Firm?

A    Oh, yes.

Q    What did you understand your role in the

Page 35

lawsuit to be at that time?

A    Again, I was on the first filing, initial complaint filed in the federal court, so my name is on some of the documents.

Q    And at that point in time after Mr. Correa had been appointed as the lead plaintiff, did you believe that The Rosen Law Firm still represented you?

A    Oh, absolutely.

Q    If we look back at Exhibit 6, the retention agreement, do you have that in front of you?

A    Right here.

Q    Look at Paragraph 5.  In the first sentence it says, "If the Court does not appoint the Client as a lead plaintiff or the Client is not included as a plaintiff in the operative complaint in the case, then The Rosen Law Firm's representation of Client shall automatically terminate."

Did I read that correctly?

A    Yes, you did.

Q    Did you have any understanding of whether The Rosen Law Firm's representation of you automatically terminated when Mr. Correa was appointed as the lead plaintiff and you were not included in the first amended complaint as a plaintiff?

A    I believe they still represented me because,

Page 36

again, I was on the documents.

Q    Have you ever -- after the -- your agreement to the retention agreement, Exhibit 6, at the time you signed your certification, have you ever entered into any other -- any subsequent retention agreement with The Rosen Law Firm?

A    No, I have not.

Q    You mentioned, I believe, that you -- you mentioned that you remained in communication with The Rosen Law Firm after Mr. Correa was appointed lead plaintiff; correct?

A    That's correct.

Q    Did you receive copies of court filings during that time period?

A    Well, I've got all the court filings, so whenever they happened is when I received them.

Q    Did you receive those from The Rosen Law Firm or did you go and find those yourself?

A    No.  The Rosen Law Firm has been sending them to me.

Q    Do you review drafts of those filings before they're filed with the court?

A    Yes, I do.

Q    After Mr. Correa was appointed lead plaintiff, there was an amended complaint filed with the court that

Page 37

does not identify you as a named plaintiff.  Did you

review that before it was filed with the court?

    A   I've seen those documents, yes.

    Q   Did you review that amended complaint before it

was filed with the court?

    A   Yes.

    Q   Are you aware that the amended complaint and

the second amended complaint which you referenced refer

to two former Liberty employees as FE1 and FE2?

    A   Yes.

    Q   Do you know who those former employees are?

    A   I do not.

    Q   I take it you've never spoken with them?

    A   I have not.

    Q   Have you taken any steps to verify that what

was attributed to those former employees in the

complaints is accurate?

    A   I trust The Rosen Law Firm has done their due

diligence and that everything that they have researched

is correct.

    Q   Separate and apart from your trust of The Rosen

Law Firm, have you done anything to confirm that those

former employees exist and said what is attributed to

them in the complaint?

    A   No, I have not.

Page 38

Q    You referenced earlier the court decision on the defendant's motion to defendant; correct?

A    That's correct.

Q    Did you review that opinion from the court?

A    Yes, I think -- are you talking about Judge Brooks Jackson's review; correct?

Q    His opinion?

A    Yes, his opinion.  Is that the one you are referring to?

Q    Yes.

A    Yes, I thought it was powerful.  What Judge Brooks Jackson said --

Q    I was just asking if you reviewed it.

A    Oh, you don't want me to say what he said?

Q    I know what it says.

A    Powerful.

Q    At some point you were added to the second amended complaint as a named plaintiff; correct?

A    That's correct.

Q    How did that come about?

A    Well, again, my name was on the first document to begin with, so it was just added again.

Q    Do you have any understanding of why you were added again?

A    I just thought it was a procedural thing.

Page 39

Q    Did you make a request to be added?

A    No, I did not.  No, I did not.

Q    Have you ever spoken with Mr. Correa?

A    No, I have not.

Q    Have you ever had any communications with him?

A    No, I have not.

Q    About how much time would you estimate you've spent on this case since you first got involved?

A    I would estimate probably 20 hours.

Q    And what have you been doing for those 20 hours?

A    Those 20 hours I've been reading these different filings and so forth, I've been communicating with The Rosen Law Firm.

Q    Have you made any decisions in connection with this litigation?

        MR. ROSEN:  Objection.  Vague.

Q    BY MR. GOLD:  You can answer.

        MR. ROSEN:  If you understand what he's asking, you can answer.

        THE WITNESS:  I don't understand the question.

Q    BY MR. GOLD:  What do you view as your role in this case?

A    I view my role as a fiduciary for all the other stockholders that lost money based on the information

Page 40

that the company put out, and so that is my duty is to make sure that all the little guys, much like I've done all my life looking out for the little guys, that the little guys who are hurt by this, you know, get justice.

Q    BY MR. GOLD:  When you use the word "fiduciary," what is your understanding of that word?

A    It means that I need to look out and make sure that everything is processed in a proper way.

Q    Who are you -- are you seeking to represent other people in this case?

A    Just these stockholders who got burned by this.

Q    Which stockholders?

A    Stockholders who bought stock in the company between when it went public and April 3rd when the stock was down to $2.48, and so those are the stockholders that I wanted to take on the responsibility of representing.

Q    Who are you suing in this lawsuit?

A    There are several.  Obviously we are suing Liberty Oilfield Services, we are suing the nine directors and officer who are involved, we are suing Riverstone Holdings who, you know, at the beginning owned 49.7 percent of the company and appointed three of the directors, and we are suing the 12 banks of the underwriters of the Liberty IPL.

Q    In answering that question, are you reviewing

Page 41

the handwritten notes that we marked earlier?

A     Absolutely, that's why I wrote it down.

Q     Why are you suing Liberty?

A     Case is about false and misleading registration statement.

Q     What's a registration statement?

A     That is when you have an IPO, you have to say why about your company.  They failed to disclose the fracking industry was adding capacity at an unprecedented rate, this oversupply was having a negative impact on prices.

Q     In answering my question there, you are reading from your notes that you took from the court documents?

A     Oh, absolutely, yes.

Q     What are you claiming Liberty should have disclosed in its registration statement in connection with its initial public offering?

A     I'd like to quote Judge Brooks Jackson, and what he said in his -- in the filing that he did in the answers, that they misled investors by emitting essential information from the prospectus.  I conclude that the emissions on industry oversupply and impact on pricing are actionable.  So I agree with the judge.

Q     What is it you are claiming that Liberty should have disclosed?

Page 42

A    They should have disclosed that there was not a shortage of, you know, fracking equipment and the kinds of things in need and that the oversupply was not true, you know, that there was an oversupply, and because of this oversupply of people providing the service, it would have a negative impact on the pricing.

Q    So are you saying that Liberty should have disclosed that there was, in your view, an oversupply of fracking fleets that was leading to a reduction in pricing?

MR. ROSEN:  Objection.  Mischaracterizing the witness' testimony.

MR. GOLD:  It's a question.  I'm not mischaracterizing.  Can you read the question back.

(Record read.)

THE WITNESS:  What they should have done is talk about -- not talk about that there was an opportunity that they had, and because they had -- they talked about the pricing possibly going up and so forth. So they shouldn't have issued those kinds of statements.

Q    BY MR. GOLD:  Do you have any idea how Liberty's business performed in 2018?

A    Right now I can't recall.

Q    When you were in the retail business, were you familiar with supply and demand?

Page 43

A    I would hope so, yes.

Q    How would you describe supply and demand based on your experience in the retail business?

A    My experience in the retail business is as supply decreases and demand increases, it creates a rush on products.

Q    And in your experience in the retail business, is supply and demand static or does it change over time?

A    Supply and demand on many products changes over time, on many of the products it's static.

Q    And for products where it changes over time, can there be not enough supply at one point in time and an oversupply at some later point in time?

A    It's going on right now with, you know, all kinds of PPE products, so yes.

Q    We've been going about an hour.  Why don't we take a short break.

MR. ROSEN:  Sounds good.

THE VIDEOGRAPHER:  We are going off the record at 10:01 a.m.

(Break taken at 10:01 a.m.)

(Back on the record at 10:17 a.m.)

THE VIDEOGRAPHER:  We are back on the record at 10:17 a.m.

Q    BY MR. GOLD:  Mr. Joseph, have you lived in

Page 44

Arizona full-time?

A    Yes, I do.

Q    How long have you lived here?

A    I moved here in 1997.

Q    How did you decide how many shares of Liberty stock to purchase?

A    It was the price at the time and how much money I had and added it up and that's how many shares I bought.

Q    When you say "how much money I had," I'm assuming you didn't invest your entire lifesavings on Liberty stock?

A    No, I did not.

Q    You decided you were going to invest a certain amount in the market?

A    That's correct.

Q    When you sold your stock in -- I believe it was November?

A    November 8, 2019.

Q    2019.  At that point in time, did you believe that Liberty had lied to you or misled you?

A    I was disappointed in Liberty that their stock did not advance.

Q    I understand you were disappointed the stock price had gone down.  My question is:  At that point in

Page 45

time when you sold your stock in November 2019, did you believe that Liberty had lied to you or misled you in any way?

A    The stock went down, so I felt that the company was not performing and didn't live up to what they said they were going to do.

Q    Do you believe that Liberty had promised the stock price was going to go up?

A    Nobody promises the stock prices go up or down.

Q    Let me ask again.  At the time you sold your stock, did you believe that Liberty had lied to you or misled you in any way?

A    I can't answer that because I don't know.

Q    Earlier you told me that -- when I asked you about some of the allegations in the complaint, you told me that you trust The Rosen Law Firm and are relying on them; correct?

A    That's correct.

Q    And I think you mentioned you trusted them to do their due diligence?

A    That's correct.

Q    Do you have an understanding what due diligence The Rosen Law Firm has done to -- in connection with the allegations of the complaint?

A    I think in the research that has been filed,

Page 46

they talked to former employees, and obviously they did
other research on what the company had put out.

Q    Do you know if it was lawyers from The Rosen
Law Firm who spoke to former employees or if it was
private investigators?

A    No, I do not.

Q    Do you know if those former employees were
given an opportunity to review the allegations in the
complaint attributed to them?

A    No, I do not.

Q    Earlier you talked about keeping an eye on the
price of gas?

A    I think we all do.  Does anybody know what gas
sold for this week?  I bet everybody can tell me.

MR. ROSEN:  $3.69 a gallon in Phoenix.

Q    BY MR. GOLD:  That's where I was going with my
question.  Were you talking about the price of gas at the
pump when you fill up your car?

A    Yes.

Q    Do you follow natural gas prices like the
commodity prices?

A    No, I do not.

Q    Do you understand the defendants in this case
asked you to provide them with certain categories of
documents?

Page 47

A     Was that part of the filings?

MR. ROSEN:  Could you maybe rephrase the question so he understands the question.

Q     BY MR. GOLD:  I'll rephrase it.

At some point in time were you asked by the defendants to collect and provide documents as part of this lawsuit?

A     Again, everything goes through The Rosen Law Firm, so whatever documents that they talked about with the defendants, I trust that they did that.

Q     Did you at some point collect documents to give to your lawyers to provide to the defendants?

A     Just the Ameritrade document.

Q     Did you search for any other documents other than the brokerage -- the TD Ameritrade documents?

A     I had no other documents.

Q     Well, I think you told me that you had copies of all the court papers; right?

A     That's correct.

Q     Do you have those at your house?

A     Yes, I do.

Q     In paper or in electronic?

A     In paper.

Q     So you do have those documents; correct?

A     Yes.

Page 48

Q    Do you have any other documents about Liberty?

A    No.

Q    Any other documents about the litigation?

A    No.

Q    Did you ever have any documents about Liberty other than the court filings?

A    No.

Q    Other than your lawyers, have you communicated with anyone about this lawsuit?

A    No.  My wife, I told her that I was coming here today.

Q    Have you emailed with anyone about this lawsuit?

A    No.

Q    Other than your lawyers?

A    No.

Q    I don't have any further questions at this time.

A    Thank you.

MR. ROSEN:  No questions for me.

Anyone else have anything you want to contribute?

MR. JOHNSTON:  No questions from underwriters.

MR. ROSEN:  I guess we're done.

MR. GOLD:  Off the record.

Page 49

THE VIDEOGRAPHER:  We are off the record at 10:25 a.m., and this concludes today's testimony given by Marc Joseph.  The total number of media units used was two and will be retained by Veritext.

MR. ROSEN:  We will get one copy.  I say one copy.  Electronic copy of the deposition and I don't think we need a copy of the video at the moment.

THE VIDEOGRAPHER:  Okay.

MR. GOLD:  I think we have a standing order.

THE VIDEOGRAPHER:  That's good.

(Whereupon the deposition of MARC JOSEPH was concluded at 10:25 a.m.)


*   *   *


(No signature was requested.)

Page 50

STATE OF ARIZONA        )

                        ) ss

COUNTY OF MARICOPA      )


     BE IT KNOWN that the foregoing deposition was taken

before me, SHANNON STEVENSON, a Certified Reporter in and

for the County of Maricopa, State of Arizona; that the

witness before testifying was duly sworn to testify to

the whole truth; that the questions propounded to the

witness and the answers of the witness thereto were taken

down by me in shorthand and thereafter reduced to

computer-aided transcription under my direction; that the

foregoing 49 pages are a true and correct transcript of

all proceedings had upon the taking of said deposition,

all done to the best of my skill and ability.

     I FURTHER CERTIFY that I am in no way related to any

of the parties hereto, nor am I in any way interested in

the outcome hereof.

(   )  Signature was requested.

(XXX)  Signature was not requested.

     DATED at Phoenix, Arizona, this 30th day of

December, 2021.


                         /s/ Shannon Stevenson

                         _____

                         SHANNON STEVENSON, CR, RPR

                         Certified Reporter

                         Certificate No. 50461

Colorado Rules of Civil Procedure

Chapter 4, Disclosure and Discovery

Rule 30

(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall be notified by the officer that the transcript or recording is available. Within 35 days of receipt of such notification the deponent shall review the transcript or recording and, if the deponent makes changes in the form or substance of the deposition, shall sign a statement reciting such changes and the deponent's reasons for making them and send such statement to the officer. The officer shall indicate in the certificate prescribed by subsection (f)(1) of this rule whether any review was requested and, if so, shall append any changes made by the deponent.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

DocuSign Envelope ID: F4C399A6-0F64-46FB-AFC0-2A69900AB7D9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-00946-RM-NYW

CIPRIANO CORREA and MARC JOSEPH, Individually and on Behalf of All Others Similarly Situated,

    Plaintiffs,

v.

LIBERTY OILFIELD SERVICES INC., CHRISTOPHER A. WRIGHT, MICHAEL STOCK, CARY D. STEINBECK, WILLIAM F. KIMBLE, PETER A. DEA, N. JOHN LANCASTER, JR., BRETT STAFFIERI, KEN BABCOCK, JESAL SHAH, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, EVERCORE GROUP L.L.C., PIPER SANDLER & CO., TUDOR, PICKERING, HOLT & CO. SECURITIES, LLC, HOULIHAN LOKEY CAPITAL, INC., INTREPID PARTNERS, LLC, PETRIE PARTNERS SECURITIES, LLC, SUNTRUST ROBINSON HUMPHREY, INC., R/C ENERGY IV DIRECT PARTNERSHIP, L.P., and R/C IV LIBERTY HOLDINGS, L.P.,

    Defendants.

---

### ERRATA SHEET – DECEMBER 14, 2021 DEPOSITION OF MARC JOSEPH

---

| Page | Line | From | To | Reason |
|------|------|------|------|------|
| 10 | 25 | Adriene | Arianna | Transcription error |
| 17 | 17 | certification authorization | certification and authorization | Transcription error |
| 17 | 18 | security | securities | Transcription error |
| 17 | 21 | verification | certification | Transcription error |
| 17 | 21 | plaintiff's | plaintiffs' | Clarification |
| 17 | 22 | response | responses | Transcription error |
| 17 | 22 | defendants | defendants' | Clarification |
| 17 | 23 | amendment | amended | Clarification |

DocuSign Envelope ID: F4C399A6-0F64-46FB-AFC0-2A69900AB7D9

| 29 | 9 | complainant | complaint | Transcription error |
|----|----|----|----|----|
| 34 | 20 | Lawrence | Laurence | Clarification |
| 38 | 6 | Brooks | Brooke | Transcription error |
| 38 | 12 | Brooks | Brooke | Transcription error |
| 40 | 24 | IPL | IPO | Transcription error |
| 41 | 18 | Brooks | Brooke | Transcription error |
| 41 | 20 | emitting | omitting | Transcription error |
| 41 | 22 | emissions | omissions | Transcription error |

Executed under penalty of perjury on 1/7/2022 _____

DocuSigned by:

*Marc Joseph*

D5C215ECA39B437...

Marc Joseph

2